**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Yield10 Bioscience, Inc., *et al.,* | Case No. 24-12752 |
| Debtors,[1] |  |

**DECLARATION IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY MOTIONS[2]**

I, Oliver P. Peoples, declare and state as follows:

1.      I am the President and Chief Executive Officer of Yield10 Bioscience, Inc., a Delaware corporation ("Yield10"). Yield10 has two wholly-owned subsidiaries: (i) Yield10 Bioscience Securities Corp. (f/k/a Metabolix Securities Corp.), a Massachusetts corporation ("Securities Corp.") and (ii) Yield10 Oilseeds Inc., a company organized under the laws of Canada ("Oilseeds" and, collectively with Yield10 and Securities Corp., the "Debtors"). I am the President of Securities Corp. and a director of Oilseeds. On December 6, 2024 (the "Petition Date"), the Debtors each filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware commencing these cases (collectively, the "Chapter 11 Cases").

2.      To maximize and preserve the value of the Debtors' assets for the benefit of its residual stakeholders and facilitate the transition into operating in the chapter 11 environment, the

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Yield10 (x 8289); (ii) Securities Corp. (x7435) and (ii) Oilseeds (Canadian Business No.x9469).

[2] Capitalized terms not defined herein shall have the meanings given them in the applicable First Day Motion.

Debtors have filed certain pleadings requesting "first day" relief (collectively, the "First Day Pleadings").[3] I am familiar with the contents of each First Day Pleading and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption, (b) is critical to the Debtors' efforts to preserve value and maximize recoveries, and (c) best serves the Debtors' estates and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the single goal of these Chapter 11 Cases; *i.e.,* to seek approval and consummate the private sale of substantially all of the Debtors' assets to Nuseed Nutritional US Inc. ("Nuseed") pursuant to a negotiated, arm's-length and agreed upon Asset Purchase Agreement (defined below).

3.      I submit this declaration (the "Declaration") to support the First Day Pleadings. I have been in a management position with the Debtors since its original founding in 1992. As a result of my work with the Debtors, my review of relevant documents, and my discussions with our advisors, I am familiar with the Debtors' day-to-day operations, business affairs, financial affairs, and books and records. In making this Declaration, I have relied in part on information and materials that the Debtors' officers and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.      This Declaration is divided into three parts. Part I provides relevant background information about the Debtors, their business, corporate and capital structure, and the events

---

[3] First day relief also includes a request that the Court approve the form and manner of the Sale Notice to be served setting a hearing date and objection deadline for the sale of substantially all of the Debtors' assets and the assumption and assignment of certain executory contracts.

leading up to the filing of the Chapter 11 Cases. Part II discusses the path that led to the private sale to Nuseed.  If consummated, the Debtors will propose a plan of liquidation providing for the distribution of sale proceeds to residual stakeholders in accordance with the priorities of the Bankruptcy Code.  Part III sets forth the relevant facts and considerations in support of each of the First Day Motions.

**PART I**

**The Debtors: History, Purpose and Business Overview
of the Debtors, and Events Leading to Chapter 11 Filing**

**A.      History**

5.      In 1992, Yield10 was incorporated in Massachusetts under the name Metabolix, Inc. Metabolix was a pioneer in the development of synthetic biology to enable advanced bioplastics production technology.  Metabolix provided sustainable solutions to the plastic, chemical and energy industries.  In September 1998, Yield10 reincorporated in Delaware, and in January 2017 changed its name to Yield10 to reflect its change in mission to crop research.

**B.      Yield10's Business & Purpose**

6.      Yield10 Bioscience, Inc. ("Yield10" or the "Company") is an agricultural bioscience company focused on commercializing sustainable products using the oilseed *Camelina sativa* ("Camelina") as a platform crop. The unique features of Camelina including the availability of winter varieties and a short growth cycle make it attractive for integration into crop rotations and double cropping on millions of acres in North America. To unlock this potential and make Camelina an attractive option for farmers, the Company is developing and planning to commercialize advanced varieties with elite weed control herbicide tolerance traits, improved agronomic performance, and increased crop value.

7.     Yield10 is pursuing two Camelina seed oil products with different market opportunities, value chains, scale requirements and challenges. The first product, Camelina seed oil, used as a low-carbon intensity feedstock oil for biofuels including biodiesel, renewable diesel ("RD") and sustainable aviation fuel ("SAF").  Markets for biofuels are driven by government policies, have the potential to be very large, and will require the production of tens of millions of acres of new oilseed cover crops like Camelina. The second product, seed oil produced by Camelina which has been genetically engineered to enable production of high levels of the omega-3 fatty acids eicosapentaenoic acid ("EPA") and docosahexaenoic acid ("DHA") in the oil is driven by the growing demand for new sources of omega-3 feedstocks and the production constraints and supply volatility of the traditional raw material source, fish oil extracted from ocean harvested fish.  The growing omega-3 market opportunity offers the potential for revenue and margin growth at acreage levels accessible to Yield10 operationally, addresses an unmet need for a reliable, scalable supply of omega-3 oils for aquaculture, and represents multiple opportunities for further product development to address higher value markets for omega-3 oils in nutraceuticals and pharmaceuticals.

8.     In early 2023, we revised our commercial strategy for biofuels to focus on providing research and development services to third parties interested in Camelina for biofuels and/or partnering with the goal of generating service and licensing revenues from of our advanced Camelina capabilities, technology capabilities, varieties, and traits. This decision reflects the current oversupply of soybean oil for the biofuels market as new refinery capacity is being built as well as the challenging financing environment for small cap pre-revenue companies. Over the last four years, Yield10 has developed proprietary, engineered spring and winter Camelina varieties, including herbicide tolerant ("HT") and stacked herbicide tolerant ("stacked HT") varieties traits

which form the genetic foundation for introducing commercial-quality Camelina varieties tailored to address both markets. Based on our current biofuels strategy, in early 2024 we signed our first non-exclusive global, commercial license with Vision Bioenergy Oilseeds for certain Camelina herbicide tolerance traits. Going forward, we plan to continue seeking technology partnerships and other types of agreements for the development of Camelina technologies for biofuels. Yield10 is headquartered in Woburn, Massachusetts and has a Canadian subsidiary, Yield10 Oilseeds Inc., located in Saskatoon, Saskatchewan, Canada.

9.      We selected Camelina, an annual oilseed plant in the mustard family, as our platform crop based on its unique attributes, including its excellent agronomic traits such as low water and fertilizer input, drought resistance and short life cycle.  Based on its flexible agronomic profile, we believe growers have the option of using Camelina as a winter cover crop, as a relay crop with soybean in the U.S. Midwest, and as a spring rotation crop within the U.S. and regions of Canada. Meeting the growing demand for biofuel feedstocks in North America will require tens of millions of acres of new oilseed production and, given existing crop production practices, the best way to access this scale is through double cropping using short season winter oilseed cover crops integrated into crop rotations in a second growing season with the major row crops corn and soybean. Camelina is in the same plant family as canola and naturally produces a relatively abundant harvest of oil-containing protein-rich seeds.  Camelina has several advantages for producing novel seed products and is readily segregated from commodity crops used in export markets that dramatically simplifies the regulatory path for engineered products in North America.  Planting, harvesting, storage and transportation of Camelina does not require growers to make capital investments in new equipment.  Camelina grain can be processed in soft seed (e.g.

canola) crushing facilities, by either cold press or solvent extraction.  The residual protein meal is approved for use in certain animal feed rations in the U.S. and Canada.

10.     Crop development was conducted at Oilseeds at five greenhouses.  Oilseeds also manages contract research organizations in the United States and Canada.  Securities is a tax driven entity where the Company's excess working capital was invested due to lower state income tax rates in Massachusetts for qualified securities corporations.

**C.**     Pre-Petition Restructuring/Marketing Efforts to Sell Assets/License Agreements.[4]

11.     As part of the ongoing consideration and evaluation of Yield10's long-term prospects and strategies, the Debtors frequently review strategic and financial alternatives for Yield10.  Among other things, the Debtors consider developments in Yield10's business, the sectors which it is targeting commercially, the economy generally and financial markets, with the goal of enhancing value for its stockholders.  The restructuring discussions have resulted in several agreements and then the Original Agreement (defined below) with Nuseed.

**i.     The Rothamsted Agreement**

12.     One restructuring effort involved forming a biofuel partnership/joint venture where the partner would support Yield10's Camelina development activities, as well as financing plans and a cash runway.  The Company believed that by using this approach it could leverage the interest in biofuels to secure funding that would enable Yield10 to focus on commercializing the omega-3 oils that have a higher market value at lower scale. Based on its exclusive Option Agreement, on June 13, 2024, Yield10 and Rothamsted Research Limited ("Rothamsted") signed an agreement whereby Rothamsted granted Yield10 an exclusive, global license to advanced

---

[4] A comprehensive description of the events leading up to executing the revised APA with Nuseed is set forth in Yield10's publicly filed Definitive Proxy Statement filed with the Securities and Exchange Commission on October 16, 2024 is attached hereto as **Exhibit A**.

technology for producing omega-3 products in Camelina (the "Rothamsted Agreement"). This facilitated Yield10 executing its plan to use engineered Camelina to commercially produce omega-3 oil and meal products targeting the aquafeed, pet food, and nutritional markets for omega-3 fatty acids. In consideration for the commercial license, Yield10 is expected to pay certain license fees, future milestone payments, and royalties based on commercialization of Rothamsted's omega-3 technology.

        **ii.**       **The VISION License**

13.      Another restructuring effort was with Vision Bioenergy Oilseeds LLC ("VISION"). On February 9, 2024, Yield10 executed a license and service fee agreement with VISION for access to herbicide tolerance technology in Camelina ("Vision License Agreement"). In consideration for the Vision License Agreement and completion of certain deliverables, VISION will make cash payments to Yield10 totaling $3 million. By facilitating the large-scale commercial production of herbicide tolerant Camelina, this license agreement is intended to empower farmers to capitalize on the growing biofuel market while advancing the decarbonization goals of aviation, maritime, and heavy-duty transport industries.

        **iii.**      **Other License Agreements.**

14.      In the normal course of its business Yield10 in-Licensed patented technologies from other research organizations because of their potential to add value to Camelina. These License Agreements require Yield10 to pay for the prosecution and maintenance of the patents and patent applications and to pay milestones and royalties on commercial sales or sub-licensing. These License agreements are a valuable asset of the Company and include genetic technologies for improving crops including Camelina. These technologies were licensed from the University of Missouri Agriculture, Agrifood Canada (AAFC) and the University of Massachusetts. In addition to the License agreement with AAFC, Yield10 entered into a Collaborative Research and

Developments program to breed new varieties of Camelina. Nuseed is interested in taking an assumption and assignment of these agreements.

15.     The Debtors unfortunately continued to face financial challenges typical for pre-revenue agbiotech companies in the United States. To address this, on November 30, 2023, Yield10 caused the full or partial furlough of approximately 65% of Yield10's workforce, most of whom were located at the Woburn Premise.[5]   Ultimately, the Debtors determined they would not be able to achieve their operational goal as a revenue generating business. As a result, the Debtors consulted with experienced restructuring and other advisors to facilitate their review, analysis, and development of potential alternatives, including the sale of their assets.

## PART II

### The Path that Led to the Private Sale to Nuseed

**A.     Events Leading up to the Original Agreement with Nuseed**

16.     During the past approximately 24 months or so, the Debtors have engaged in financing discussions with bankers, potential investors as well as business development and strategic transaction discussions with companies in a wide variety of industries including energy, seed, grain processing, animal feed, chemical and pharmaceutical companies to discuss support for Yield10's Camelina development activities. A list of parties that Yield10 met with during that time is attached hereto as **Exhibit B**.  The only party that expressed interest in a transaction with the Debtors was Nuseed.[6]

---

[5] Yield10's headquarters are located in Woburn, Massachusetts pursuant to a lease (the "Woburn Lease") for the premise located at 19 Presidential Way, Suite 201, Woburn, MA  01801 (the "Woburn Premise").  On or before November 30, 2024, Yield10 surrendered full possession and control of the Woburn Lease back to the landlord and will seek rejection of the Woburn Lease as of that date and abandonment of any remaining property.

[6] Even though Yield10 is seeking approval of a private sale to Nuseed, it will provide notice of the proposed sale to the entities listed on **Exhibit B**.

B.    **The Original Agreement**

17.    The proposed transaction with Nuseed has occurred in three integrated steps.  First, on July 12, 2024, Yield10 and Nuseed signed a commercial license to omega-3 assets for producing oil in Camelina and an MOU for an asset sale for a consideration of up to $6 million with a $3 million up-front payment and an additional $2 million to be paid on completion of specific milestones and as needed a Loan of up to $1 million to enable the Company to obtain shareholder approval for the asset sale. However, the milestones could not be met on time and Nuseed then provided a loan of $3 million secured against the Yield10 assets pending completion of the shareholder vote. Nuseed agreed to pay Yield10 $5 million for the assets minus the outstanding loan amount. The overall consideration would be $3 million for the License plus $5 million for the remaining assets for a total of $8 million.   On September 5, 2024, Yield10 and Nuseed signed the Secured Note Agreement under which Yield10 may borrow up to $3 million. The maturity for the Secured Note Agreement is December 2, 2024 and Yield 10 drew down the full amount available. On October 1, 2024, Yield10 and Nuseed signed the Asset Purchase Agreement (the "Original Agreement").  The purchase price under the Original Agreement incorporates the commercial license, the Secured Note Agreement and other valuable consideration.  Because Yield10 is incorporated in Delaware and is a public company, the Original Agreement was subject to a 50% favorable vote of common stockholders.

18.    Yield10 scheduled a meeting of its shareholders on November 8, 2024 for purposes of obtaining the requisite shareholder vote to approve the Original Agreement. The meeting was adjourned to November 21, 2024 as a result of failure to obtain a sufficient number of affirmative votes prior to November 8, 2024. Unfortunately, due to the fact that the stock is widely held in small amounts and voter apathy, the requisite 50% approval was not achieved.

**C.     The Services Agreement**

19.     When stockholder approval was not achieved, the Debtors were in an immediate need of credit support and services to sustain operations and preserve their assets for a sale to Nuseed that would have to take a different path.  To that end, Nuseed, as Service Provider, and Yield10, as Customer, agreed to enter into a Services Agreement.  Yield10 agreed to engage Nuseed to perform certain regulatory obligations for purposes of preventing defaults by Yield10 under its various license agreements.  Specifically, the Services Agreement enables Yield10 to progress key milestones in the Vision License Agreement. If these milestones are not achieved then some rights to critical technology may be lost thereby reducing Yield10's asset value. Nuseed has indicated it has the capability and capacity to perform the Regulatory Obligations (as defined in the Services Agreement).

**D.     Amended and Restated Asset Purchase Agreement**

20.     In response to the failure to secure majority shareholder approval but in an continuing effort to maximize asset value for residual stakeholders, the Debtors and Nuseed engaged in good faith discussions to resolve their respective business issues.  Together, they achieved a consensual path forward that is both a value-maximizing proposition for Yield10 and its residual stakeholders and allows Nuseed to acquire the Purchased Assets without stockholder approval.  The Original Agreement was revised and the need to secure stockholder approval as a condition to closing was deleted.  The revised Asset Purchase Agreement requires instead a private bankruptcy sale with the certainty of the protections contained in a Sale Order approved by this Court.

E.    **Summary of Terms and Conditions of the Asset Purchase Agreement.**[7]

a)   **Parties to the Asset Purchase Agreement.**  Yield10 & Oilseeds as Sellers and Nuseed as Buyer. Nuseed is not an affiliate or insider of the Debtors and the Asset Purchase Agreement was negotiated at arm's length for fair consideration following a prolonged restructuring process. No directors, officers, management or employees of the Debtors are being hired by Nuseed.

b)   **Purchase Price.**  The total consideration for the purchase and sale of Yield10's assets is $5.00 million less (i) outstanding loan amounts received by Yield10 through the date of closing and (ii) the aggregate amount of Yield10 trade payables assumed by Nuseed before or in connection with the closing of the asset sale.  The terms of the promissory note with Nuseed permits the Company to borrow up to $3.00 million with an interest rate of 7 percent per annum.  Through the Petition Date, the Company received loan amounts totaling $3 million under the promissory note.

c)   **Purchased Assets.** All of Yield10's rights, title and interest in, to, and under all of the assets, properties and rights which relate to, or are used or held for use in connection with its Camelina research and development program, including the following assets, collectively referred to as the Purchased Assets including the following:

▪   all Camelina seed inventory, germplasm, seeds (including parent seeds) and other breeding materials;

▪   certain contracts;

▪   all of Yield10's patents and other intellectual property rights (excluding trademarks and copyrights) that are owned by Yield10 or as to which Yield10 has been granted a license to use in Camelina and oilseed crops;

▪   rights under Yield10's commercial license agreements with Rothamsted and VISION;

▪   all of Yield10's regulatory permits, filings and records with USDA-APHIS, CFIA, and EPA;

▪   all of Yield10's know-how and records related to the GRAIN platform as well as research records;

▪   rights to Actions;

▪   prepaid expenses and credits;

---

[7] The following is intended only as summary of the principal terms and conditions of the Asset Purchase Agreement and is qualified in its entirety by the full text of the Asset Purchase Agreement. The description of the Asset Purchase Agreement contained in this Declaration is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

- rights under warranties and indemnities;

- insurance policies and benefits;

- certain of Yield10's furniture, lab equipment, lab supplies and other tangible personal property;

- books and records related to Yield10's business (other than as excluded below); and

- all goodwill and going concern value of the Yield10's business.

**d) Excluded Assets**

- all cash and cash equivalents of Yield10;

- all contracts other than the Assigned Contracts (the "Excluded Contracts");

- all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property other than the Tangible Personal Property;

- corporate seals, organizational documents, minute books, stock books, books of account or other records having to do with the corporate organization of Yield10;

- all rights that accrue or will accrue to Yield10 in connection with the Asset Purchase Agreement;

- any Purchased Assets sold or otherwise disposed of in the ordinary course of business and not in violation of any provisions of the Asset Purchase Agreement from the date of the Asset Purchase Agreement until the Closing of the Asset Sale;

- all rights in connection with, and assets of, any benefit plan; and

- all rights, claims and credits of Yield10 to the extent relating to any Excluded Asset or any Excluded Liability (as defined below).

**e) Assumed Liabilities.** Nuseed will assume specified accounts payable related to contracts assigned to Nuseed, all liabilities arising after the closing under or relating to the Assigned Contracts (other than those liabilities that relate to any performance or failure to perform prior to the Closing) and all other liabilities solely to the extent arising exclusively or primarily out of Nuseed's operation of Yield10's business and ownership and use of the Purchased Assets from and after the Closing (collectively, the "Assumed Liabilities").

f) **Excluded Liabilities.** . Buyer shall not assume certain liabilities (collectively, the "Excluded Liabilities") as set forth in Section 1.04 of the Asset Purchase Agreement.

g) **Representations and Warranties.** Usual and customary for a transaction of this nature.

h) **Closing Conditions.** Section 6 of the Asset Purchase Agreement contains certain closing conditions.

i) **Termination.** Section 7 of the Asset Purchase Agreement contains certain Termination provisions.

F.    Form and Manner of the Notice of Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases.

21.    The Debtors expect to file the Sale Motion on the Petition Date and seek approval of the Sale Notice Order at the First Day Hearing.  The Sale Notice Order includes the form and manner of giving notice of the sale and the proposed assumption of executory contracts and unexpired leases that will be provided to appropriate Notice Parties (defined below) and Counter-Parties to Contracts.  The Sale Notice will include the date, time and place of the Sale Hearing and the relevant objection deadline.  *See* Sale Motion, Ex A, Ex. 1.[8]  The Debtors are seeking authority at the First Day hearing to serve the Sale Notice in connection with a sale hearing to be conducted no later than January 10, 2025.

G.    **Debt and Equity Structure**

iv.    **Secured Debt.**

22.    The Debtors owe $3,000,000 plus interest pursuant to the Secured Promissory Note, dated as of September 5, 2024 (the "Note").  The Note matures on December 2, 2024.  If the Debtors are unable to close the sale of assets to Nuseed pursuant to the Asset Purchase Agreement,

---

[8] The Sale Notice is attached as Exhibit 1 to the Proposed Sale Notice Order, which is attached as Exhibit A to the Sale Motion.

Nuseed may seek relief from the automatic stay to foreclose on the sale assets and acquire the assets by credit bid.

### v.       Unsecured Debt.

23.       The Debtors on a consolidated basis have approximately sixty (60) unsecured trade creditors holding approximately $785,000 in aggregate claims.

### vi.      Prepaid Expenses:

24.       In connection with preparing for the chapter 11 filing, and to reduce going forward costs necessary to maintain and preserve the Purchased Assets for the Buyer, the Debtors pre-paid certain expenses, as follows:

- Innovation Place, landlord in Saskatoon, pre-paid ($6,266 CDN) for storage through end of January 2025 of non-hazardous biological materials and equipment as part of Asset Purchase Agreement.

- The Debtors pre-paid a patent lawyer approximately $8,700 to address post-petition patent issues.

### vii.     Equity.

25.       Debtor Yield10's equity securities are publicly held as follows (as of December 6, 2024):

| Amount Authorized | Amount Issued | Amount Outstanding |
|---|---|---|
| Preferred Stock | None | None |
| Common Stock | 734,408 | 734,408 |

Debtor Yield10 owns 100% of each of Oilseeds and Securities.

### H.      Decommission and Surrender of Commercial Lease at Woburn Premise.

26.       Yield10 is a party to a lease agreement dated January 20, 2016 (as may have been amended from time to time, the "Woburn Lease") with ARE-MA REGION No. 20, LLC.  The

Woburn Lease is for the premise located at 19 Presidential Way, Suite 201, Woburn, MA 01801 (the "Woburn Premise").   Yield10 used the Woburn Premise as its headquarters and to conduct plant research in its fields of endeavor.   Immediately prior to the Petition Date, Yield10 decommissioned the Woburn Premise and surrendered complete possession, custody and control of Woburn Premise to the landlord. All Purchased Assets for the Nuseed sale; *e.g.,* equipment, biological materials, lab notebooks, were removed for storage by Tobin Scientific (Beverly, Mass.).

**I.     Yield10 De-Listed from Nasdaq.**

27.     Yield10 is a public company that historically traded on the Nasdaq stock market under the ticket symbol YTEN. On May 15, 2024, Bioscience received a final delisting notice from Nasdaq.   Following de-listing, shares of Yield10 continue to trade publicly on the "over the counter" market by the OTC Markets Group.   On the Petition Date, Bioscience filed a Current Report on Form 8-K with the SEC, announcing that it had filed for chapter 11 bankruptcy and ceased operating.

**PART III**

First Day Motions

**A.     Joint Administration**

28.     The Debtors request entry of an order directing that their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by Yield10. The Debtors believe that it would be more efficient for these Chapter 11 Cases to be jointly administered.   The Debtors anticipate docket activity, if any, will concern the sale motion and believe that most hearings and contested matters will apply to all of the Debtors' cases equally. Consequently, joint administration of these Chapter 11 Cases will promote the economical and

efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

**B.** Post-Petition Use of Bank Account

29. Yield10 maintains an Operating Account (x3488) at Citizens Commercial Banking, 1 Citizens Drive, Riverside, RI 02915 for USD checking (the "Citizens Account"). The Citizens checking account is its U.S. operating account used for paying day-to-day ordinary business expenses incurred by Yield10 and for providing funding to Oilseeds to the extent necessary. Oilseeds maintains an Operating Account (x9951) at Bank of Montreal, 595 Burrard Street, Vancouver, BC, Canada S7N 0W9 for CAD checking (the "BOM Account" and together with the Citizens Account, the "Bank Accounts"). The BOM account is used for paying day-to-day ordinary business expenses incurred by Oilseeds.

30. The Debtors needs to maintain their Bank Accounts in order to maintain normal business operations, collections and disbursements in the ordinary course. Accordingly, to ensure as smooth a transition into Chapter 11 as possible with minimal disruption, the Debtors seek authority to continue to maintain their Bank Accounts.

**C.** Payment of Employee Obligations Motion

31. In preparing to commence the Chapter 11 Cases, the Debtors pared down the number of continuing employees to a skeletal crew as follows: (a) Olly Peoples, President and CEO; (b) Andrea Ramirez, Controller; and (c) Charles Haaser, Vice President – Finance and Chief Accounting Officer (collectively, the "Continuing Employees"). The Continuing Employees are necessary to complete the sale to Nuseed. The Debtors will pay the Employee Obligations (as defined below) that become due and payable during the pendency of these Chapter 11 Cases in accordance with the Budget attached hereto as **Exhibit C** and to continue at this time their practices, programs, and policies with respect to their Continuing Employees, as such practices,

programs, and policies were in effect as of the Petition Date. However, the salaries of the Continuing Employees will be substantially reduced from pre-petition levels of compensation. Because the Woburn Premise was surrendered pre-petition, the Continuing Employees are working remotely.

32.     Certain Employee Obligations (not limited to the Continuing Employees), however, were incurred prior to the Petition Date but will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date. The Employee Obligations include:

- *Wages, salaries, and other compensation.* These obligations consist of wages, salaries and PTO for vacation/holidays/sick leave owed (the "Payroll Obligations"). As of the Petition Date, the Debtors estimate that they owe approximately $30,220 in Payroll Obligations. Post-petition, the average bi-weekly gross amount of the Payroll Obligations is approximately $5,064.

- *Payroll taxes.* These obligations consist of federal, state, and local income taxes, social security, Medicare taxes and unemployment taxes. The payroll taxes include the amounts that the Debtors withhold from the gross amount of wages or salary as well as the amounts separately owed by the Debtors. As of the Petition Date, the Debtors estimate that they owe approximately $345 in payroll taxes.

- *401(k) plan obligations.* Pre-petition, the Debtors maintain a 401(k) plan, under which Employees may defer a portion of their salary. The 401(k) plan recently was terminated pre-petition in mid-November. As of the Petition Date, the Debtors estimate that they do not owe any 401(k) plan obligations.

- *Health and welfare benefits.* The Debtors provide several health and welfare benefit plans for the employees, including insurance plans relating to medical, health, life and disability insurance, workers' compensation, and a Health Reimbursement Account (HRA). Under the HRA, the Debtors reimburse for medical claims and prescription costs submitted each year of up to the first 75% of the employee's deductible. Employees have 90 days to submit their claims for reimbursement. As of the Petition Date, the Debtors estimate that they owe approximately up to an aggregate amount of $14,500 in health and welfare benefits related obligations.

- *Payroll and Healthcare Services.* In the ordinary course of their business, the Debtors administer their payroll and procure insurances through Insperity, Inc. ("Insperity"). Insperity processes direct deposit transfers to the employees, as well as the appropriate third-party recipients of the deductions and withholdings.

Insperity charges a bi-weekly fee in the approximate amount of $400. As of the Petition Date, the Debtors estimate that they owe approximately $154 to Insperity.

- *Corporate Business Card*. In the ordinary course of business, the Debtors also maintains a corporate business card with Ramp.com ("Ramp") to make necessary and authorized business purchases, such as business software subscriptions, laboratory/research supplies and materials, service payments for certain vendors, corporate travel, and other related business expenses (the "Corporate Business Card"). The balance owed is paid in full at the end of the month. As of the Petition Date, the Debtor estimates that it owes $1,677 on the Corporate Business Card.

(collectively, the "Employee Obligations").

33. The Debtors believe that all claims for Employee Obligations would constitute priority claims pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. Any delay in paying Employee Obligations and Workers' Compensation Obligations will adversely impact the Debtors' relationships with their Continuing Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely on to complete the sale to Nuseed. The Debtors must have the support of their Continuing Employees in order for the sale to be consummated. Put quite simply, if the relief requested by the Employee Obligations Motion is not granted, the Debtors will likely be out of business altogether.

34. Moreover, absent an order granting the relief requested in the Employee Obligations Motion, the Debtors' Continuing Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations. The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

35. The Debtors do not seek to alter their compensation, vacation, and other benefit policies in the Employee Obligations Motion, and the Employee Obligations Motion is not to be deemed an assumption or adoption of any agreement or policy providing for any such benefits.

Instead, the Employee Obligations Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with those policies and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to their employees, as such practices, program, and policies were in effect as of the Petition Date.

36.     The Debtors request that they be authorized to pay any cost or penalty incurred by a person to which Employee Obligations or Workers' Compensation Obligations are owed in the event that a check issued by the Debtors for payment of the Employee Obligations or Workers' Compensation Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy cases.  Though the Debtors estimate any such costs or penalties to be *de minimis* in amount, if the Debtors are not authorized to pay such costs or penalties, then their employees will suffer the exact type of harm that the Employee Obligations Motion seeks to prevent, and the Debtors will suffer from loss of employee goodwill.

37.     Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates, and residual stakeholders.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: December 6, 2024
            Wilmington, Delaware                    Yield10 Bioscience, Inc.

                                                                       Debtor

                                                                       By:  */s/ Oliver P. Peoples*
                                                                              Oliver P. Peoples
                                                                              President and Chief Executive Officer