## Exhibit B

**Blackline**

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Yield10 Bioscience, Inc., *et al.*, | Case No. 24-12752 |
| Debtors.[1] | (Joint Administration Requested) |

## ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) GRANTING THE PURCHASER THE PROTECTIONS AFFORDED TO A GOOD FAITH PURCHASER, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (D) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**") in their Chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2002-1, 6004-1 and 9006-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for entry of an order (this "**Sale Order**"), (i) approving that certain asset purchase agreement, dated as of December [],4, 2024 by and among NUSEED NUTRITIONAL US INC ("**Nuseed**" or "**Buyer**") YEILD10 BIOSCIENCE, INC. AND YIELD10 OILSEEDS INC. ("**Y10**" or "**Seller**" or "**Pre-Petition Debtors**") (including all exhibits, annexes and schedules related thereto, and as the same may be amended from time to time in accordance with the terms

---

[1]  The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Yield10 Bioscience, Inc. (x8289), (ii) Yield10 Bioscience Securities Corp. (x7435), and (iii) Yield10 Oilseeds Inc. (Canadian Business No. x9469). The Debtors' mailing address is 19 Presidential Way, Suite 201, Woburn, MA 01801.

thereof, the "**Purchase Agreement**"), a copy of which is attached hereto as **Exhibit 1**, (ii) authorizing and approving the Debtors' private sale of substantially all of their assets (collectively, the "**Acquired Assets**") to Buyer or to any affiliate thereof designated in accordance with the Purchase Agreement as a "good faith" purchaser pursuant to 11 U.S.C § 363(m) (the "**Sale**") free and clear of all liens, encumbrances, and other interests (collectively, the "**Encumbrances**"), except and only to the extent Buyer has expressly assumed a liability as set forth in the Purchase Agreement (the "**Sale**");  (iii) authorizing and approving the assumption and assignment of the executory contracts and leases which Buyer has expressly agreed to assume as set forth in the Purchase Agreement (the "**Assumed Contracts**"); and (iv) granting related relief. This Sale Order is entered in connection with the order entered by the United States Bankruptcy Court for the District of Delaware (the "**Court**") on December [],10, 2024 (the "**Sale Notice Order**") (i) approving the form and manner of notice of the private Sale to Buyer, (ii) approving procedures for the assumption and assignment of the Assumed Contracts (the counterparties thereto, the "**Contract Counterparties**"); (iii) approving the form of notice to Contract Counterparties in connection with the Debtors' proposed amounts necessary to cure any pre-petition defaults in connection with Assumed Contracts ("**Cure Notice**"); (iv) approving procedures for resolving prior to the Sale any objections to the amounts set forth in the Cure Notice asserted by Contract Counterparties; and (v) granting related relief, all as more fully set forth in the Motion; and the Court. having held a hearing on January [],8, 2025 (the "**Sale Hearing**") to approve the Sale; and the Court having reviewed and considered (a) the Motion, (b) the declarations filed in support of the Motion, (c) the objections to the Motion, (d) all responses to any objections and replies in further support of the Motion, and (e) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested

in the Motion is in the best interests of the Debtors, their estates and creditors, and other parties in interest; and upon the record of the Sale Hearing and the Chapter 11 Cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby **FOUND AND DETERMINED THAT:**[2]

### Jurisdiction, Final Order and Statutory Predicates

A.      The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. The Motion is a core proceeding under 28 U.S.C. § 157(b). The Court may enter a final order with respect to the Motion, the Sale, the transactions contemplated thereby, and all related relief, in each case, consistent with Article III of the United States Constitution. Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory bases for the relief requested in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Rules 2002-1, 6004-1, and 9006-1.

C.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and, thus, waives any stay and expressly directs that this Sale Order be effective immediately upon entry.

---

[2] All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

**Notice of Sale and the Cure Amounts**

D.        Actual written notice of the Motion, the assumption and assignment of the Assumed Contracts, the Sale Hearing, the Sale of the Purchased Assets, and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein, has been afforded to all known interested Persons, including, but not limited to the following parties: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel to the ~~Official Committee of Unsecured Creditors (the "Committee"), (iii) counsel to the Buyer, (iv~~Buyer, (iii) all Contract Counterparties and any other non-debtor parties to relevant contracts or leases (executory or otherwise), (~~v~~iv) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Purchased Assets, (~~vi~~v) the Internal Revenue Service, (~~vii~~vi) all applicable state and local taxing authorities, (~~viii~~vii) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (~~ix~~viii) all parties set forth in the Debtors' Master Service List maintained in these Chapter 11 Cases (collectively, the "**Notice Parties**").

E.        In accordance with the provisions of the Sale Notice Order, the Debtors have served notice upon the Contract Counterparties: (i) that the Debtors seek to assume and assign to the Buyer the Assumed Contracts upon the Closing (as defined in the Purchase Agreement) of the Sale; and (ii) of the relevant Cure Amounts (as defined below). The service of such notice was good, proper, timely, adequate, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Assumed Contracts. Each of the Contract Counterparties has had an opportunity to object to the Cure Amounts set forth in the notice and to the assumption and assignment to the Buyer of the applicable Assumed Contract.

F.      As evidenced by the certificates of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, due, good, proper, timely, adequate, sufficient, and appropriate notice of the Motion, the Sale, the Sale Hearing, and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assumed Contracts to the Buyer, was provided in accordance with the orders previously entered by the Court, sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.  The notices described herein were good, proper, timely, adequate, sufficient, and appropriate under the circumstances, and reasonably calculated to provide the Notice Parties and all other interested parties with timely and proper notice under the circumstances of these Chapter 11 Cases and no other or further notice of the Motion, the Sale, the Auction, the Sale Hearing, the Closing, the assumption and assignment of the Assumed Contracts to the Buyer or with respect to the matters described herein is, or shall be, required.  A reasonable opportunity to object and be heard with respect to the Sale, the Motion, and the relief requested therein, including but not limited to the assumption and assignment of the Assumed Contracts and the Cure Amounts, has been afforded to all interested parties, including the Notice Parties.

G.      The disclosures made by the Debtors and the Buyer concerning the Sale, the pre-petition marketing efforts regarding the Purchased Assets, the Purchase Agreement, the Motion, the Sale Hearing, and the assumption and assignment of the Assumed Contracts to the Buyer were good, proper, timely, adequate, sufficient, and appropriate.

H.      A reasonable opportunity to object and be heard with respect to the Sale, the Motion, and the relief requested therein, including but not limited to the assumption and assignment of the Assumed Contracts and the Cure Amounts, has been afforded to all interested parties, including the Notice Parties.

**Pre-Petition Marketing Efforts**

I.       Based upon evidence presented at the hearing after which the Court entered the Sale Notice Order, the Declaration(s), and evidence presented at the Sale Hearing, Yield10 was reincorporated in Delaware in 2017 with a new goal of developing and commercializing (i) Camelina sativa seed oil that has been genetically engineered to enable production of high levels of certain types of omega-3 fatty acids and (ii) Camelina sativa seed oil for use as a low-carbon intensity feedstock oil for biofuels.  Since that time, however, the Debtors faced financial and market challenges that ultimately prevented the Debtors from achieving their operational goal as a revenue generating business. As a result, the Debtors retained experienced restructuring and other advisors to facilitate their review, analysis, and development of potential alternatives. The Debtors had outreach to multiple potential partners and potential acquirers, including players along the oilseed value chain: seed companies, grain processing companies, biofuel producers and multiple players in the omega-3 nutrition business. No party came forward with a formal expression of interest in the acquisition of either Yield10 or its assets. There were indications of potential interest but when pressed for a formal offer no party except Nuseed was willing to and did move forward.

J.       The Debtors and Nuseed entered into the Original Agreement (defined in the Motion) on ~~_____~~October 1, 2024. Because Yield10 is a public company the Original Agreement was subject to approval by a majority of Yield10's common shareholders. To finance operations pending stockholder approval, the Debtors borrowed $3 million from Nuseed pursuant to a Promissory Note. The $3 million was fully funded. Repayment of the Promissory Note was secured by a security interest in and lien upon substantially all of the Debtors' assets. The Promissory Note, as amended, was due and payable on December 2, 2024. The requisite percentage of stockholder approval was not achieved.

K.      After Yield10 failed to achieve the necessary stockholder approval to close the Original Agreement, it was left it in a precarious financial position. The Debtors lacked sufficient funds to pay the Promissory Note at maturity. That meant Nuseed could exercise its right to foreclose on the Purchased Assets as of December 2, 2024. The Debtors also lacked sufficient cash to pay rent going forward at their headquarters located in Woburn, Massachusetts where they stored much of the Purchased Assets.

L.      The Debtors and Nuseed engaged in good faith discussions to resolve their respective business issues. Together, they achieved a consensual path forward that is both a value-maximizing proposition for Yield10 and its residual stakeholders and allows Nuseed to acquire the Purchased Assets without stockholder approval or much further delay. The Original Agreement was revised and the need to secure stockholder approval was deleted as a condition to closing. The revised APA instead requires a private bankruptcy sales process to be completed within 35 days of the Petition Date; *i.e.,* January 10, 2025, and the certainty of protections contained in a Sale Order approved by this Court.

M.      A private sale is appropriate under these circumstances and the proposed timeline is reasonable. After considering the evidence presented at the Sale Hearing, the Court is persuaded that there is no viable, value-maximizing transaction for the Debtors other than the private sale to Nuseed. While there was no cash available to run an active post-petition marketing process for the Purchased Assets, the private Sale Hearing was noticed, to among others, parties that previously expressed interest in the assets. No competing offer emerged and given the unique nature of the Purchased Assets, there is a limited number of potential purchasers and no other party has made a proposal to purchase the assets other than Nuseed.

N.      [Hold for other factual findings deemed necessary or proper by the Court to support entry of this Sale Order]

N.      Only one limited objection to the relief requested has been filed in connection with the proposed Sale, which has been resolved and withdrawn, and no party presented evidence in opposition to the Sale at the Sale Hearing.

**Good Faith of the Buyer**

O.      The Debtors and Buyer have proffered or otherwise adduced evidence that (i) they proposed, negotiated, and entered into the Purchase Agreement without collusion, in good faith, and from arm's length bargaining positions both prepetition and up to and immediately prior to the Closing, (ii) immediately prior to the Closing, neither the Buyer nor any of the Buyer Parties (as defined below) was an "insider" or "affiliate" of any Debtor (each as defined under sections 101(2) and 101(31) of the Bankruptcy Code), (iii) the Buyer and the Buyer Parties proceeded in good faith in connection with all aspects of the Sale, including, but not limited to: (a) recognizing that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets pursuant to and in accordance with the Sale Notice Order; (b) neither inducing nor causing the filing of the Chapter 11 Cases; (c) disclosing all payments to be made, and all other material agreements or arrangements entered into, by the Buyer in connection with the Sale; and (d) having no common identity of directors or controlling stockholders between the Buyer, on the one hand, and the Debtors, on the other hand, and (iv) no admissible evidence having been proffered or adduced that contradicts clauses (i) through (iii) of this paragraph.  The Buyer is therefore purchasing the Purchased Assets in good faith and is a good faith Buyer within the meaning of section 363(m) of the Bankruptcy Code. As such, the Buyer is entitled to all of the rights, benefits,

privileges and protections afforded under section 363(m) of the Bankruptcy Code, and under any other applicable or similar bankruptcy and nonbankruptcy law.

P.        Further, neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtors nor the Buyer has violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Buyer has not acted in a collusive manner with any Person and the Purchase Price paid by the Buyer for the Purchased Assets was not controlled by any agreement among any of the interested or potentially interested parties, all of whom acted in good faith, at arm's length, and in a noncollusive manner. The transactions under the Purchase Agreement may not be avoided, and no damages may be assessed against the Buyer or any Buyer Party (defined below) under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

## Highest and Best Offer

Q.        As set forth in the Sale Notice Order, the private sale contemplated thereunder is a reasonable and appropriate method for maximizing the value of the Purchased Assets and represents the best available method for conducting the Sale process in a manner that maximizes value for the benefit of the Debtors' estates. The Debtors conducted a marketing and sale process with respect to the Purchased Assets pre-petition as described in the Motion, through testimony at the Sale Hearing and in Declarations filed with Court in accordance with, and have otherwise complied in all respects with the Sale Notice Order. The marketing and Sale process that proceeded the Chapter 11 filing as described in the Sale Notice Order and the ensuing 35 day period during which higher and better offers could have been presented by third parties afforded a full, fair, and

reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Purchased Assets. The Sale was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Purchased Assets.

R.    The Purchase Agreement constitutes the highest and best offer for the Purchased Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative in these Chapter 11 Cases and would be better than if such cases were converted to cases under Chapter 7 of the Bankruptcy Code. The Debtors' determination that the Purchase Agreement maximizes value for the benefit of the Debtors' estates and constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment and is in accordance and compliance with the Sale Notice Order.

S.    The Purchase Agreement represents fair and reasonable terms for the purchase of the Purchased Assets. No other Person or group of Persons has offered to purchase the Purchased Assets for greater overall value to the Debtors' estates than the Buyer.

T.    Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby will maximize the value of each Debtors' estates, are in the best interests of the Debtors, these Chapter 11 Cases, their creditors, and other parties-in-interest.

**No Merger; The Buyer Not an Insider; No Successor Liability**

U.    Neither the Buyer nor any of the Buyer Parties is a successor to or a mere continuation or substantial continuation of the Debtors or the Debtors' estates, and there is no continuity of enterprise or common identity between the Buyer (or any of the Buyer Parties) and the Debtors. None of the Buyer or the Buyer Parties is holding itself out to the public as a successor to or a continuation of the Debtors or the Debtors' estates. Each of the Buyer and Buyer Parties is

not, and shall not be, considered a successor in interest to any of the Debtors or the Debtors' estates by reason of any theory of law or equity, and the Sale does not amount to a consolidation, succession, mere continuation of, combination of, merger, or *de facto* merger of the Buyer and the Debtors.

V.     As set forth above, immediately prior to the Closing, neither the Buyer nor any of the Buyer Parties was an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of the Debtors, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors on the one hand and the Buyer or the Buyer Parties on the other hand.  The transfer of the Purchased Assets to the Buyer, and the assumption of the Assumed Liabilities, except as otherwise explicitly set forth in the Purchase Agreement, does not, and will not, subject the Buyer or the Buyer Parties to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing (as modified by the Purchase Agreement) or by reason of such transfer, including under the laws of any foreign, federal, state, or local revenue, pension, tax, antitrust, environmental, labor or employment or benefits law, including without limitation, any WARN Act, the Consolidated Omnibus Budget Reconciliation Act (COBRA), or Employee Retirement Income Security Act (ERISA), under the basis of *de facto* merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, fraudulent transfer or avoidance, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether

contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their respective affiliates, or in any way relating to the operation of any of the Purchased Assets prior to the Closing (Paragraphs O and P collectively, the "**Successor or Other Liabilities**").  Pursuant to the Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is only purchasing the Purchased Assets identified in the Purchase Agreement, is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities and shall have no liability for the Excluded Liabilities.

### **Validity of Transfer**

W.       The transfer of the Purchased Assets to the Buyer will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and will vest the Buyer with all legal, equitable, and beneficial right, title, and interest of the Debtors to the Purchased Assets free and clear of all Claims and Interests (as defined below) (other than Assumed Liabilities) of any kind or nature whatsoever, including without limitation, rights or claims that are Successor or Other Liabilities, or that are based on any Successor or Other Liabilities.

X.       The Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. The Purchase Agreement, the Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 trustee or chapter 11 trustee appointed in these Chapter 11 Cases and shall not be subject to rejection or avoidance by the foregoing parties or any

other Person. The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction. The consideration provided by the Buyer for the Purchased Assets pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and similar laws and acts).  Neither the Debtors nor the Buyer is entering into the transactions contemplated by the Purchase Agreement fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

Y.    The Debtors have, to the extent necessary and applicable, (i) full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (iii) taken all corporate action necessary to authorize and approve the Purchase Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the Sale, execute the Purchase Agreement, or consummate the transactions contemplated thereby.

## Free and Clear of All Claims and Interests

Z.      The Debtors are the sole and lawful owners of the Purchased Assets, and no other Person has any ownership right, title, or interests therein. The Purchased Assets constitute property of the Debtors' estates and good title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors have (except to the extent otherwise provided in the Purchase Agreement) all right, title, and interest in the Purchased Assets. The transfer of the Purchased Assets to the Buyer will be, as of the Closing, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all (i) liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising any time prior to the Closing (collectively, the "**Liens**"), and (ii) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, imperfections or restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, defenses, credits, allowances, options, limitations, action, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, whether known or unknown, legal or

equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (x) that purport to give to any party a right or option to effect a setoff against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Purchased Assets, or any similar rights, if any, or (y) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (the items in this clause (ii), collectively, the "**Claims**", and together with the Liens and other interests of any kind or nature whatsoever, the "**Claims and Interests**"), relating to, accruing, or arising any time prior to entry of this Sale Order), with the exception of any such Claims and Interests that are expressly assumed by the Buyer as Assumed Liabilities solely to the extent set forth in the Purchase Agreement, including, for the avoidance of any doubt, Cure Amounts or any other obligations arising under the Assumed Contracts solely to the extent identified and/or set forth in the Purchase Agreement. For the avoidance of doubt, the Buyer shall obtain the Purchased Assets free and clear of any pre-petition or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever, unless such Claim is expressly assumed by the Buyer as Assumed Liabilities, or Cure Amounts arising under the Assumed Contracts.

AA.    The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

**Section 363(f) Is Satisfied**

BB.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Purchased Assets free and clear of any Claims and Interests in the Purchased Assets (other than the Assumed Liabilities).

CC.    The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Purchased Assets to the Buyer, and the assumption and assignment of the Assumed Contracts to the Buyer, were not free and clear of all Claims and Interests of any kind or nature whatsoever (except the Assumed Liabilities), or if the Buyer would, or in the future could, be liable for any of such Claims and Interests (except the Assumed Liabilities), including, without limitation any pre-petition or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever arising under contracts that are not Assumed Contracts.  The Buyer will not consummate the transactions contemplated by the Purchase Agreement unless the Court expressly orders that none of the Buyer, its affiliates, its past, present and future members, shareholders, subsidiaries, parents, divisions, agents, representatives, insurers, attorneys, successors and assigns, or any of its or their respective directors, managers, officers, employees, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (each a "**Buyer Party**", and collectively, the "**Buyer Parties**"), or the Purchased Assets, will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any Claims and Interests (other than Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities.  The total consideration to be provided under the Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Claims

and Interests (other than Assumed Liabilities) of any kind or nature whatsoever (including, without limitation, free and clear of any potential Successor or Other Liabilities of any kind whatsoever including potential Successor or Other Liabilities in connection with any pre-petition or post-petition Claim for royalties or any other payments or obligations arising under contracts that are not Assumed Contracts).

DD.    Not transferring the Purchased Assets free and clear of all Claims and Interests (other than Assumed Liabilities) of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities and/or applicable state, federal, or foreign law or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Claims and Interests (other than Assumed Liabilities) of any kind or nature whatsoever (including any potential Successor or Other Liabilities) would be of substantially less benefit to the Debtors' estates.

EE.    The Debtors may sell the Purchased Assets free and clear of all Claims and Interests against the Debtors, their estates, or any of the Purchased Assets (except the Assumed Liabilities) because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims and Interests against the Debtors, their estates, or any of the Purchased Assets, who did not timely object, or who withdrew their objections to, the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Claims and Interests (except to the extent that such Claims and Interests are Assumed Liabilities) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. All holders of Claims and Interests are adequately protected by having their Claims and Interests, if any, in each instance against the

Debtors, their estates, or any of the Purchased Assets attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such holder alleges a Claim and Interest, in the same order of priority, with the same validity, force, and effect that such Claim and Interest had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess thereto.

**Assumption and Assignment of the Assumed Contracts**

FF.    The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order, the Sale Notice Order, and the Purchase Agreement, is integral to the Purchase Agreement and is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest, and represents the Debtors' reasonable exercise of sound and prudent business judgment.  The assumption and assignment of the Assumed Contracts (i) is necessary to sell the Purchased Assets to the Buyer, (ii) allows the Debtors to maximize the value of the Purchased Assets, including the Assumed Contracts, (iii) limits the losses suffered by counterparties to the Assumed Contracts, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Contracts.  For these reasons, the Debtors have exercised sound business judgment in assuming and assigning the Assumed Contracts and such assumption and assignment is in the best interests of the Debtors' estates.

GG.    Pursuant to section 365(f) of the Bankruptcy Code, each of the Assumed Contracts required to be assumed and assigned under the Purchase Agreement shall be assigned and transferred to and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in such contract or other restrictions prohibiting its assignment or transfer. No section of any of the Assumed Contracts that would prohibit, restrict, or condition, whether directly or

indirectly, the use, assumption, or assignment of any of the Assumed Contracts in connection with the Sale shall have any force or effect.

HH.    Except as expressly assumed by the Buyer under the Purchase Agreement, the transfer of the Purchased Assets to the Buyer and the assignment to the Buyer of the Assumed Contracts will not subject the Buyer or any Buyer Party to any liability whatsoever which may become due or owing under the Assumed Contracts prior to the Closing (other than Cure Amounts which shall be subject to a purchase price adjustment as set forth in the Purchase Agreement), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities.

II.    The respective amounts set forth ~~on **Exhibit**[●] annexed hereto~~in the Cure Notice are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all pecuniary losses under the Assumed Contracts, subject in all respects to the terms and conditions of the Purchase Agreement including ~~Section []~~Sections 1.05 and 2.03 regarding purchase price adjustments~~.~~ (the "**Cure Amounts**").

JJ.    The Buyer has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to the respective Assumed Contracts.

## Compelling Circumstances for an Immediate Sale

KK.    The Debtors have demonstrated through the testimony and/or other evidence proffered or adduced in connection with the Motion, at the hearing to consider approval of the Sale Notice Order and at the Sale Hearing, and the arguments, statements and representations of counsel

made on the record of the Sale Hearing good and sufficient reasons for approval of the Purchase Agreement, the Sale and the transactions contemplated thereby. The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest. The Debtors have demonstrated (i) good, sufficient, and sound business purposes and justifications for approving the Purchase Agreement and (ii) compelling circumstances for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement for the Sale, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates, and the Sale will provide the means for the Debtors to maximize distributions to their creditors. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transactions contemplated by this Sale Order.

LL.    To maximize the value of the Purchased Assets and preserve the viability of the businesses to which they relate, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement. Time is of the essence in consummating the Sale.

MM.    Given all of the circumstances of the Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

NN.    The Sale does not constitute a *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating Chapter 11 plan for the Debtors.

OO.    The consummation of the Sale and the assumption and assignment of the Assumed Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy

Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

**General Provisions**

1.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

2.      The Motion and the relief requested in the Motion is granted and approved, and the Sale and the transactions contemplated in the Motion and by the Purchase Agreement are approved.

3.      The Court's findings of fact and conclusions of law set forth in the Sale Notice Order remain in full force and effect.

4.      All objections to, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the Purchase Agreement, the Sale, the entry of this Sale Order, or the relief granted herein, including, without limitation, any objections to Cure Amounts or relating to the cure of any defaults under any of the Assumed Contracts or to the assumption and assignment of any such Assumed Contracts to the Buyer by the Debtors, that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court or otherwise been resolved pursuant to the terms thereof, including any and all reservations of rights included in such objections or otherwise, are hereby denied and

overruled on the merits with prejudice.  Those parties who did not object or withdrew their objections to the Motion or the entry of this Sale Order in accordance with the Sale Notice Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

## Approval of the Purchase Agreement

5.    The Debtors are authorized to enter into the Purchase Agreement. Pursuant to sections 105(a), 363(b) and (f), and 365 of the Bankruptcy Code, the Debtors are authorized and empowered on behalf of themselves to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (ii) close the Sale as contemplated in the Purchase Agreement and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their obligations as contemplated by the Purchase Agreement, without further notice to or order from the Court, including the assumption and assignment of the Assumed Contracts to the Buyer, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale.

6.    This Sale Order shall be binding in all respects upon (a) the Debtors, (b) the Debtors' estates, (c) all creditors of, and holders of equity interests in, the Debtors, (d) all holders of Liens, encumbrances, or other Claims and Interests (whether known or unknown) in, against, or on all or any portion of the Purchased Assets, (e) all the Contract Counterparties, (f) the Buyer and all successors and assigns of the Buyer, (g) the Purchased Assets, and (h) all successors and assigns of each of the foregoing, including, without limitation, any trustee subsequently appointed

in the Chapter 11 Cases, or a chapter 7 trustee appointed upon a conversion of one or more of the

Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.  This Sale Order shall inure

to the benefit of the Debtors, their estates and creditors, the Buyer, and the respective successors

and assigns of each of the foregoing, including, without limitation, any trustee subsequently

appointed in the Chapter 11 Cases or upon conversion to chapter 7 under the Bankruptcy Code,

and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the

Debtors' estates.  The Purchase Agreement shall be binding in all respects upon the Debtors.

### Transfer of the Purchased Assets

7.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy

Code, the Debtors are authorized to transfer the Purchased Assets, including the Assumed

Contracts, to the Buyer at the Closing in accordance with the terms of the Purchase Agreement,

and such transfer shall (a) constitute a legal, valid, binding, and effective transfer of the Purchased

Assets, (b) vest the Buyer with title to and possession of the Purchased Assets, and (c) upon the

Debtors' receipt of the Purchase Price, be free and clear of all Claims and Interests (other than

Assumed Liabilities) of any kind or nature whatsoever, including, without limitation, any potential

Successor or Other Liabilities, with such Claims and Interests to attach to the net cash proceeds of

the Sale ultimately attributable to the Purchased Assets in which such Claim and Interest is alleged

in the order of their priority, with the same validity, force, and effect which they now have as

against the Purchased Assets (subject to any rights, claims and defenses the Debtors or their estates

may possess with respect thereto).  Upon the Closing, the Buyer shall take title to and possession

of the Purchased Assets subject only to the Assumed Liabilities.

8.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale and transfer

of the Debtors' right, title and interest in the Purchased Assets to the Buyer pursuant to the

Purchase Agreement is a legal, valid and effective disposition of the Purchased Assets, and vests the Buyer with all right, title and interest of the Debtors to and in the Purchased Assets free and clear of all Claims and Interests.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full and the Debtors sale of the Purchased Assets shall be free and clear of any Claims and Interests in the Purchased Assets (other than the Assumed Liabilities), including, without limitation, any pre-petition or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever arising under contracts that are not Assumed Contracts.

9.      To the extent provided for in the Purchase Agreement, any and all of the Debtors' security deposits, or other security held by landlords, lessors and other counterparties to the contracts, leases, and licenses that are to be assumed and assigned under the Purchase Agreement are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing (as modified by the Purchase Agreement), which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all contracts, leases, and licenses assumed and assigned pursuant to this Sale Order or the Purchase Agreement.

10.     The Debtors are hereby authorized on behalf of themselves to take any and all actions necessary to consummate the transactions contemplated by the Purchase Agreement, including any actions that otherwise would require further approval by shareholders, partners, members, or their respective boards of directors or boards of managers, as the case may be, without the need of obtaining such approvals.

11.     Each and every federal, state, local, and other governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

12.     The transactions authorized herein shall be of full force and effect, regardless of the Debtors' lack of good standing in any jurisdiction in which they are formed or authorized to transact business. Upon Closing of the transactions set forth in the Purchase Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Claims and Interests, with respect to the Purchased Assets, that is extinguished or otherwise released pursuant to this Sale Order under section 363 and the related provisions of the Bankruptcy Code.

13.     Subject to the terms, conditions, and provisions of this Sale Order, all Persons are hereby

forever prohibited and barred from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Sale Order.

14.     The Buyer may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county, or other territory or jurisdiction in which any of the Debtors are incorporated or have real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder.

15.     The provisions of this Sale Order authorizing the Sale of the Purchased Assets free and clear of all Claims and Interests, other than Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order. If any Person which has filed a financing statement, mortgage, mechanic's lien, *lis pendens*, or other statement, document, or agreement evidencing

any Claims and Interests on, or in, all or any portion of the Purchased Assets (other than statements or documents with respect to Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or any other documents necessary for the purpose of documenting the termination of all Claims and Interests which the Person has or may assert with respect to all or any portion of the Purchased Assets, then (i) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such Person with respect to the Purchased Assets, (ii) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the termination of all Claims and Interests of any kind or nature against or in the Purchased Assets, and (iii) the Buyer is authorized to seek in the Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Claims and Interests that such Person has against or in the Purchased Assets.

16.    On the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Purchased Assets. And with respect to the Purchased Assets, this Sale Order is and shall be effective as a determination that, on the Closing, all Claims and Interests and any other interest of any kind or nature whatsoever including, without limitation, any Successor or Other Liabilities existing as to such Purchased Assets prior to the Closing, other than the Assumed Liabilities, shall have been terminated, and that the conveyances described herein have been effected; provided, however, that such Claims and Interests shall attach to the proceeds of the Sale

in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets.

17.    To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing.

18.    To the extent section 525 of the Bankruptcy Code is applicable, no governmental unit may deny, revoke or suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Purchase Agreement, including the Sale and the assumption and assignment of the Assumed Contracts.

<u>**No Successor Liability**</u>

19.    Neither the Buyer nor any of the Buyer Parties is a "successor" to, continuation of, or alter ego of, any of the Debtors or the Debtors' estates by reason of any theory of law or equity. Except for the Assumed Liabilities, the Buyer and the Buyer Parties shall not have assumed, or be deemed to have assumed, or in any way be responsible for, any liability or obligation of any of the Debtors, or the Debtors' estates, or any of the Debtors' predecessors or affiliates with respect to the Purchased Assets or otherwise. Neither the purchase of the Purchased Assets by the Buyer nor the fact that the Buyer is using any of the Purchased Assets previously used or operated by the Debtors will cause the Buyer or any of the Buyer Parties to be deemed a successor to, combination of, or alter ego of, in any respect, any of the Debtors or the Debtors' businesses, or incur any liability derived therefrom within the meaning of any foreign, federal,

state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, *de facto* merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, fraudulent transfer or avoidance, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their respective affiliates, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.

**Claims and Interests; Prohibition of Actions Against the Buyer**

20.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Sale Order or the Purchase Agreement, neither the Buyer nor any of the Buyer Parties shall have any liability, responsibility or obligation for any Claims and Interests of the Debtors or their estates, including any claims, liabilities, or other obligations arising under or related to any of the Purchased Assets which may become due or owing (a) prior to the Closing or (b) from and after the Closing but which arise out of or relate to any act, omission, circumstances, breach, default, or other event occurring prior to the Closing.

21.     Except with respect to Assumed Liabilities, or as otherwise permitted by the Purchase Agreement or this Sale Order, all Persons, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, Contract Counterparties, customers, landlords, licensors, employees, and other creditors and holders of Claims and Interests of any kind or nature whatsoever against or in any of the Debtors or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Purchased Assets to the Buyer (including without limitation any Successor or Other Liabilities or rights or claims based thereon or based in any manner upon any pre-petition or post-petition Claim for royalties or any other payments or obligations of any kind whatsoever arising under contracts that are not Assumed Contracts) shall be, and hereby are forever barred and estopped from asserting against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets, the Claims and Interests of any kind or nature whatsoever such Person had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Purchased Assets, such Persons' Claims and Interests or any other interests in and to the Purchased Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets;

{00040356. }
321659720.1

(b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (c) creating, perfecting, or enforcing any Claims and Interests against the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (d) asserting any setoff, or right of subrogation of any kind against any obligation due to the Buyer or any Buyer Party, or their respective assets or properties, including, without limitation, the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply with or is inconsistent with the provisions of this Sale Order, other orders of the Court, the Purchase Agreement or any other agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets in connection with the Sale.

22.    On the Closing, or as soon as possible thereafter, each creditor shall, and the Buyer is hereby authorized, on behalf of each of the Debtors' creditors, to execute such documents and take all other actions as may be necessary to release any Claims and Interests and other interests in or on the Purchased Assets (except Assumed Liabilities), if any, as provided for herein, as such Claims and Interests may have been recorded or may otherwise exist.

23.    All Persons are hereby barred and forever prohibited from taking any action that would adversely affect or interfere with the ability of any of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Sale Order.

24.     The consideration provided by the Buyer for the Purchased Assets under the Purchase Agreement is fair and reasonable, and accordingly, the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

25.     Following the Closing, no holder of a Claim or an Interest in the Debtors shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets and the Assumed Contracts based on or related to such Claim or Interest or any actions that the Debtors may take in these Chapter 11 Cases.

## Assumption and Assignment of Contracts

26.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code and the Sale Notice Order, and subject to and conditioned upon the terms of the Purchase Agreement and payment of the applicable Cure Amounts by the Buyer (after adjustment of the Purchase Price pursuant to the terms of the Purchase Agreement), the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Purchase Agreement, of the Assumed Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Upon the Closing and payment of the applicable Cure Amounts by the Buyer after adjustment of the Purchase Price pursuant to the terms of the Purchase Agreement (including Section 2.6 thereto) and in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assumed Contracts free and clear of any Claims or Interests, and each such Assumed Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited by this Sale Order.  To the extent provided in the Purchase Agreement, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

27.    With respect to the assumption and assignment of the Assumed Contracts to Buyer as provided in Paragraph 26 of this Sale Order:  (a) any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions which are void and of no force and effect; (b) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Contract have been satisfied; and (c) effective upon the Closing, the Assumed Contracts shall be transferred and assigned to, and from and following the Closing (as modified by the Purchase Agreement) shall remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any Assumed Contract (including those of the type described in sections 365(b)(2) and (d) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and pursuant to section 365(k) of the Bankruptcy Code, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assumed Contract and the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assumption and assignment to the Buyer, except as otherwise provided in the Purchase Agreement.  Further, to the extent any provision in any of the Assumed Contracts assumed and assigned pursuant to Paragraph 26 of this Sale Order (i) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption and assignment (including, without limitation, any "change of control" provision), or (ii) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (A) the commencement of the Chapter 11 Cases, (B) the insolvency or financial condition of any of the Debtors at any time before the closing of the Chapter

11 Cases, (C) the Debtors' assumption and assignment of such Assumed Contract, (D) a change of control or similar occurrence, or (E) the consummation of the Sale, then such provision shall be deemed modified in connection with the Sale so as not to entitle the Contract Counterparty thereto to prohibit, restrict, or condition such assumption and assignment, to modify, terminate, or declare a breach or default under such Assumed Contract, or to exercise any other default-related rights or remedies with respect thereto, including without limitation, any such provision that purports to allow the Contract Counterparty thereto to terminate or recapture such Assumed Contract, impose any penalty, additional payments, damages, or other financial accommodations in favor of the Contract Counterparty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.  All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect in connection with the Sale pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

28.    All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts (in each case, without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code), whether monetary or non-monetary, shall be cured solely to the extent set forth in the Purchase Agreement and this Sale Order on the Closing or as soon thereafter as reasonably practicable.

29.    All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assumed Contracts, and each Assumed Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited by this Sale Order. To the extent provided in the Purchase Agreement, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

30.    Upon the Debtors' assignment of the Assumed Contracts to the Buyer under the provisions of this Sale Order and the Buyer's payment of the applicable Cure Amounts (after adjustment of the Purchase Price pursuant to the terms of the Purchase Agreement), no default or other obligations arising prior to the Closing shall exist under any Assumed Contract, and each Contract Counterparty to an Assumed Contract is forever barred and estopped from (a) declaring a default by the Debtors or the Buyer under such Assumed Contract, (b) raising or asserting against the Debtors or the Buyer (or any Buyer Party), or the property of either of them, any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts, or (c) taking any other action against the Buyer or any Buyer Party as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assumed Contract, in each case in connection with the Sale.  Each Contract Counterparty is also forever barred and estopped from raising or asserting against the Buyer or any Buyer Party any assignment fee, default, breach, Claim, pecuniary loss, or condition to assignment arising under or related to the Assumed Contracts existing as of the Closing or arising by reason of the closing of the Sale, except for any amounts that are Assumed Liabilities.

31.    Any party that may have had the right to consent to the assumption or assignment of an Assumed Contract, including (if applicable) the Contract Counterparty to each Assumed Contract, is deemed to have consented to such assumption and assignment for purposes of sections

365(c)(1)(B) and 365(e)(2)(A)(ii) of the Bankruptcy Code and any other applicable law if such party failed to object timely to the assumption or assignment of such Assumed Contract (in accordance with, among other things, the Sale Notice Order (if any)), and the Buyer shall enjoy all of the Debtors' rights and benefits under each such Assumed Contract as of the applicable date of assumption without the necessity of obtaining such Contract Counterparty's written consent to the assumption or assignment thereof.  The Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assumed Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

32.    To the extent a Contract Counterparty to an Assumed Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such Contract Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall be deemed to resolve any defaults or other breaches with respect to any Assumed Contract to which it relates.

33.    With respect to objections to any Cure Amounts that remain unresolved as of the Hearing, such objections shall be resolved in accordance with the procedures to be developed among the applicable Contract Counterparty, the Debtors, and the Buyer.

34.    For the avoidance of doubt, a Contract shall not be an Assumed Contract pursuant to the Purchase Agreement and shall not be assigned to, or assumed by Buyer to the extent that such Contract was not listed on the Assumed Contract List.

35.    Nothing in this Sale Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors that any contract or Assumed Contract is an

executory contract or unexpired lease or must be assumed and assigned pursuant to the Purchase Agreement or in order to consummate the Sale.

### Buyer Standing and Assumed Liabilities

36.    The Buyer shall have standing to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Debtors or their estates including, without limitation, any unresolved or disputed Assumed Liabilities, Cure Amounts or otherwise, that constitute obligations assumed by the Buyer pursuant to the terms of the Purchase Agreement.  Nothing in this Sale Order shall divest the Debtors of their standing or duty as debtors-in-possession under the Bankruptcy Code from reconciling claims asserted against the Debtors or their estates and objecting to any such claims that should be reduced, reclassified or otherwise disallowed.

### Releases

37.    Effective as of the Closing of the Sale (the "**Debtor Release Effective Date**"), the Buyer, on its own behalf and on behalf of its predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Debtors and each of their estates, and each of their officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (solely in their capacities as such) (collectively, the "**Debtor Released Parties**"), from any and all liability to the Buyer (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether

matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, that the Buyer at any time had, now has or may have, or that its predecessors, successors or assigns at any time had or hereafter may have against any of the Debtor Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the Debtor Release Effective Date; provided, however, that the release set forth in this Paragraph 37 shall not release (i) any claims against or liabilities of a Debtor Released Party that a court of competent jurisdiction determines has resulted from such Debtor Released Party's bad faith, fraud, gross negligence, collusion or willful misconduct; or (ii) the Debtors from honoring their agreements with and obligations to the Buyer that survive the Closing as set forth in the Purchase Agreement, the Sale Notice Order, and/or this Sale Order.

38.     Effective as of the Closing of the Sale ("**Buyer Release Effective Date**"), each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits Buyer and its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (solely in their capacities as such) (collectively, the "**Buyer Released Parties**"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending

or threatened, arising in law or equity, in contract or tort, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Buyer Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the Buyer Release Effective Date; provided, however, that the release set forth in this Paragraph 38 shall not release (i) any claims against or liabilities of a Buyer Released Party that a court of competent jurisdiction determines has resulted from such Buyer Released Party's bad faith, fraud, gross negligence, collusion or willful misconduct; or (ii) Buyer from honoring any of its post-Closing obligations to the Debtors pursuant to the terms of the Purchase Agreement, the Sale Notice Order, and/or this Sale Order.

### Other Provisions

39.    This Sale Order shall be binding in all respects upon all of the Debtors' creditors and equity-holders, all Contract Counterparties, all successors and assigns of the Debtors, and any of their respective affiliates and subsidiaries, any trustees, examiners, "responsible persons," or other fiduciaries appointed in the Chapter 11 Cases or upon a conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.  The Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.

40.    The Purchase Agreement and any other documents ancillary thereto may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

41.    Notwithstanding anything in this Sale Order or the Purchase Agreement to the contrary, neither the Sale nor this Order shall impair, alter, modify, improve, or diminish the rights,

claims, or interests of Vision Bioenergy Oilseeds, LLC ("Vision") under (i) the Memorandum of Understanding dated January 6, 2025 executed by Vision and Nuseed ("MOU") or (ii) the February 9, 2024 License and Service Fee Agreement between Vision and Y10 (the "LSFA"); *provided, however*, that subject to Paragraph 42 of this Order, the Debtors reserve all rights with respect to the LFSA including, but not limited to, the ownership of the Vision Materials (as defined in the MOU) and any claims which Vision may assert against the Debtor pursuant to the LFSA or in connection with the rejection of the LFSA.  Nothing in this Order shall constitute authority for the Debtor to assume and/or assign the LSFA or the Vision Materials (as defined in the MOU).  The Vision Materials are not Purchased Assets or otherwise included in the Sale, and nothing in this Order shall constitute authority for the Debtor to sell or otherwise transfer them. For the avoidance of doubt, the parties anticipate that the Debtor will reject the LSFA and that, as a consequence, Vision's rights and obligations (if any) under the LSFA and any of the rights and obligations of the Debtor under the LSFA shall be governed by 11 U.S.C. § 365(n) and other applicable law. For further avoidance of doubt, Nuseed shall have no liability to Vision for any default of the LSFA by Y10 and the Sale to Nuseed is expressly free and clear of any and all claims, liens and encumbrances that may be or have been asserted by Vision in this Bankruptcy Case or otherwise for any such defaults.

42.     Within 7 days after entry of this Order, the Debtor shall file a motion to reject the LSFA and a notice of abandonment of any right, title, or interest in and to the Vision Materials in favor of Vision.  Before or promptly upon such notice of abandonment, the Debtor shall provide reasonable cooperation with Vision's efforts to obtain any Vision Materials within the Debtor's custody, possession, or control. The Debtor shall also use reasonable efforts to instruct vendors,

contractors, and other third parties in custody, possession, or control of any Vision Materials to surrender or transfer the same to Vision.

41.43.  The transactions contemplated by the Purchase Agreement and this Sale Order are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not alter, affect, limit, or otherwise impair the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code. As a good faith buyer of the Purchased Assets, the Buyer has not entered into an agreement with any other potential bidders and has not colluded with any potential or actual bidders, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

42.44.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

43.45.  The failure to specifically include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized in its entirety. All of the provisions of this Sale Order are non-severable and mutually dependent.

44.46.  The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, and any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery

of the Purchased Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Sale Order and the Purchase Agreement, including but not limited to the injunctions and limitations of liability set forth in this Sale Order, (c) protect the Buyer against any Claims and Interests in or against the Debtors or the Purchased Assets of any kind or nature whatsoever attaching to the net cash proceeds of the Sale as provided herein including, without limitation, to enjoin the commencement or continuation of any action seeking to impose successor liability or bulk sale liability; (d) enter any orders under sections 105, 363 and 365 of the Bankruptcy Code with respect to the Purchased Assets and the Assumed Contracts; (e) decide any disputes concerning this Sale Order, the Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Purchase Agreement and this Sale Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Assumed Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Claims and Interests; (f) adjudicate any and all remaining issues concerning the Debtors' right and authority to assume and assign the Assumed Contracts and the rights and obligations of the Debtors and the Buyer with respect to such assignment and the existence of any default under any such Assumed Contract; (g) adjudicate any and all disputes concerning alleged pre-closing Claims and Interests in and to the Purchased Assets including without limitation the extent, validity, enforceability, priority, and nature of any and all such alleged Claims and Interests; (h) adjudicate any and all disputes relating to the Debtors' right, title, or interest in the Purchased Assets and the proceeds thereof; and (i) re-open the Chapter 11 Cases to determine any of the foregoing.

45.47.  Notwithstanding any provision in the Sale Motion, the Asset Purchase Agreement, this Sale Order, and any implementing sale documents (collectively, "**Sale Documents**"), nothing shall: (1) authorize the  assumption, sale, assignment or other transfer to the Purchaser of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, including but not limited to, any Medicare Coverage Gap Discount Program Agreement, (vii) certifications, (viii) applications or other interests of the federal government (collectively, "**Federal Interests**") without compliance by the Debtors and the Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including but not limited to, inventory, inventions, records, patents, intellectual property, licenses, and data; (4) affect the setoff or recoupment rights or defenses of a governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the assumption, transfer, sale or assignment of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy laws; (6) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property; (7) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (8) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order; or (9) expand the scope of 11 U.S.C.§ 525.  For the avoidance of doubt and without limiting the foregoing,

notwithstanding any provision in the Sale Documents, nothing shall impair, affect, alter or modify any statutes (including but not limited to the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act), regulations, rules, guidelines, standards, policies and procedures of the Department of Health and Human Services, including but not limited to, the Food and Drug Administration.

46.    For cause shown, this Sale Order shall take effect immediately and shall not be stayed

47.48.  pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6004(d) are hereby expressly waived and shall not apply. Accordingly, the Debtors and the Buyer are authorized and empowered to close the Sale immediately upon entry of this Sale Order subject to the terms of the Purchase Agreement.

48.49.  To the extent that this Sale Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.

## **Exhibit 1**

**Asset Purchase Agreement**

**EXECUTION VERSION**

AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

BY AND AMONG

NUSEED NUTRITIONAL US INC.,

YIELD10 BIOSCIENCE, INC.

AND

YIELD10 OILSEEDS INC.

DATED AS OF

DECEMBER 4, 2024

## TABLE OF CONTENTS

**ARTICLE I PRINCIPAL TRANSACTION** ........................................................................ 2
    Section 1.01    Sale and Purchase of Assets ................................................... 2
    Section 1.02    Excluded Assets .................................................................... 3
    Section 1.03    Assumed Liabilities .............................................................. 3
    Section 1.04    Excluded Liabilities .............................................................. 4
    Section 1.05    Purchase Price ...................................................................... 5
    Section 1.06    Withholding Tax ................................................................... 5
    Section 1.07    Allocation of Purchase Price ................................................ 5

**ARTICLE II CLOSING** ........................................................................................................ 6
    Section 2.01    Closing Date and Transactions. ............................................ 6
    Section 2.02    Closing Deliverables. ........................................................... 6
    Section 2.03    Purchase Price Adjustment. ................................................. 7
    Section 2.04    Payments .............................................................................. 9

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** .................... 9
    Section 3.01    Organization and Authority; Due Execution; Board Approval. ... 10
    Section 3.02    No Conflicts; Consents. ...................................................... 10
    Section 3.03    Financial Statements; Undisclosed Liabilities. ................... 11
    Section 3.04    [INTENTIONALLY OMITTED] ......................................... 11
    Section 3.05    Title to Purchased Assets; Real Property. ........................... 11
    Section 3.06    Condition and Sufficiency of Purchased Assets. ................. 12
    Section 3.07    Intellectual Property ........................................................... 12
    Section 3.08    IT Systems. ........................................................................ 15
    Section 3.09    Privacy and Data Security ................................................... 15
    Section 3.10    Assigned Contracts. ........................................................... 17
    Section 3.11    Suppliers. ........................................................................... 17
    Section 3.12    Insurance. ........................................................................... 17
    Section 3.13    Legal Proceedings; Governmental Orders. ......................... 18
    Section 3.14    Compliance With Laws; Permits. ....................................... 18
    Section 3.15    Taxes. ................................................................................. 18
    Section 3.16    Employment Matters. ......................................................... 20
    Section 3.17    Employee Benefit Matters. ................................................. 22
    Section 3.18    Environmental Matters. ...................................................... 23
    Section 3.19    Related Party Transactions ................................................. 25
    Section 3.20    No Brokers. ........................................................................ 25

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER** ..................... 25
    Section 4.01    Organization and Authority of Buyer; Due Execution. ....... 25
    Section 4.02    No Conflicts; Consents. ...................................................... 25
    Section 4.03    Brokers. .............................................................................. 26
    Section 4.04    Sufficiency of Funds .......................................................... 26
    Section 4.05    Legal Proceedings .............................................................. 26
    Section 4.06    Investigation by Buyer ....................................................... 26

**ARTICLE V COVENANTS** ............................................................................................... 26
    Section 5.01    Conduct of Business Prior to the Closing. .......................... 26
    Section 5.02    Access to Information ......................................................... 28
    Section 5.03    No Solicitation of Other Bids. ............................................ 28
    Section 5.04    Efforts to Consummate Contemplated Transactions. .......... 31
    Section 5.05    Approval as Sole Stockholder of Oilseeds .......................... 31

Section 5.06    Notice of Certain Events.................................................................31
Section 5.07    Employees and Employee Benefits. .............................................32
Section 5.08    Public Announcements ..................................................................32
Section 5.09    Confidentiality ..............................................................................32
Section 5.10    INTENTIONALLY OMITTED. ...................................................33
Section 5.11    Wrong-Pockets...............................................................................33
Section 5.12    INTENTIONALLY OMITTED .....................................................33
Section 5.13    Further Assurances ........................................................................33
Section 5.14    Transfer Taxes ...............................................................................33
Section 5.15    Tax Clearance Certificates ............................................................34
Section 5.16    Bulk Sales Laws.............................................................................34
Section 5.17    Tax Matters. ...................................................................................34
Section 5.18    Access to Purchased Assets ...........................................................34
Section 5.19    Reasonable Access to Records. .....................................................35
Section 5.20    Bankruptcy Matters........................................................................35
**ARTICLE VI CONDITIONS TO CLOSING** ...........................................................**35**
Section 6.01    Closing Conditions of All Parties ..................................................35
Section 6.02    Closing Conditions of Buyer .........................................................36
Section 6.03    Closing Conditions of Sellers. .......................................................36
**ARTICLE VII TERMINATION** ................................................................................**37**
Section 7.01    Termination.....................................................................................37
Section 7.02    Effect of Termination.....................................................................38
Section 7.03    Seller Termination Fee...................................................................38
**ARTICLE VIII MISCELLANEOUS** ..........................................................................**39**
Section 8.01    Rules of Construction.....................................................................39
Section 8.02    Seller Disclosure Schedule ............................................................40
Section 8.03    Notices ...........................................................................................40
Section 8.04    Entire Agreement...........................................................................41
Section 8.05    Amendment and Modification; Waiver .........................................41
Section 8.06    Successors and Assigns ..................................................................41
Section 8.07    No Third-party Beneficiaries .........................................................41
Section 8.08    Severability ....................................................................................41
Section 8.09    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ................42
Section 8.10    Specific Performance .....................................................................42
Section 8.11    Counterparts ...................................................................................42
Section 8.12    Expenses .........................................................................................42

Annex A          Definitions

<u>Schedules</u>

Schedule 1.01(c)        Assigned Contracts
Schedule 1.01(e)        Tangible Personal Property
Schedule 1.01(f)        Permits
Schedule 1.07           Allocation Methodology
Schedule 2.02           Required Consents
Schedule 5.01(b)(v)     Maintained Employees
Seller Disclosure Schedule

<u>Exhibits</u>
Exhibit A        Form of Bill of Sale
Exhibit B        Form of Assignment and Assumption Agreement
Exhibit C        Form of Patent Assignment Agreement

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This Amended and Restated Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of December 4, 2024, is entered into among Nuseed Nutritional US Inc., a Delaware corporation ("<u>Buyer</u>"), Yield10 Bioscience, Inc., a Delaware corporation ("<u>Yield10</u>") and Yield10 Oilseeds Inc., a Canadian federal corporation ("<u>Oilseeds</u>") (Yield10 and Oilseeds collectively referred to herein as "<u>Sellers</u>" or when the context requires, each individually a "<u>Seller</u>").

## BACKGROUND

A.    Sellers are engaged in the business of developing and commercializing (i) *Camelina sativa* seed oil which has been genetically engineered to enable production of high levels of the omega-3 fatty acids eicosapentanoic acid (EPA) and docosahexanoic acid (DHA) and (ii) *Camelina sativa* seed oil for use as a low-carbon intensity feedstock oil for biofuels (such activities as they are conducted on the Closing Date, the "<u>Business</u>").

B.    Sellers desire to sell and assign to Buyer, and Buyer desires to purchase and assume from Sellers, all assets that are Related to the Business (the "<u>Proposed Acquisition</u>").

C.    For purposes of funding the operation of the Business until the Proposed Acquisition could be negotiated, approved, and consummated, Buyer, Sellers, and Yield10 Bioscience Securities Corp., a Massachusetts corporation and wholly owned subsidiary of Yield10, entered into the Operating Loan, the aggregate principal amount of which has been advanced by Buyer and remains outstanding as of the date hereof.

D.    Sellers and Buyer previously entered into that certain Asset Purchase Agreement, dated as of October 1, 2024 (the "<u>Original Agreement</u>"), pursuant to which Sellers and Buyer agreed to the terms and conditions of the Proposed Acquisition, including a condition that the Original Agreement shall have been adopted by the affirmative vote or consent of the holders of a majority of the outstanding shares of common stock of Yield10.

E.    Yield10 scheduled a meeting of its shareholders on November 8, 2024 for purposes of obtaining the requisite shareholder vote to approve the Original Agreement. The meeting was adjourned to November 21, 2024 as a result of failure to obtain a sufficient number of affirmative votes prior to November 8, 2024. Yield10 failed to obtain a sufficient number of affirmative votes at the meeting of shareholders held on November 21, 2024.

F.    Yield10 intends to file a voluntary petition for relief (the "<u>Petition</u>") commencing a case (the "<u>Chapter 11 Case</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

G.    In anticipation of such filing, Sellers and Buyer desire to amend and restate the Original Agreement as set forth herein to permit the Proposed Acquisition to occur in accordance with Sections 105, 363 and 365 of the Bankruptcy Code, subject to, among other things, the entry of the Sale Order under Sections 363 and 365 of the Bankruptcy Code.

H.    Capitalized terms used in this Agreement have the meanings set forth in <u>Annex A</u>.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**ARTICLE I**
**PRINCIPAL TRANSACTION**

Section 1.01   <u>Sale and Purchase of Assets</u>. On the terms and subject to the conditions of this Agreement, Sellers hereby agree to sell, assign, transfer, convey and deliver to Buyer, and Buyer hereby agrees to purchase from Sellers, free and clear of any Encumbrances, other than Permitted Encumbrances, all of Sellers' right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), in each case, which are Related to the Business (collectively, the "<u>Purchased Assets</u>"), including the following:

(a)   all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("<u>Inventory</u>");

(b)   all germplasm, seeds (including parent seeds) and other breeding materials;

(c)   all Contracts, including Business IP Agreements, set forth on <u>Schedule 1.01(c)</u>, but only those Contracts which are assumed by the Seller and assigned to the Buyer at the Closing pursuant to the Sale Order and Section 365 of the Bankruptcy Code (the "<u>Assigned Contracts</u>");

(d)   all Business Intellectual Property, including Sellers' gene editing algorithm model, Sellers' GRAIN gene discovery platform, and Sellers' seed databases maintained via shinyapps.io and otherwise;

(e)   all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property listed on <u>Schedule 1.01(e)</u> (the "<u>Tangible Personal Property</u>");

(f)   all Permits, including Environmental Permits, including those listed on <u>Schedule 1.01(f)</u>;

(g)   all rights to any Actions of any nature available to or being pursued by Sellers, whether arising by way of counterclaim or otherwise;

(h)   all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any refunds or credits or other governmental charges relating to the Business through the Closing Date);

(i)   all of Sellers' rights under warranties, indemnities and all similar rights against third parties;

(j)   all insurance policies and insurance benefits, including rights and proceeds;

(k)   (i) electronic copies of monthly accounting and financial closing records for the past three (3) years and (ii) all originals, or where not available, copies, of the other books and records of the Business, including machinery and equipment maintenance files, supplier lists, production data, breeding records, quality control records and procedures, research and development files, records and data (including all correspondence with any Governmental Authority), strategic plans, internal financial statements, files relating to the Business Intellectual Property and the Business IP Agreements, all information relating to Taxes imposed on or with respect to the Business, including Tax Returns and related work papers; and

(l)     all goodwill and the going concern value of the Business and the Purchased Assets, together with the right to represent to third parties that Buyer is the successor to Sellers in connection with the Business.

Section 1.02     <u>Excluded Assets</u>.

(a)     Notwithstanding the foregoing, the Purchased Assets shall not include any of the following assets (collectively, the "<u>Excluded Assets</u>"):

(i)     all cash and cash equivalents of Sellers;

(ii)     any Contracts, including Business IP Agreements, that are not Assigned Contracts (the "<u>Excluded Contracts</u>");

(iii)     all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property other than the Tangible Personal Property;

(iv)     the corporate seals, Organizational Documents, minute books, stock books, books of account or other records having to do with the corporate organization of Sellers;

(v)     the rights that accrue or will accrue to Sellers under the Transaction Documents;

(vi)     any Purchased Assets sold or otherwise disposed of in the Ordinary Course of Business and not in violation of any provisions of this Agreement during the period from the date hereof until the Closing Date;

(vii)     all rights in connection with, and assets of, any Benefit Plan;

(viii)     all rights, claims and credits of the Sellers to the extent relating to any Excluded Asset or any Excluded Liability; and

(ix)     all claims arising under Chapter 5 of the Bankruptcy Code as of the Petition, except for such claims which may exist against counterparties to Assigned Contracts, in which case such claims shall be released by Seller, as Debtor in Possession on behalf of itself, any statutory committee which may be or have been appointed in the Chapter 11 Case, and any successor to the Debtor in Possession, including a Chapter 11 or Chapter 7 Trustee.

(b)     At any time prior to the Closing, Buyer may, in its sole discretion and by written notice to Sellers, designate any of the Purchased Assets as additional Excluded Assets. Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Purchased Assets as additional Excluded Assets pursuant to the foregoing sentence.

Section 1.03     <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth herein, Buyer shall, effective at the Closing, assume and agree to pay, perform and discharge only the following Liabilities (collectively, the "<u>Assumed Liabilities</u>"), and no other Liabilities:

(a)     all pre-Petition cure costs (including costs related to patents and patents pending) required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and

assignment of the Assigned Contracts, as determined by the Bankruptcy Court (collectively, the "Cure Costs");

(b)      all Assumed Payables under Assigned Contracts;

(c)      all Liabilities in respect of the Assigned Contracts to the extent that such Liabilities are required to be performed after the Closing Date, were incurred in the Ordinary Course of Business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing; and

(d)      all other Liabilities solely to the extent arising exclusively or primarily out of Buyer's operation of the Business and ownership and use of the Purchased Assets from and after the Closing Date.

Section 1.04    Excluded Liabilities. Notwithstanding any provision of this Agreement or any other writing to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Sellers or any of their Affiliates (or any other predecessor owners of all or part of their businesses and assets) of any kind or nature whatsoever, whether presently in existence or arising or asserted hereafter, other than the Assumed Liabilities (the "Excluded Liabilities"). Sellers and their Affiliates shall remain responsible to pay and satisfy in due course, or to make distributions in accordance with a confirmed plan of reorganization with respect to, all Excluded Liabilities that they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)      any Liabilities of Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of the Transaction Documents and the Contemplated Transactions, including fees and expenses of counsel, accountants, consultants, advisers and others;

(b)      any Liability for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period (or portion thereof) ending on or before the Closing Date; (ii) Taxes that arise out of the consummation of the Contemplated Transactions or that are the responsibility of Sellers pursuant to Section 5.14; or (iii) Taxes of Sellers (or any owner or Affiliate of Sellers) of any kind or description for any taxable period, including any Liability for Taxes of Sellers (or any owner or Affiliate of Sellers) that becomes a Liability of Buyer under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) or any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of Contract or Law;

(c)      any Liabilities relating to or arising out of the Excluded Assets;

(d)      any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the ownership or use of the Purchased Assets to the extent such Action relates to such operation, ownership or use on or prior to the Closing Date;

(e)      any Liabilities of Sellers arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Sellers, whether arising prior to, on or after the Closing;

(f)      any Liabilities of Sellers for any present or former employees, agents or independent contractors of Sellers, including any Liabilities associated with any claims for wages or other benefits, workers' compensation, severance, retention, termination or other payments, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing;

(g)        any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Sellers;

(h)        any Liabilities of Sellers relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets, (ii) did not arise in the Ordinary Course of Business, or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(i)        any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Sellers (including with respect to any breach of fiduciary obligations by same);

(j)        any Liabilities under the Excluded Contracts or any other Contracts, including Business IP Agreements, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement, (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement, or (iii) to the extent such Liabilities arise out of or relate to a breach by Sellers of such Contracts prior to Closing;

(k)        any Liabilities associated with indebtedness for borrowed money of Sellers, including any debt, loans or credit facilities of Sellers owing to financial institutions; and

(l)        any Liabilities arising out of, in respect of or in connection with the failure by Sellers or any of their Affiliates to comply with any Law or Governmental Order.

Section 1.05        Purchase Price. The aggregate purchase price to be paid by Buyer for the Purchased Assets shall consist of (i) the Estimated Closing Consideration Amount and (ii) the Post-Closing Consideration, subject to adjustment pursuant to Section 2.03, *plus* the assumption of the Assumed Liabilities (the "Purchase Price").

Section 1.06        Withholding Tax. Buyer shall be entitled to deduct and withhold from amounts payable under this Agreement all Taxes that Buyer may be required to deduct and withhold under any provision of applicable Law. All such withheld amounts shall be treated as paid to the relevant Person in respect of which such deduction or withholding was made.

Section 1.07        Allocation of Purchase Price. Sellers and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items treated as consideration for the Purchased Assets for Tax purposes) shall be allocated among the Purchased Assets for Tax purposes as shown on the allocation schedule (the "Allocation Schedule") in accordance with the methodology set forth on Schedule 1.07 and Section 1060 of the Tax Code and the Treasury Regulations thereunder (and any corresponding or similar provisions of applicable state or local Law). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Sellers within sixty (60) days following the Closing Date, and such draft shall be deemed final unless Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule within thirty (30) days following delivery of the Allocation Schedule to Sellers. If Sellers timely notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule, Sellers and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days following the delivery of the Allocation Schedule to Sellers, such dispute shall be resolved by the Designated Accounting Firm. The fees and expenses of the Designated Accounting Firm shall be borne equally by Sellers and Buyer. Buyer and Sellers shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule. Any

adjustments to the Purchase Price pursuant to Section 2.03 shall be allocated in a manner consistent with the Allocation Schedule. Neither Sellers nor Buyer will take any position (whether in financial statements, audits, Tax Returns or otherwise) that is inconsistent with the Allocation Schedule as finally determined under this Section 1.07 unless required to do so pursuant to a final determination as defined in Section 1313(a) of the Tax Code (or pursuant to any similar provision of applicable state or local Law).

**ARTICLE II**
**CLOSING**

Section 2.01    Closing Date and Transactions.

(a)    Closing. The closing of the Contemplated Transactions (the "Closing") shall occur no later than the second (2nd) Business Day after the fulfillment or waiver of all conditions set forth in Article VI (other than those conditions which by their terms are to be satisfied or waived at the Closing but subject to the satisfaction or waiver of such conditions) (the "Closing Date"), and shall take place at the offices of K&L Gates LLP, 599 Lexington Avenue, New York, NY 10022 (or by electronic exchange of documents in lieu of an in-person Closing), or at such other time and/or place as the parties may mutually agree to in writing.

(b)    Closing Transactions. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall pay or cause to be paid to each Seller, a cash amount equal to such Seller's Pro Rata Portion of (x) the Estimated Closing Consideration Amount *less* (y) the Cure Costs (subject to Section 5.20(b)), *less* (z) the outstanding amount of the Operating Loan as of the Closing, including interest accrued thereon and unpaid as of the Closing (and upon making such payments the Operating Loan shall be deemed paid in full).

Section 2.02    Closing Deliverables.

(a)    Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver, or cause to be delivered, to Buyer, the following:

(i)    the Sale Order approved and entered by the Bankruptcy Court;

(ii)    the Ancillary Documents duly executed by Sellers;

(iii)    a schedule setting forth the name of each Seller and each Seller's Pro Rata Portion (the "Payment Schedule");

(iv)    at least three (3) Business Days prior to the anticipated Closing Date, the Estimated Closing Statement pursuant to Section 2.03(a);

(v)    a certificate, dated as of the Closing Date and signed by a duly authorized officer of each Seller, certifying that each of the conditions set forth in Section 6.02(a), Section 6.02(b), Section 6.02(c), and Section 6.02(d) has been satisfied;

(vi)    a certificate, dated as of the Closing Date and executed by the secretary (or equivalent officer) of each Seller certifying the incumbency and signatures of the officers of each Seller authorized to act on behalf of each Seller in connection with the Contemplated Transactions and attaching and certifying as true and correct copies of the resolutions duly adopted by the board of directors of each Seller authorizing and approving the execution and delivery of this Agreement, each Ancillary Document to which Sellers are a party and the consummation of the Contemplated Transactions;

(vii)    a properly completed IRS Form W-9 or a certificate satisfying the requirements of Treasury Regulations Section 1.1445-2(b)(2), duly executed by each Seller of any Purchased Assets located in the United States, dated within thirty (30) days prior to the Closing Date;

(viii)    satisfactory evidence that all approvals, consents and notices listed in Schedule 2.02 have been received or sent and not revoked;

(ix)    two (2) complete electronic copies of the VDR;

(x)    physical possession of all of the Purchased Assets capable of passing by delivery at the location where such Purchased Assets are located with the intent that title in such Purchased Assets shall pass by and upon delivery; and

(xi)    such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the Contemplated Transactions.

(b)    Deliveries by Buyer. At or prior to the Closing, Buyer shall deliver, or cause to be delivered, to Sellers, the following:

(i)    a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 6.03(a) and Section 6.03(b) has been satisfied;

(ii)    the payment of the Estimated Closing Consideration Amount in accordance with Section 2.01(b); and

(iii)    such other documents or instruments as Sellers reasonably request and are reasonably necessary to consummate the Contemplated Transactions.

Section 2.03    Purchase Price Adjustment.

(a)    Closing Estimates. Sellers shall deliver to Buyer, at least three (3) Business Days prior to the anticipated Closing Date, a written statement (the "Estimated Closing Statement") setting forth in reasonable detail Sellers' good faith estimates of the Assumed Payables with respect to each Pre-Petition Assigned Contract and each other Assigned Contract (collectively, the "Estimated Assumed Payables Amount"), which statement shall contain a calculation of each of the Assumed Payables and the Estimated Assumed Payables Amount. Sellers shall provide Buyer an opportunity to review and comment on the Estimated Closing Statement and Sellers will consider in good faith any adjustments reasonably requested by Buyer not later than one (1) Business Day prior to the anticipated Closing Date.

(b)    Post-Closing Adjustment. As soon as reasonably practicable, but no later than sixty (60) days following the Closing Date, Buyer shall deliver to Sellers a written statement (the "Closing Statement") setting forth in reasonable detail (i) Buyer's calculation of the Assumed Payables with respect to each Pre-Closing Assigned Contract and each other Assigned Contract (collectively, the "Assumed Payables Amount") and (ii) the resulting calculation of the Closing Consideration Amount (collectively, the "Closing Amounts").

(c)    Review; Disputes.

(i)    During the thirty (30) day period commencing upon receipt by Sellers of the Closing Statement (the "Review Period"), Buyer shall provide Sellers and any accountants or advisors

retained by Sellers with reasonable access to the books and records and personnel of Buyer in connection with the Business for the purpose of enabling Sellers and their accountants and advisors to calculate, and to review Buyer's calculation of, the Closing Amounts (the "Review Materials"); *provided* that Buyer shall not be required to provide access to information that would violate (A) any obligation of confidentiality to which Buyer or any of its Affiliates may be subject, (B) any attorney-client privilege, attorney work product protection, or other privilege associated with such information, or (C) any applicable Laws (the matters referred to in clauses (A), (B) and (C), the "Access Limitations"). If Sellers and Buyer disagree on the scope of the Review Materials to which Sellers are entitled under this Section 2.03(c)(i), such dispute shall be referred to the Designated Accounting Firm, who shall be instructed by the parties to resolve such dispute within fifteen (15) days of the appointment of the Designated Accounting Firm.

(ii)    If Sellers dispute the calculation of any of the Closing Amounts set forth in the Closing Statement, then Sellers shall deliver a written notice (a "Dispute Notice") to Buyer at any time during the Review Period. To be in proper form, each disagreement contained in a Dispute Notice must specify in reasonable detail the nature and amount of such disagreement, as well as a reasonable basis therefor and relevant supporting documentation and calculations (each specific item in disagreement meeting the requirements of this Section 2.03(c)(ii) and included in a timely Dispute Notice, a "Disputed Item"). Any other items and amounts that are not Disputed Items, and the calculation thereof, set forth in the Closing Statement shall be final and binding on the parties.

(iii)    If Sellers deliver to Buyer written notice that they agree with all Closing Amounts or do not deliver a Dispute Notice in proper form to Buyer prior to the expiration of the Review Period, Buyer's calculation of Closing Amounts set forth in the Closing Statement shall be deemed final and binding on Buyer and Sellers for all purposes of this Agreement.

(iv)    If Sellers deliver a Dispute Notice to Buyer prior to the expiration of the Review Period, then Sellers and Buyer shall use commercially reasonable efforts to reach agreement on the Disputed Items. In connection therewith, Sellers shall provide Buyer and its Representatives with access to information that Buyer reasonably requests relating to the Dispute Notice and Sellers' preparation thereof (and all information which bears on such calculation shall be deemed to be the subject of a reasonable request); *provided* that Sellers shall not be required to provide access to information which would violate the Access Limitations. Buyer and Sellers acknowledge and agree that the Federal Rules of Evidence Rule 408 (and any applicable similar state rule) shall apply to any such negotiations and communications by or on behalf of Buyer and Sellers.

(v)    If Sellers and Buyer are unable to reach agreement on the Disputed Items within fifteen (15) days after Sellers deliver a Dispute Notice, either party shall have the right to refer such dispute to an independent nationally recognized accounting firm that is mutually agreed upon by Buyer and Sellers (such firm, or any successor thereto, being referred to herein as the "Designated Accounting Firm") after such fifteenth (15th) day. In connection with the resolution of any such dispute by the Designated Accounting Firm (A) the Designated Accounting Firm shall act as an expert and not as an arbitrator, (B) none of Sellers, Buyer, or any of their respective Affiliates or Representatives shall have any *ex parte* communications or meetings with the Designated Accounting Firm regarding the subject matter hereof without the other parties' prior written consent, (C) Sellers and Buyer shall each submit to the Designated Accounting Firm the Closing Statement and the Dispute Notice, and shall have the opportunity to provide one (1) initial submission with support for such party's position and one (1) submission responding to the other party's initial submission (collectively, the "Dispute Submissions"), (D) the Designated Accounting Firm shall be instructed to determine the Closing Amounts in accordance with the terms of this Agreement within thirty (30) days after receipt of the Dispute Submissions, and upon reaching such determination shall deliver a copy of its calculations (the "Expert Calculations") to Sellers and Buyer, and (E) the determination made by the Designated Accounting Firm of the Closing Amounts that are in dispute shall be conclusive,

binding upon the parties, non-appealable, and not subject to further review absent manifest error, and shall be considered a final arbitration award that is enforceable pursuant to the terms of the Federal Arbitration Act. In calculating the Closing Amounts, the Designated Accounting Firm (1) shall be limited to addressing only those particular Disputed Items referred to in the Dispute Notice and will have no authority to make any adjustments to any financial statements or amounts other than any items on the Dispute Notice which Buyer and Sellers dispute, (2) shall be limited to reviewing the Dispute Submissions and, except as may be agreed in writing by Buyer and Sellers, the Designated Accounting Firm shall not be permitted to review any other materials or information, including any negotiations and/or settlement offers exchanged by the parties, (3) shall, with respect to any Disputed Item, not assign an amount greater than the higher amount calculated by Buyer or Sellers, as the case may be, or lower than the lower amount calculated by Buyer or Sellers, as the case may be, and (4) shall only apply the provisions of this Agreement concerning the determination of such amounts, and the decision of the Designated Accounting Firm shall be based solely upon the Dispute Submissions and the definitions and applicable provisions of this Agreement. The Expert Calculations shall reflect in detail the differences, if any, between the Closing Amounts reflected therein and the Closing Amounts set forth in the Closing Statement. The fees and expenses of the Designated Accounting Firm shall be allocated between Buyer, on the one hand, and Sellers, on the other hand, based upon the percentage which the portion of the contested amount not awarded to each party bears to the amount actually contested by such party.

(d)     Distributions.

(i)     If (x) the Closing Consideration Amount as finally determined pursuant to this Section 2.03 exceeds (y) the Estimated Closing Consideration Amount (such excess, the "Excess Amount"), then, no later than two (2) Business Days after such determination, Buyer shall pay to Sellers the Excess Amount.

(ii)     If (x) the Closing Consideration Amount as finally determined pursuant to this Section 2.03 is less than (y) the Estimated Closing Consideration Amount (such difference, the "Shortfall Amount"), then, no later than two (2) Business Days after such determination, Sellers shall pay to Buyer the Shortfall Amount.

(iii)     If not paid within the time period set forth above, the amount of the Excess Amount or the Shortfall Amount shall bear interest from and including the date such payment was to be made pursuant to this Section 2.03(d) up to and including the date of payment at a rate per annum equal to five percent (5%). Such interest shall be calculated daily on the basis of a 365-day year and the actual number of days elapsed, compounding at the end of each calendar month.

(e)     Adjustments for Tax Purposes. Any payments made pursuant to Section 2.03 shall constitute an adjustment of the Purchase Price for Tax purposes and shall be treated as such by the parties on their Tax Returns to the extent permitted by applicable Law.

Section 2.04     Payments. Payments made pursuant to this Article II shall be made by wire transfer of immediately available funds to an account designated by each recipient prior to the Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date hereof and as of the Closing Date.

Section 3.01    <u>Organization and Authority; Due Execution; Board Approval</u>.

(a)    Each Seller is a corporation duly organized, validly existing, and in good standing under the applicable Laws of its jurisdiction of incorporation and has full corporate power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by it and to carry on the Business as it has been and is currently conducted, subject to the entry of the Sale Order. Each Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which it is or will be a party, to carry out its obligations hereunder and thereunder and to consummate the Contemplated Transactions, subject to the entry of the Sale Order. The execution and delivery by each Seller of this Agreement and any other Transaction Document to which it is or will be a party, the performance by each Seller of its obligations hereunder and thereunder, and the consummation by each Seller of the Contemplated Transactions have been duly authorized by all requisite corporate action on the part of each Seller, subject to the entry of the Sale Order.

(b)    Subject to the entry of the Sale Order, (i) this Agreement has been duly executed and delivered by each Seller and (assuming due authorization, execution, and delivery by Buyer) constitutes a legal, valid, and binding obligation of each Seller, Enforceable against each Seller, (ii) when each other Transaction Document to which each Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal, valid, and binding obligation of such Seller, Enforceable against such Seller, and (iii) all corporate actions taken by Sellers in connection with this Agreement and the other Transaction Documents will be duly authorized on or prior to the Closing.

(c)    Each Seller has made available to Buyer true and correct copies of (i) its Organizational Documents and (ii) the minutes of all meetings of and written consents taken by its directors and stockholders during the past three (3) years. Sellers are not in breach of or default under any provision of their respective Organizational Documents. <u>Section 3.01(c) of the Seller Disclosure Schedule</u> sets forth a correct and complete list of the officers and directors of each Seller.

(d)    The Seller Board, by resolutions duly adopted by a majority vote at a meeting of all directors of Yield10 duly called and held, or by unanimous written consent in lieu of a meeting, and not subsequently rescinded, withdrawn, or modified in any way, has: (i) determined that this Agreement and the Contemplated Transactions, upon the terms and subject to the conditions set forth herein, are fair to, and in the best interests of, Yield10 and its stockholders and (ii) approved and declared advisable this Agreement, including the execution, delivery, and performance thereof, and the consummation of the Contemplated Transactions, upon the terms and subject to the conditions set forth herein.

Section 3.02    <u>No Conflicts; Consents</u>.

(a)    Subject to the entry of the Sale Order, the execution, delivery, and performance by each Seller of this Agreement and the other Transaction Documents to which it is or will be a party, and the consummation of the Contemplated Transactions do not and will not: (i) conflict with or result in a violation or breach of, or default under, any provision of the Organizational Documents of such Seller; (ii) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to such Seller; (iii) except as set forth in <u>Section 3.02(a) of the Seller Disclosure Schedule</u>, require the consent, notice, or other action by any Person under, conflict with, result in a material violation or material breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify, or cancel any Assigned Contract or any Permit affecting the Purchased Assets or the Business; or (iv) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) on any Purchased Asset.

(b)     Subject to the entry of the Sale Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Sellers in connection with the execution, delivery, and performance of this Agreement and the other Transaction Documents and the consummation of the Contemplated Transactions, except for such reports under the Exchange Act as may be required in connection with this Agreement and the Contemplated Transactions.

Section 3.03     Financial Statements; Undisclosed Liabilities.

(a)     True and correct copies of the audited consolidated financial statements of the Sellers, consisting of the consolidated balance sheets of the Sellers as at December 31 in each of the years 2022 and 2023 and the related consolidated statements of income and cash flow for the years then ended (the "Annual Financial Statements"), and unaudited consolidated financial statements consisting of the balance sheet of Yield10 as at June 30, 2024 and the related statements of income and cash flow for the three (3) month period then ended (the "Interim Financial Statements" and together with the Annual Financial Statements, the "Financial Statements") have been provided to Buyer. The balance sheet of Yield10 as of December 31, 2023 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date" and the balance sheet of Yield10 as of June 30, 2024 is referred to herein as the "Interim Balance Sheet" and the date thereof as the "Interim Balance Sheet Date".

(b)     The Financial Statements have been prepared in accordance with GAAP on the basis of the same accounting principles, policies, methods, and procedures, consistently applied, throughout the periods involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the amount and effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Annual Financial Statements). The Financial Statements are based on the books and records of Sellers and fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

(c)     Sellers do not have any material Liabilities with respect to the Business, including guarantees by Sellers of Liabilities of any other Person, except (i) Liabilities as and to the extent reflected on the Balance Sheet, (ii) Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date (none of which is a material Liability for breach of contract, breach of warranty, tort, infringement, or Action) and adequately reflected on the books and records of Sellers in connection with the Business, and (iii) obligations not in default under Contracts entered into by Sellers in the Ordinary Course of Business.

Section 3.04     [INTENTIONALLY OMITTED]

Section 3.05     Title to Purchased Assets; Real Property.

(a)     Sellers have good and valid title to, or a valid leasehold interest in, all of the Purchased Assets. All of the Purchased Assets (including leasehold interests) are free and clear of Encumbrances, other than Permitted Encumbrances.

(b)     Section 3.05(b) of the Seller Disclosure Schedule lists (i) the street address of each parcel of Real Property used in the Business, (ii) the applicable lease or sublease for each such parcel and, with respect to each such lease: (A) the landlord, (B) the rental amount currently being paid, and (C) the expiration date, and (iii) the current use of such Real Property. Sellers are not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to the possession, lease, occupancy, or enjoyment of any such Real Property. The use and operation of such Real Property in the conduct of the Business do not violate in any material respect any Law (including any applicable zoning, building, use,

safety or other similar Law), covenant, condition, restriction, easement, Permit, or Contract. To Sellers' Knowledge, no material improvements constituting a part of such Real Property encroach on real property owned or leased by a Person other than Sellers. There are no Actions pending nor, to Sellers' Knowledge, threatened against or affecting such Real Property or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain proceedings and no material unrepaired damage by casualty has occurred with respect thereto. The Real Property listed on <u>Section 3.05(b) of the Seller Disclosure Schedule</u> comprises all of the Real Property that is Related to the Business, and Sellers are not party to any Contract, including any option, to purchase any real property or any interest therein.

Section 3.06    <u>Condition and Sufficiency of Purchased Assets</u>.

(a)    The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles, and other items of Tangible Personal Property included within the Purchased Assets are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, in all material respects. None of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles or other items of Tangible Personal Property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost, and such buildings, plants, structures, furniture, fixtures, machinery, and equipment are supplied with utilities and other services necessary for the operation of the Business and are safe for their current occupancy and use, as applicable.

(b)    The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles, and other items of Tangible Personal Property included within the Purchased Assets, together with the intangible assets included within the Purchased Assets, are sufficient for the continued conduct of the Business immediately after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business from and after the Closing. Upon (i) the purchase and acquisition of the Purchased Assets in accordance with this Agreement and (ii) receipt by Buyer of the services and benefits available or otherwise offered by Sellers or their Affiliates to Buyer or its Affiliates under the Ancillary Documents, Buyer shall have, directly or indirectly, immediately following the Closing, the assets, properties, rights and services sufficient to operate the Business immediately following the Closing in substantially the same manner as the Business is currently being conducted.

Section 3.07    <u>Intellectual Property</u>.

(a)    <u>Section 3.07(a) of the Seller Disclosure Schedule</u> contains a complete and correct list of (i) all Business IP Registrations, specifying as to each, as applicable: the title, mark, or design; the record owner and inventor(s), if any; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; the issue, registration, or filing date; and the current status, (ii) all unregistered Trademarks included in the Business Owned Intellectual Property, (iii) all proprietary Software used or held for use in connection with the Business, and (iv) all other Business Owned Intellectual Property used or held for use in the Business that is material to the conduct of the Business.

(b)    <u>Section 3.07(b) of the Seller Disclosure Schedule</u> contains a complete and correct list of all Business IP Agreements separately identifying the Business IP Agreements (i) under which Sellers are licensors or otherwise grant to any Person any right or interest relating to any Business Intellectual Property, (ii) under which Sellers are licensees or otherwise granted any right or interest relating to the Intellectual Property of any Person, other than licenses for Off-the-Shelf Software, and (iii) which otherwise relate to Sellers' ownership or use of Intellectual Property in connection with the Business, in each case identifying the Intellectual Property covered by such Business IP Agreement. Sellers have made available to Buyer true and correct copies (or in the case of any oral agreements, a complete and correct written

description) of all Business IP Agreements, other than licenses for Off-the-Shelf Software, including all modifications, amendments, and supplements thereto and waivers thereunder. Each Business IP Agreement is Enforceable against Sellers and, to Sellers' Knowledge, is Enforceable against each other party thereto. Neither Sellers nor any other party thereto are, or are alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Business IP Agreement, with the exception that Seller is in breach of its patent license agreement with University of Missouri and plans to let the patent license agreement lapse.

(c)     Sellers are the sole and exclusive legal and beneficial, and with respect to the Business IP Registrations, record, owners of all right, title, and interest in and to the Business Owned Intellectual Property, and have the valid and Enforceable right to use all other Intellectual Property used or held for use in or necessary for the conduct of the Business, in each case, free and clear of Encumbrances other than Permitted Encumbrances. Sellers have not granted any Person any right to control the prosecution or registration of, or commence, defend, or otherwise control any Action with respect to, any (i) Business Owned Intellectual Property or (ii) Business Licensed Intellectual Property for which Sellers have been granted the right to control prosecution, registration, or any Actions with respect thereto (as applicable). Sellers have entered into Enforceable written Contracts with each current and former Employee and Independent Contractor whereby such Employee or Independent Contractor (A) acknowledges Sellers' exclusive ownership of all Intellectual Property invented, created, or developed by such Employee or Independent Contractor within the scope of such Person's employment or engagement with Sellers, (B) grants to Sellers a present, irrevocable assignment of any ownership interest such Employee or Independent Contractor may have in or to such Intellectual Property, and (C) irrevocably waives any right or interest, including any moral rights, regarding any such Intellectual Property, to the extent permitted by applicable Law. Sellers have made available to Buyer true and correct copies of all such Contracts. All assignments and other instruments necessary to establish, record, and perfect Sellers' ownership interest in the Business IP Registrations have been validly executed, delivered, and filed with the relevant Governmental Authorities and authorized registrars. Any payments due by Law or Contract from Sellers to inventors, authors, or other creators of Business Owned Intellectual Property have been made.

(d)     All of the Business Intellectual Property is valid and Enforceable, and all Business IP Registrations are subsisting and in full force and effect. Sellers have taken all reasonable and necessary steps to maintain and enforce the Business Intellectual Property and to preserve the confidentiality of all Trade Secrets included in the Business Intellectual Property, including by requiring all Persons having access thereto to execute binding, written non-disclosure agreements. Sellers have provided Buyer with true and correct copies of all such Contracts. All required filings and fees related to the Business IP Registrations have been timely submitted with and paid to the relevant Governmental Authorities and authorized registrars, and Section 3.07(d) of the Seller Disclosure Schedule contains a complete and correct list of all filings and fees due in the next ninety (90) days with respect to the Business IP Registrations. Sellers have made available to Buyer true and correct copies of all file histories, documents, certificates, office actions, correspondence, assignments, and other instruments relating to the Business IP Registrations.

(e)     Neither the execution, delivery nor performance of this Agreement, nor the consummation of the Contemplated Transactions, will result in the loss or impairment of, or require the consent of any other Person in respect of Sellers' right to own or use any Business Intellectual Property or Business Licensed Intellectual Property, as applicable.

(f)     Other than pending challenges by Buyer regarding Buyer's patents and patent applications related to Omega-3 technology, of which Yield10 was made aware by letter dated May 24, 2024, previous discussions between Seller and BASF Corporation regarding potential licensing from BASF Corporation of Camelina varieties that produce land-based Omega-3 docosahexaenoic acid and eicosapentaenoic acid oils, of which Buyer was made aware, and previous discussions between Seller and

Broad/Corteva regarding the requirement for third parties to obtain a commercial license to CRISPR technology to use Seller's E3902 Camelina line, FAE1 deletion mutants, and C3007 gene trait, of which Buyer was made aware, (i) there have been no Actions (including any interference, opposition, reissue, re-examination, inter partes review, or post grant review), whether settled, pending or threatened (including in the form of offers to obtain a license) (A) challenging Sellers' rights to exploit any of the Business Intellectual Property, (B) alleging any infringement, misappropriation, or other violation by Sellers of the Intellectual Property rights of any Person, (C) challenging the validity, enforceability, registrability, patentability, or ownership of any Business Owned Intellectual Property, or Sellers' right, title, or interest in or to any Business Owned Intellectual Property or Business Licensed Intellectual Property, or (D) by Sellers alleging any infringement, misappropriation, or other violation by any Person of the Business Intellectual Property, and (ii) to Sellers' Knowledge, there are no facts, circumstances, or conditions that could reasonably be expected to form the basis for such an Action. Sellers are not subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or could reasonably be expected to restrict or impair the use of any Business Intellectual Property.

(g)     Other than with respect to pending challenges by Buyer regarding Buyer's patents and patent applications related to Omega-3 technology, of which Yield10 was made aware by letter dated May 24, 2024, previous discussions between Seller and BASF Corporation regarding potential licensing from BASF Corporation of Camelina varieties that produce land-based Omega-3 docosahexaenoic acid and eicosapentaenoic acid oils, of which Buyer was made aware, and previous discussions between Seller and Broad/Corteva regarding the requirement for third parties to obtain a commercial license to CRISPR technology to use Seller's E3902 Camelina line, FAE1 deletion mutants, and C3007 gene trait, of which Buyer was made aware, (i) the conduct of the Business as currently and formerly conducted and as currently proposed to be conducted, including the use of the Business Intellectual Property in connection therewith, and the products, processes and services of Sellers in connection with the Business, have not infringed, misappropriated, or otherwise violated, and will not infringe, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person, and (ii) to Sellers' Knowledge, no Person has infringed, misappropriated, or otherwise violated any Business Intellectual Property.

(h)     Sellers have not received any opinion of counsel that the conduct of the Business, or the practice or other exploitation of any Business Intellectual Property, has infringed, misappropriated, diluted, or otherwise violated, or will infringe, misappropriate, dilute, or otherwise violate, any Intellectual Property rights of any other Person.

(i)     All prior art and information known to Sellers in connection with the Business and material to the patentability of the Patents included in the Business Owned Intellectual Property was disclosed to the relevant Governmental Authority during the prosecution of the Patents included in the Business IP Registrations in accordance with applicable Laws. Sellers have not nor, to Sellers' Knowledge, has any other Person, made any untrue statement of a material fact or fraudulent statement or omission to any applicable Governmental Authority regarding any pending or issued Patent claims included in the Business IP Registrations. Each of the Patents included in the Business IP Registrations properly identifies each and every inventor of the claims thereof as determined in accordance with the Laws of the jurisdiction in which such Patent is issued or pending.

(j)     Except as described in <u>Section 3.07(j) of the Seller Disclosure Schedule</u>, no funding, facilities or personnel of any Governmental Authority were used, directly or indirectly, to develop or create, in whole or in part, any Business Owned Intellectual Property, and no such Governmental Authority has any right to, or right to royalties or other payment for, or to impose any requirement on the manufacture or commercialization of any product incorporating, Business Intellectual Property.

(k)    No funding, facilities, or personnel of any educational or research institution, non-profit organization or any private entity other than Sellers was used to develop or create in whole or in part, any of Business Owned Intellectual Property, and no such institution or entity has any right to, or right to royalties or other payment for, or to impose any requirement on the manufacture or commercialization of any product incorporating, Business Owned Intellectual Property.

(l)    Sellers have not used any Open Source Materials in connection with the Business in a manner that requires any of the Business Owned Intellectual Property, or any portion thereof, to be subject to any Open Source License. Sellers are in compliance in all material respects with terms of all relevant licenses (including all requirements related to notices and making source code available to third parties) for all Open Source Materials Related to the Business.

(m)    Sellers are not and have not been, nor are or have any current or former Employee been, a member of or participated in the work of any standard setting organization, standard development organization, or patent pool, or may otherwise be obligated to license any Business Owned Intellectual Property on "reasonable and non-discriminatory" terms or "fair, reasonable, and non-discriminatory" terms, or to grant a non-assert or a covenant not to sue in relation to Business Intellectual Property.

Section 3.08    IT Systems.

(a)    All Software, computer hardware, servers, networks, platforms, Software services, communications networks (including telecommunications networks and systems for voice, data, and video), peripherals, and similar or related items of automated, computerized, or other information technology networks and systems Related to the Business that are owned, leased, licensed, or used (including through cloud-based or other third-party service providers) by Sellers ("IT Systems") are (i) in good working order in all material respects, (ii) have no material defects, (iii) include safeguards and security, including physical and electronic access controls, data backup, and disaster recovery systems in accordance in all material respects with current, generally accepted industry standards and practices, and (iv) are adequate and sufficient in all material respects for the operation of the Business as currently conducted and as proposed to be conducted.

(b)    In the past three (3) years, there has been no material malfunction, failure, continued substandard performance, denial-of-service, or other cyber incident, including any cyberattack or other impairment of the IT Systems. The IT Systems are free of any Harmful Code, and Sellers have taken all commercially reasonable steps to detect and remove any Harmful Code in their IT Systems and to safeguard the confidentiality, availability, security, and integrity of the IT Systems, including implementing and maintaining appropriate backup, disaster recovery, and Software and hardware support arrangements.

(c)    All third-party Software used in or comprising an IT System, including Software applications approved by Sellers for use on Personal Devices, are used in all material respects in accordance with valid Software license agreements and such licenses and related maintenance agreements will remain in effect notwithstanding the Contemplated Transactions.

Section 3.09    Privacy and Data Security.

(a)    Sellers have policies and procedures to provide secure remote access from personal devices, such as personal computers, cell phones, laptops, and tablet computers ("Personal Devices"), to the IT Systems and Sellers have processes to enable them to delete confidential, proprietary, and personal information stored on such Personal Devices.

(b)     Sellers, and to Sellers' Knowledge, all vendors, processors, or other third parties acting for or on behalf of Sellers in connection with the collection, receipt, access, use, handling, compilation, creation, analysis, monitoring, maintenance, retention, storage, transmission, transfer, protection, disclosure, distribution, destruction, or disposal of Personal Information in the conduct of the Business ("Processing"), or that otherwise have been authorized to have access to Personal Information in the possession or control of Sellers in the conduct of the Business, comply and at all times in the past three (3) years have complied in all material respects with (i) all applicable Privacy Laws, (ii) rules of self-regulatory organizations, including the Payment Card Industry Data Security Standard, (iii) industry standards, guidelines, and best practices for data security, including the National Institute of Standards and Technology (NIST) Cybersecurity Framework, (iv) Sellers' Privacy and Data Security Policies, and (v) applicable contractual obligations concerning the Processing of Personal Information to which Sellers are a party or otherwise bound.

(c)     In the past three (3) years, (i) to Sellers' Knowledge, no Personal Information in the possession or control of Sellers or held or Processed by any vendor, processor, or other third party for or on behalf of Sellers, in each case, in connection with the Business, have been subject to any data breach or other security incident that has resulted in unauthorized access, disclosure, use, denial of use, alteration, corruption, destruction, compromise, or loss of such Personal Information or that has caused or would reasonably be expected to cause a disruption to the conduct of the Business (a "Security Incident") and (ii) Sellers have not notified and, to Sellers' Knowledge, there have been no facts or circumstances that would require Sellers to notify, any Governmental Authority or other Person of any Security Incident.

(d)     In the past three (3) years, Sellers have not received any notice, request, claim, complaint, correspondence, or other communication in writing from any Governmental Authority or other Person, and to Sellers' Knowledge there has not been any audit, investigation, enforcement action (including any fines or other sanctions), or other Action, relating to any actual, alleged, or suspected Security Incident or violation of any Privacy Law, Sellers' Privacy and Data Security Policy, any contractual agreement relating to the Processing of Personal Information, or any Person's individual privacy rights involving Personal Information in the possession or control of Sellers, or held or processed by any vendor, processor, or other third party for or on behalf of Sellers, in each case, in connection with the Business, and there are no facts or circumstances that would reasonably be expected to give rise to any of the foregoing.

(e)     Sellers have at all times in the past three (3) years maintained, and required all vendors, processors, or other third parties that Process any Personal Information for or on behalf of Sellers to implement and maintain, commercially reasonable security measures, plans, procedures, controls, and programs to (i) identify and address internal and external risks to the privacy and security of Personal Information in their possession or control in connection with the Business, (ii) implement, monitor, and improve adequate and effective administrative, technical, and physical safeguards to protect such Personal Information, and (iii) provide notification in compliance with applicable Privacy Laws in the case of any Security Incident.

(f)     For the past three (3) years, Sellers have posted to their websites and any mobile applications their Privacy and Data Security Policy. No disclosure or representation made or contained in such Privacy and Data Security Policy has been inaccurate, misleading, deceptive, or in violation of any applicable Privacy Laws (including by containing any material omission). Sellers and, to Sellers' Knowledge, any vendor, processor, or other third-party Processing Personal Information for or on behalf of Sellers in connection with the Business are and have been in compliance with such Privacy and Data Security Policies in all material respects.

(g)     The execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions do not and will not: (i) conflict with or result in a violation or breach of any Privacy Laws or Sellers' Privacy and Data Security Policies (as currently existing or as existing at any time during which any Personal Information was collected or Processed by or for Sellers) or (ii) require the consent of or notice to any Person concerning such Person's Personal Information.

(h)     For the past two and one half (2.5) years, Sellers have maintained a cyber insurance policy that is adequate and suitable for the nature and volume of Personal Information Processed by or on behalf of Sellers in connection with the Business. Sellers have made available to Buyer a true and correct copy of such cyber insurance policy.

Section 3.10    Assigned Contracts. Each Assigned Contract is Enforceable against Sellers, and to Sellers' Knowledge, is Enforceable against each other party to such Contract. Neither Sellers nor, to Sellers' Knowledge, any other party thereto is in material breach of or default under (or is alleged to be in material breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. True and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer.

Section 3.11    Suppliers.

(a)     Sellers have not received any written notice or, to Sellers' Knowledge, oral notice, and have no reason to believe, that any supplier of goods or services to the Business has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its supply of goods or services in connection with the Business.

(b)     Sellers have no sole-source supplier of significant goods or services with respect to the Business (other than utilities) with respect to which practical alternative sources are not reasonably available on substantially equivalent terms and conditions.

Section 3.12    Insurance. Section 3.12 of the Seller Disclosure Schedule sets forth a complete and correct list of all current policies and binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors' and officers' liability, fiduciary liability, and other casualty and property insurance maintained by Sellers and primarily relating to the assets, business, operations, employees, officers, and directors of the Business (collectively, the "Insurance Policies") and true and correct copies of such Insurance Policies have been made available to Buyer. The Insurance Policies are in full force and effect. Sellers have not received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of the Insurance Policies. All premiums due on the Insurance Policies have either been paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each Insurance Policy. The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based liability on the part of Sellers. All of the Insurance Policies (a) are valid and binding in accordance with their terms and (b) have not been subject to any lapse in coverage. Sellers are not in default under, and have not otherwise failed to comply in any material respect with any provision contained in, any Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Business and are sufficient for compliance with all applicable Laws and Contracts to which Sellers are a party or by which they are bound. There are no claims related to the Business pending under any of the Insurance Policies as to which coverage has been questioned, denied, or disputed or in respect of which there is an outstanding reservation of rights.

Section 3.13    <u>Legal Proceedings; Governmental Orders</u>. Except in connection with the Chapter 11 Case:

(a)    There have been no Actions pending or threatened in writing (i) against or by Sellers or (ii) against any director, officer, or employee of Sellers acting in their capacity as such who has a right to seek indemnification from Sellers, in each case, in connection with the Business. No event has occurred or circumstances exist that may give rise to, or serve as a reasonable basis for, any such Action. There are no pending or threatened whistleblower claims concerning Sellers (including any employees thereof) in connection with the Business.

(b)    There are no Actions pending in which Sellers are plaintiff or claimant, and no event has occurred or circumstances exist to Sellers' Knowledge that would give rise to, or serve as a reasonable basis for, any such Action, in each case, in connection with the Business.

(c)    There are no outstanding Governmental Orders and no unsatisfied judgments, penalties, or awards against or affecting Sellers in connection with the Business or any of the Purchased Assets.

Section 3.14    <u>Compliance With Laws; Permits</u>.

(a)    Sellers have complied, and are now complying, in all material respects with all Laws applicable to the Business.

(b)    In connection with the Business, Sellers have not, nor, to the Sellers' Knowledge, have any of their directors, officers, agents, employees, or representatives, violated the Foreign Corrupt Practices Act of 1977, the U.S. Bank Secrecy Act, or the Corruption of Foreign Public Officials Act (Canada), each as amended, any rules or regulations thereunder, or any other applicable anti-corruption or anti-kickback Law of any jurisdiction (collectively, "<u>Anti-corruption Laws</u>"), and none of the foregoing Persons have been involved, or are currently involved, in any investigation or have received notice of any current or past complaint of an anti-corruption, anti-bribery, or anti-money laundering issue or violation of any Anti-corruption Laws, or have received any notice of investigation by a Governmental Authority with respect to any alleged non-compliance with any Anti-corruption Laws.

(c)    In connection with the Business, neither Sellers nor any of their directors, officers, agents, employees, or representatives or other persons acting on their behalf has been or is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(d)    All material Permits required for Sellers to conduct the Business have been obtained by them and are valid and in full force and effect. All fees and charges with respect to such Permits have been paid in full. <u>Section 3.14(d) of the Seller Disclosure Schedule</u> contains a complete and correct list of all current Permits issued to Sellers in connection with the Business, including the names of the Permits and their respective dates of issuance and expiration. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse, or limitation of any such Permit.

Section 3.15    <u>Taxes</u>.

(a)    All Tax Returns required to be filed by on or behalf of Sellers with respect to the Business on or before the Closing Date have been, or will be, timely filed with the appropriate Governmental Authority (taking into account applicable extensions of time to file). All such Tax Returns

are, or will be, true, complete and correct in all respects. All Taxes due and owing by Sellers with respect to the Business (whether or not shown on any Tax Return) have been, or will be, timely paid. All Taxes required to have been paid by or on behalf of Sellers with respect to the Business on or before the Closing Date, regardless of whether such Taxes are required to have been shown on any Tax Return, have been timely paid to the appropriate Governmental Authority.

(b)     There are no Encumbrances for Taxes upon any of the Purchased Assets and no Governmental Authority is in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(c)     There are no Tax audits, examinations, investigations or other claims or assessments pending or threatened in writing against or with respect to Sellers.

(d)     There are not currently in force any waivers, agreements or other arrangements extending the period for assessment or collection of any Taxes (including any applicable statute of limitation) by or on behalf of Sellers.

(e)     Sellers have complied in all respects with all applicable Laws relating to the payment and withholding of Taxes and have properly and timely withheld all Taxes required to be withheld by Sellers in connection with amounts paid or owing to any employee, former employee, independent contractor, creditor, shareholder, Affiliate, customer, supplier, or other Person as it relates to the Business. Sellers have properly and timely paid all such withheld Taxes to the appropriate Governmental Authority or have properly set aside such withheld amounts in accounts for such purpose.

(f)     Neither Seller has been a member of an affiliated, combined, consolidated, or unitary Tax group for Tax purposes, other than a group the common parent of which is Yield10. Sellers have no Liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise. Sellers are not a party to, nor is bound by, any Tax indemnity agreement, Tax sharing agreement or Tax allocation agreement (other than any agreement entered into in the Ordinary Course of Business the principal purpose of which is not related to Taxes). Sellers are not, nor has ever been, a party to a "reportable transaction" within the meaning of Section 6707A of the Tax Code and Treasury Regulation Section 1.6011-4(b).

(g)     Sellers have made available to Buyer true and correct copies of (i) the portion of Sellers' federal Tax Returns primarily relating to the Business for taxable periods since January 1, 2021, (ii) any state, local, or foreign Tax Returns of the Business since January 1, 2021, and (iii) any audit report or statement of deficiencies assessed against, agreed to by, or with respect to Sellers for all Tax periods ending after January 1, 2021.

(h)     None of the Purchased Assets is (i) required to be treated as being owned by another person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, (ii) subject to Section 168(g)(1)(A) of the Tax Code, or (iii) subject to a disqualified leaseback or long-term agreement as defined in Section 467 of the Tax Code.

(i)     None of the Purchased Assets is tax-exempt use property within the meaning of Section 168(h) of the Tax Code.

(j)     No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any Governmental Authority with respect to Taxes of Sellers or with respect to the Business.

(k)    No written claim has been made by any Governmental Authority in any jurisdiction where a Seller does not file Tax Returns that such Seller is, or may be, subject to Tax in that jurisdiction. Neither Seller has any branch or permanent establishment (within the meaning of any applicable tax treaty) in any country other than the country of its formation.

Section 3.16    Employment Matters.

(a)    Except as set forth in Section 3.16(a) of the Seller Disclosure Schedule, (i) all compensation, including wages, commissions, and bonuses, payable to all Employees or Independent Contractors for services performed on or prior to the date hereof have been paid in full, (ii) there are no Actions with respect to payment of compensation, commission, bonuses, wages, salary or overtime pay that are pending or, to Sellers' Knowledge, threatened before any Governmental Authority with respect to any Employees or Independent Contractors, and (iii) there are no outstanding agreements, undertakings, or commitments of Sellers with respect to any compensation, commissions, or bonuses of any Employees or Independent Contractors that have not been made available to Buyer.

(b)    The employment of each Employee is "at will," and can be terminated at any time without Liability to Sellers. Except as set forth in Section 3.16(b) of the Seller Disclosure Schedule, Sellers are not a recipient of any outsourced or temporary labor from any third party or contracts with a professional employer organization, staffing agency, or similar entity in relation to the Business. No management-level Employee has informed Sellers of any plan to terminate employment and, to Sellers' Knowledge, no such person has any plans to terminate employment with Sellers. To Sellers' Knowledge, no Employee is a party to or bound by any Contract that (i) could adversely affect the performance of such Employee's duties other than for the benefit of the Business, (ii) could adversely affect the ability of Sellers to conduct the Business, (iii) restricts or limits in any way the scope or type of work in which such Employee may be engaged other than for the benefit of the Business, or (iv) requires such Employee to transfer, assign, or disclose information concerning such Employee's work to anyone other than Sellers.

(c)    Neither Seller is, or has ever been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council, or labor organization (collectively, "Union") in connection with the Business, and there is not, and there has never been, to Sellers' Knowledge, any Union representing or purporting to represent any Employee, and no Union or group of such Employees is seeking or has sought to organize Employees for the purpose of collective bargaining. Similarly, neither Seller is, or has ever been, a party to, bound by, or negotiating any neutrality agreement, labor harmony agreement, labor peace agreement or other similar Contract. Sellers are not and, never have been, subject to any charge, demand, petition, representation proceeding, or picketing seeking to compel, require, or demand them to bargain with any Union in relation to the Business. Sellers have not committed any unfair labor practice in relation to the Business and there is no pending or, to Sellers' Knowledge, threatened complaint regarding any alleged unfair labor practice in relation to the Business, nor is there any pending grievance (including a grievance which has been arbitrated and is awaiting on a decision and award) pursuant to any collective bargaining agreement or other Contract. There has never been, nor is there currently pending, any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime, picketing, or other similar labor disruption or dispute affecting Sellers in relation to the Business. Sellers have no duty to bargain with any Union in connection with the Business.

(d)    Sellers are and have been in compliance in all material respects with all applicable Laws pertaining to employment and employment practices in the conduct of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration (including work visas and employment authorization), wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, plant closures and layoffs, affirmative action,

pay transparency, pay equity, working conditions, meal and break periods, privacy, occupational health and safety, workers' compensation, paid sick leave, leaves of absence, and unemployment insurance, and the collection and payment of withholding Tax, social security Tax, and similar Tax arising from the conduct of the Business. All Persons characterized and treated by Sellers as Independent Contractors satisfy (or satisfied) the requirements of applicable Laws to be treated as independent contractors, including wage Laws and Laws applicable to employee benefits, and no current or former Independent Contractor is (or was) entitled to be classified as an employee of Sellers. To Sellers' Knowledge, no current or former Independent Contractor has made any claim, whether verbally or in writing, that they are (or were), or should be (or should have been) classified as, an employee of Sellers. All current Employees classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are (or were) properly classified.

(e)    Sellers are, and since January 1, 2018 have been, in compliance in all material respects with the requirements of the Immigration Reform Control Act of 1986 in the conduct of the Business, including maintaining timely, accurate and complete Form I-9s with respect to each of its former and current Employees as required by and in accordance with applicable Law concerning immigration and employment eligibility verification obligations. All Employees who are performing services in the United States are legally permitted to work in the United States and will be legally permitted to work in the United States and to perform services for Buyer immediately following the consummation of the Contemplated Transactions. Sellers have not received any written correspondence from the United States Social Security Administration advising of a "no-match" between any current or former Employee's name and social security number, and there has been no alleged mismatch between the name and social security number of any current or former Employee. To Sellers' Knowledge, each Employee is legally permitted to be employed by the applicable entity in the jurisdiction in which such Employee is employed in such Employee's current job capacities for the maximum period allowed under applicable Law.

(f)    There have been no Actions against Sellers or their Affiliates and there are no Actions pending, or to Sellers' Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, Employee, Independent Contractor, volunteer, or intern of Sellers arising from the conduct of the Business, including any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, reasonable accommodation, disability rights or benefits, immigration, employee classification, child labor, privacy, workers' compensation, or workplace safety and insurance claims, paid sick leave, wage and hours or any other labor or employment related matter arising under applicable Laws. Neither Seller is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices in connection with the Business. There are no pending claims against Sellers or their Affiliates under any workers' compensation plan or policy or for long-term disability in connection with to the Business.

(g)    Since January 1, 2020, no allegations of discrimination, sexual harassment or misconduct in the course of being employed by Sellers have been made against (i) any Employee holding a managerial position, or any current or former officer or director of Sellers, or (ii) Sellers' service provider, in each case, in connection with the Business. Sellers have not entered into any settlement agreement or conducted any investigation related to allegations of sexual harassment or sexual misconduct by or regarding any employee or other Representative of Sellers arising from the conduct of the Business.

(h)    Sellers have complied, and are in compliance, in all material respects with the Families First Coronavirus Response Act and all similar applicable state and local Laws, including the provision of paid leave benefits required thereunder and any applicable recordkeeping requirements, in each case, in the conduct of the Business. Sellers are and have been in compliance in all material respects with all applicable Laws related to COVID-19 in the workplace in the conduct of the Business, including

occupational health and safety Laws, Laws pertaining to confidentiality of employee medical information, Laws pertaining to sick leave or family and medical leave, and Laws pertaining to vaccination mandates (and exemptions therefrom).

(i)    Since January 1, 2021, Sellers have not implemented or been involved in any "mass layoff", "plant closing" or similarly defined conduct (as defined in the WARN Act) in connection with the Business. Sellers are, and at all material times have been, in compliance with the WARN Act, and have no plans to undertake any action before the Closing Date that would trigger the WARN Act.

Section 3.17    Employee Benefit Matters.

(a)    Each Benefit Plan and any related trust has been established, administered, and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Tax Code). Each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Tax Code (a "Qualified Benefit Plan") is so qualified and received a favorable and current determination letter from the Internal Revenue Service, or with respect to a prototype or volume submitter plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan or volume submitter plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Tax Code, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject Sellers or any of their ERISA Affiliates or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to tax or penalty under Sections 4975 or 4980H of the Tax Code. Sellers have not taken any corrective action or made a filing under any voluntary correction program of the Internal Revenue Service, Department of Labor, or any other Governmental Authority with respect to any Benefit Plan, and, to Sellers' Knowledge, there are no material plan defects with respect to any Benefit Plan that would qualify for correction under any such program.

(b)    Neither Sellers nor any of their ERISA Affiliates have, in connection with the Business, (i) violated any of the health care continuation requirements of COBRA, the requirements of the FMLA, the requirements of the Health Insurance Portability and Accountability Act of 1996, the requirements of the Women's Health and Cancer Rights Act of 1998, the requirements of the Newborns' and Mothers' Health Protection Act of 1996, the Patient Protection and Affordable Care Act, the Health Care and Education Reconciliation Act of 2010, or any amendment to each such act, or any similar provisions of state Law, (ii) incurred or reasonably expect to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA or related provisions of the Tax Code or any Tax or penalty under Section 4975 or 4980 of the Tax Code or the Patient Protection and Affordable Care Act of 2010, as amended, (iii) engaged in any transaction which would give rise to liability under Section 4069 or Section 4212(c) of ERISA, (iv) incurred taxes under Section 4971 of the Tax Code with respect to any Benefit Plan, or (v) maintained, established, sponsored, participated in, or contributed to any self-insured plan that provides benefits to employees (including any such plan pursuant to which a stop-loss policy or contract applies).

(c)    With respect to each Benefit Plan: (i) no such plan is a multiemployer plan within the meaning of Section 3(37) of ERISA, (ii) no such plan is a "multiple employer plan" within the meaning of Section 413(c) of the Tax Code, a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA), a "funded welfare plan" (within the meaning of Section 419 of the Tax Code) or a "voluntary employees' benefit association" (as defined in Section 501(c)(9) of the Tax Code), (iii) no Action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan, (iv) no such plan or the plan of any ERISA Affiliate is subject to Title IV of ERISA or the

minimum funding requirements of Section 412 of the Tax Code, and (v) no "reportable event," as defined in Section 4043 of ERISA, with respect to which the reporting requirement has not been waived, has occurred with respect to any such plan.

(d)     No Benefit Plan provides post-termination or retiree health benefits to any Person for any reason other than as required under Sections 601 to 608 of ERISA or other applicable Law.

(e)     There is no pending or, to Sellers' Knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the six (6) years prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under or is a participant in, an amnesty, voluntary compliance, self-correction, or similar program sponsored by any Governmental Authority.

(f)     There has been no amendment to, announcement by Sellers or any of their Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year (other than on a *de minimis* basis) with respect to any Employee, Independent Contractor, director, or officer of Sellers who performs services in connection with the Business. Neither Sellers nor any of their Affiliates have any commitment or obligation or have made any representations to any such Employee, Independent Contractor, director, or officer, whether or not legally binding, to adopt, amend, modify, or terminate any Benefit Plan.

(g)     Each Benefit Plan that is subject to Section 409A of the Tax Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Tax Code and all applicable regulatory guidance (including notices, rulings, and proposed and final regulations) thereunder. Sellers have no obligation to gross up, indemnify, or otherwise reimburse any Person for any excise taxes, interest, or penalties incurred pursuant to Section 409A or 4999 of the Tax Code.

(h)     Neither the execution of this Agreement nor the consummation of the Contemplated Transactions will (either alone or upon the occurrence of any additional or subsequent events) (i) entitle any current or former director, officer, Employee or Independent Contractor of Sellers to severance pay or any other payment, (ii) accelerate the time of payment, funding, or vesting or increase the amount of compensation (including stock-based compensation) due to any such Person, (iii) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan, (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Tax Code, or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Tax Code.

Section 3.18     Environmental Matters.

(a)     Sellers are currently and have been in compliance in all material respects with all Environmental Laws that are applicable to the Business and the Purchased Assets and have not received from any Person any (i) Environmental Notice or Environmental Claim or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date, in each case, with respect to the Business or the Purchased Assets.

(b)     Sellers have obtained and are in material compliance with all Environmental Permits (each of which is disclosed in Section 3.18(b) of the Seller Disclosure Schedule) necessary for the ownership, lease, or use of the Purchased Assets and the operation of the Business and all such

Environmental Permits are in full force and effect and shall be maintained in full force and effect by Sellers through the Closing Date in accordance with Environmental Law. To Sellers' Knowledge, no condition, event, or circumstance exists that could reasonably be expected to prevent or impede, after the Closing Date, the conduct of the Business or the ownership, lease, operation or use of the Purchased Assets. With respect to any such Environmental Permits, Sellers have undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of the same, and Sellers are not aware of any condition, event or circumstance that might prevent or impede the transferability of the same, and have not received any Environmental Notice or written communication regarding any Material Adverse Effect in the status or terms and conditions of the same.

(c)     To Sellers' Knowledge, no Purchased Assets or Real Property currently or formerly owned, operated, or leased by Sellers in connection with the Business is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)     To Sellers' Knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the Business or the Purchased Assets or any Real Property currently or formerly owned, operated, or leased by Sellers in connection with the Business, and Sellers have not received an Environmental Notice that any Real Property currently or formerly owned, operated, or leased in connection with the Business (including soils, groundwater, surface water, buildings, and other structures located on any such Real Property) has been contaminated with any Hazardous Material that could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, Sellers.

(e)     Section 3.18(e) of the Seller Disclosure Schedule contains a complete and correct list of all active or abandoned aboveground or underground storage tanks owned or operated by Sellers in connection with the Business or the Purchased Assets.

(f)     Section 3.18(f) of the Seller Disclosure Schedule contains a complete and correct list of all off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by Sellers in connection with the Business or the Purchased Assets as to which Sellers may retain liability, and none of these facilities or locations has been placed or proposed for placement on the National Priorities List (or CERCLIS) under CERCLA, or any similar state list, and Sellers have not received any Environmental Notice regarding potential Liabilities with respect to such off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by Sellers.

(g)     Sellers have not retained or assumed, by Contract or operation of Law, any Liabilities of third parties under Environmental Law in connection with the Business or the Purchased Assets.

(h)     Sellers have made available to Buyer and listed in Section 3.18(h) of the Seller Disclosure Schedule (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models, and other similar documents with respect to the Business or Purchased Assets or any currently or formerly owned, operated, or leased Real Property that are in the possession or control of Sellers related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials and (ii) any and all material documents concerning planned or anticipated capital expenditures required for the Business to reduce, offset, limit, or otherwise control pollution and/or emissions, manage waste, or otherwise ensure compliance with current or future Environmental Laws (including costs of remediation, pollution control equipment, and operational changes).

(i)     To Sellers' Knowledge, no condition, event, or circumstance concerning the Release or regulation of Hazardous Materials exists that, after the Closing Date, could reasonably be expected to prevent, impede, or materially increase the costs associated with the ownership, lease, operation, performance, or use of the Purchased Assets or the operation of the Business.

(j)     To Sellers' Knowledge, there has been no unintended release of any Trait developed or used by Sellers into the environment in any jurisdiction in which such Trait has not been deregulated.

Section 3.19     <u>Related Party Transactions</u>. No officer or director of either Seller nor any Person owning five percent (5%) or more of the issued and outstanding shares of capital stock of Yield10 (or any such Person's immediate family members or Affiliates) is, or has been during the past three (3) years, a party to any Contract with or binding upon Sellers, in each case, in connection with the Business (other than Benefit Plans) or has any right, title or interest in any of the Purchased Assets.

Section 3.20     <u>No Brokers</u>. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Sellers.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Sellers that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof and as of the Closing Date.

Section 4.01     <u>Organization and Authority of Buyer; Due Execution</u>.

(a)     Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the Contemplated Transactions.

(b)     The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is or will be a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the Contemplated Transactions have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Sellers) constitutes a legal, valid, and binding obligation of Buyer, Enforceable against Buyer. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution, and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer, Enforceable against Buyer.

Section 4.02     <u>No Conflicts; Consents</u>.

(a)     Subject to the entry of the Sale Order, the execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and the consummation of the Contemplated Transactions, do not and will not (i) conflict with or result in a violation or breach of, or default under, any provision of its Organizational Documents, (ii) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer, or (iii) require the consent, notice or other action by any Person under any Contract to which Buyer is a party.

(b)      Subject to the entry of the Sale Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Contemplated Transactions, except for such reports under the Exchange Act as may be required in connection with this Agreement and the Contemplated Transactions.

Section 4.03      Brokers. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Buyer.

Section 4.04      Sufficiency of Funds. Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the Contemplated Transactions.

Section 4.05      Legal Proceedings. Except in connection with the Chapter 11 Case, there are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin, or otherwise delay the Contemplated Transactions.

Section 4.06      Investigation by Buyer. Except as otherwise specifically provided herein: (a) all of the Purchased Assets and Assumed Liabilities of Sellers are being sold and transferred to Buyer on an "as is" and "where is" basis and all warranties, express or implied, including warranties of merchantability and fitness for use, are excluded from the sale and transfer of the Purchased Assets and Assumed Liabilities of Sellers and (b) Sellers make no representations or warranties of any nature with respect to the Purchased Assets, other than as expressly provided for herein, including without limitation, estimates, projections, predictions, forecasts, data, financial information, memoranda, presentations or future prospects.

**ARTICLE V**
**COVENANTS**

Section 5.01      Conduct of Business Prior to the Closing.

(a)      From the date hereof until the earlier to occur of the Closing or the termination of this Agreement pursuant to Article VII (the "Pre-Closing Period"), except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall conduct the Business in the Ordinary Course of Business and shall use commercially reasonable efforts to maintain and preserve intact the current organization and franchise of the Business and to preserve the rights, franchises, goodwill, and relationships of its Employees, Independent Contractors, customers, lenders, suppliers, regulators, and others having business relationships with Sellers in relation to the Business. Without limiting the foregoing, during the Pre-Closing Period, with respect to the Business, Sellers shall:

(i)      use their respective commercially reasonable efforts to preserve and maintain all of the Permits included within the Purchased Assets;

(ii)      maintain the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iii)      continue in full force and effect without modification all Insurance Policies that are Related to the Business;

(iv)      defend and protect the Purchased Assets from infringement or usurpation;

(v)    perform all of their respective obligations under all Assigned Contracts;

(vi)    pay accounts payable of the Business in the Ordinary Course of Business;

(vii)    maintain the books and records of Sellers in respect of the Business in accordance with past practice; and

(viii)    comply in all material respects with all applicable Laws in the conduct of the Business.

(b)    During the Pre-Closing Period, except (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (y) as set forth in Section 5.01(b)(y) of the Seller Disclosure Schedule, or (z) as specifically contemplated by this Agreement, with respect to the Business, Sellers shall not:

(i)    enter into any new material Contract, or terminate or renew, or amend, waive, modify, or violate the terms of any Assigned Contract;

(ii)    (A) transfer or license to any Person any rights to any Business Intellectual Property or enter into any agreement with respect to any Business Intellectual Property with any Person (other than non-exclusive agreements to license or provide the Business's products to end-users pursuant to agreements that have been entered into in the Ordinary Course of Business), (B) buy or license any Intellectual Property or enter into any agreement with respect to the Intellectual Property of any Person (other than non-exclusive end-user license agreements entered into in the Ordinary Course of Business), (C) enter into any agreement with respect to the development of any Intellectual Property with a third party, or (D) terminate, fail to renew, abandon, cancel, let lapse, or fail to continue to prosecute or defend any Business Intellectual Property;

(iii)    grant or agree to grant any increases in the compensation, perquisites, or benefits (whether through the payment of, or agreement to pay, bonus amounts or otherwise) to any Employee, Independent Contractor or director who performs services in connection with the Business;

(iv)    hire or offer to hire any Employees;

(v)    terminate, or encourage to resign from Sellers, any Employees responsible for or involved in performing Sellers' obligations under any Assigned Contract or any Employee listed in Schedule 5.01(b)(v);

(vi)    grant or create any Encumbrance over any of the Purchased Assets;

(vii)    revalue any of the Purchased Assets (whether tangible or intangible), other than in the Ordinary Course of Business;

(viii)    engage in or enter into any material transaction or commitment, or relinquish any material right, in connection with the Business, in each case, outside the Ordinary Course of Business;

(ix)    initiate or settle any litigation or arbitration in connection with the Business;

(x)      adopt or change Sellers' accounting policies or procedures in respect of the Business, including with respect to reserves for excess or obsolete inventory, reserves, depreciation, or amortization policies or rates, or payment or collection policies or practices;

(xi)      take any action that would result in any of the conditions to the Closing set forth in Article VI not being satisfied or that would delay their satisfaction; or

(xii)      offer to discuss entering into, negotiate entering into, authorize the entrance into, or enter into any Contract to do any of the foregoing.

Section 5.02      Access to Information. During the Pre-Closing Period, Sellers shall (i) afford Buyer and its Representatives, during normal business hours, full and free access to and the right to inspect all of the Purchased Assets and other documents and data related to the Business, subject to the Access Limitations, (ii) furnish Buyer and its Representatives with such financial, operating, and other data and information with respect to the Business as is customarily prepared by or for the management of Sellers in the Ordinary Course of Business or as Buyer or any of its Representatives may otherwise reasonably request, and (iii) instruct the Representatives of Sellers to cooperate with Buyer in its investigation of the Business. Without limiting the foregoing, Sellers shall permit Buyer and its Representatives to conduct environmental due diligence of the Real Property included in the Purchased Assets, including the collection and analysis of samples of indoor and outdoor air, surface water, groundwater, or surface or subsurface land on, at, in, under, or from such Real Property. Any investigation pursuant to this Section 5.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business. No investigation by Buyer or its Representatives or other information received by Buyer or its Representatives shall operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Sellers in this Agreement.

Section 5.03      No Solicitation of Other Bids.

(a)      Acquisition Proposal. For purposes hereof, "Acquisition Proposal" means any inquiry, proposal, or offer from any Person (other than Buyer or any of its Affiliates) concerning the sale of all or a significant portion of the Business, including in connection with (A) a merger, consolidation, liquidation, recapitalization, share exchange, or other business combination transaction involving any Seller, (B) the issuance or acquisition of Equity Interests of any Seller, or (C) the sale, lease, exchange or other disposition of any significant portion of the Purchased Assets.

(b)      Restrictions on Acquisition Proposals. During the Pre-Closing Period, Sellers shall not, and shall not authorize or permit any of their Affiliates or any of their respective Representatives to, directly or indirectly:

(i)      encourage, solicit, initiate, facilitate, or continue inquiries regarding an Acquisition Proposal;

(ii)      enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal;

(iii)      enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal;

(iv)      otherwise facilitate any effort or attempt to make an Acquisition Proposal;

(v)　　　furnish to any Person any non-public information relating to the Business or afford to any such Person access to the Business, properties, assets, books, records or other non-public information, in any such case with the intent to induce, or that would reasonably be expected to result in, the making, submission or announcement of an Acquisition Proposal; or

(vi)　　　grant any waiver or release under, or fail to enforce, any standstill or similar agreement, except to the extent that Sellers in good faith, after consultation with financial advisors and outside legal counsel, determine that the failure to do so would cause the Seller Board to be in breach of its fiduciary duties under applicable Law.

(c)　　　Exceptions to Restrictions. Notwithstanding Section 5.03(b), Sellers may, prior to the entry of the Sale Order, (i) provide information in response to a request therefor by a Person who makes an unsolicited bona fide written Acquisition Proposal if (x) such Acquisition Proposal did not result from a violation of Section 5.03(b) in any material respects, (y) prior to providing such information, Sellers receive from such Person an executed confidentiality agreement on terms that, taken as a whole, are no less favorable in the aggregate to the other party than those contained in the Confidentiality Agreement and that does not prohibit Sellers from complying with their obligations under this Section 5.03 (any confidentiality agreement satisfying the criteria of this clause (y) being an "Acceptable Confidentiality Agreement") and (z) Sellers promptly (and in any event within twenty-four (24) hours thereafter) make available to Buyer any material non-public information concerning Sellers that Sellers provide to any such Person that was not previously made available to Buyer; (ii) engage or participate in any discussions or negotiations with any Person who has made such an Acquisition Proposal, if and only if, (A) prior to taking any action described in clause (i) or (ii) above, Sellers determine in good faith, after consultation with financial advisors and outside legal counsel, that the failure to take such action would cause the Seller Board to be in breach of its fiduciary duties under applicable Law and (B) prior to taking any action described in clause (i) or (ii) above, Sellers have determined in good faith based on information then available that such Acquisition Proposal either constitutes a Superior Proposal or is reasonably likely to lead to a Superior Proposal and (iii) provide notice of the Sale Motion to all Persons that previously expressed, in writing, interest in acquiring all or substantially all of Yield10's assets.

(d)　　　Notice of Acquisition Proposals. Sellers agree to promptly (and, in any event, within twenty-four (24) hours) notify Buyer in writing (i) if any inquiries, proposals or offers with respect to an Acquisition Proposal are received by Sellers or any of their respective Representatives and the identities of the Person(s) making such inquiry, proposal or offer, (ii) if any non-public information is requested from Sellers in connection with an Acquisition Proposal and (iii) if any discussions or negotiations regarding an Acquisition Proposal are sought to be initiated or continued with Sellers or any of their Representatives, and in each case Sellers shall provide, in connection with such notice, a summary of the material terms and conditions of any proposals, offers or requests (including, if applicable, any modifications to such proposals, offers or requests and unredacted copies of any material and relevant documents and agreements relating thereto, written requests, proposals or offers, including proposed agreements). Thereafter, Sellers shall keep Buyer reasonably informed, on a reasonably prompt basis (and, in any event, within twenty-four (24) hours), of the status and material terms of any such proposals, offers, or amendments in connection therewith and the status of any such discussions or negotiations.

(e)　　　No Change of Recommendation or Alternative Definitive Agreement. Subject to Section 5.03(f), Sellers shall not:

(i)　　　approve, authorize, endorse, adopt or recommend (publicly or otherwise) (or publicly propose to approve, authorize, endorse, adopt or recommend) an Acquisition Proposal (a "Change of Recommendation"); or

(ii)    cause or permit Sellers to enter into any letter of intent, term sheet, commitment or definitive agreement (other than any Acceptable Confidentiality Agreement entered into in accordance with Section 5.03(c)) relating to any Acquisition Proposal.

(f)    Change of Recommendation/Superior Proposal Termination. Notwithstanding Section 5.03(e), (x) Sellers may make a Change of Recommendation at any time prior to the entry of the Sale Order if Sellers receive a bona fide unsolicited written Acquisition Proposal following the date hereof that did not result from a violation or breach of Section 5.03(a) in any material respects and has not been withdrawn and Sellers determine in good faith (after consultation with Sellers' outside legal and financial advisors) based on the information then available that such Acquisition Proposal constitutes a Superior Proposal, only if Sellers determine in good faith that the failure to take such action would cause the Seller Board to be in breach of its fiduciary duties under applicable Law and (y) if Sellers are permitted to make a Change of Recommendation pursuant to clause (x), Sellers may also terminate this Agreement pursuant to Section 7.01(c)(iv) to concurrently enter into a definitive agreement with respect to the applicable Superior Proposal; *provided, however*, that Sellers shall not take any of the foregoing actions unless:

(i)    Sellers shall have complied with their obligations under this Section 5.03(f);

(ii)    Sellers shall have provided prior written notice (a "Determination Notice") to Buyer at least five (5) Business Days in advance (the "Notice Period") to the effect that Sellers intend to take such action and specifying in writing, in reasonable detail, the circumstances giving rise to such proposed action, including, in the event that such action is proposed to be taken in connection with an Acquisition Proposal, the information specified by Section 5.03(d) with respect to such Acquisition Proposal;

(iii)    Sellers shall have, during the Notice Period, negotiated with Buyer and its Representatives in good faith (to the extent Buyer desires to negotiate) to make such adjustments in the terms and conditions of this Agreement such that (A) the failure to take such action would no longer cause the Seller Board to be in breach of its fiduciary duties under applicable Law and (B) with respect to any such action to be taken in connection with an Acquisition Proposal, such Acquisition Proposal ceases to constitute a Superior Proposal; *provided, however*, that in the event of any material revision to the terms of such Superior Proposal, Sellers shall be required to deliver a new Determination Notice to Buyer and to comply with the requirements of Section 5.03(f)(ii) and this Section 5.03(f)(iii) with respect to such new Determination Notice and the revised Superior Proposal (*provided, however*, that the Notice Period for any such successive written notices shall be two (2) Business Days instead of five (5) Business Days);

(iv)    at or following the end of such Notice Period, Sellers shall have determined in good faith based on the information then available that (A) after consultation with Sellers' outside legal and financial advisors, failure to take such action would continue to cause the Seller Board to be in breach of its fiduciary duties under applicable Law and (B) with respect to any such action to be taken in connection with an Acquisition Proposal, such Acquisition Proposal continues to constitute a Superior Proposal, in each case taking into account any revisions to this Agreement made or proposed in writing by Buyer prior to the time of such determination pursuant to clause (iii) above; and

(v)    in the event of a termination of this Agreement to enter into a definitive agreement with respect to a Superior Proposal, Sellers shall have validly terminated this Agreement in accordance with Section 7.01 and paid the Seller Termination Fee in accordance with Section 7.03.

(g)    Breach. Sellers agree that any breach of this Section 5.03 by any of their Affiliates or their respective Representatives shall be deemed to be a breach of this Agreement by Sellers.

Section 5.04   <u>Efforts to Consummate Contemplated Transactions</u>.

(a)   During the Pre-Closing Period, each of the parties shall act in good faith and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or advisable to expeditiously satisfy the closing conditions set forth in <u>Article VI</u> and consummate the Contemplated Transactions as soon as reasonably practicable. If all of the conditions to a party's obligation to close hereunder shall have been satisfied, such party shall diligently proceed to close. Without limiting the foregoing, Sellers shall, and shall cause their respective Affiliates to (i) give all notices to, and use commercially reasonable efforts to obtain, on or prior to the Closing, all consents from all Persons that are described in <u>Section 3.02(a) of the Seller Disclosure Schedule,</u> (ii) give all notices to, and make all filings with and applications and submissions to, all Governmental Authorities that are described in <u>Section 3.02(b) of the Seller Disclosure Schedule</u> as promptly as reasonably practicable, (iii) provide all such information concerning Sellers and their respective officers, directors, employees, trustees, and Affiliates as may be necessary or reasonably requested by another Person in connection with the foregoing, and (iv) avoid the entry of, or have vacated or terminated, any Governmental Order that would restrain, prevent or materially delay the consummation of the Contemplated Transactions, including defending through litigation any claim asserted in any court by any Governmental Authority or other Person.

(b)   Without limiting the generality of <u>Section 5.04(a)</u>:

(i)   as promptly as practicable and in any event within ten (10) Business Days after the date hereof, Sellers shall submit to the applicable Governmental Authorities all notices, filings, and other submissions required to transfer to Buyer, as of the Closing, the Permits included in the Purchased Assets.

(ii)   promptly upon Buyer's request, Yield10 shall enter into a novation agreement among Yield10, Buyer, and Rothamsted to novate the Rothamsted Agreement from Yield10 to Buyer.

Section 5.05   <u>Approval as Sole Stockholder of Oilseeds</u>. Immediately following the execution and delivery of this Agreement, Yield10, as sole stockholder of Oilseeds, shall adopt this Agreement and approve the Contemplated Transactions in accordance with applicable Law.

Section 5.06   <u>Notice of Certain Events</u>.

(a)   During the Pre-Closing Period, Sellers shall promptly notify Buyer in writing of:

(i)   any fact, circumstance, event, or action the existence, occurrence, or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Sellers hereunder not being true and correct, or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in <u>Section 6.02</u> to be satisfied;

(ii)   any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(iii)   any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions; and

(iv)   any Actions commenced or threatened against, relating to, or involving or otherwise affecting Sellers in connection with the Business that, if pending on the date of this Agreement,

would have been required to have been disclosed pursuant to <u>Section 3.13</u> or that relates to the consummation of the Contemplated Transactions.

(b)     Buyer's receipt of information pursuant to this <u>Section 5.06</u> shall not operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Sellers in this Agreement and shall not be deemed to amend or supplement the Seller Disclosure Schedule.

Section 5.07     <u>Employees and Employee Benefits</u>.

(a)     During the Pre-Closing Period, Representatives of Buyer shall be entitled to hold meetings and conferences during normal working hours with the Employees upon reasonable advance notice to Sellers, to explain and answer questions about the conditions, policies and benefits of employment in Buyer's organization. Further, Sellers shall cooperate with Buyer in communicating to the Employees any information concerning employment in Buyer's organization and, if requested by Buyer, shall encourage the Employees to agree to employment with Buyer upon Closing. Sellers shall be entitled to have one or more Representatives attend all such meetings.

(b)     During the Pre-Closing Period, (i) Sellers shall, to the extent permitted by applicable Law, assist and cooperate with Buyer by permitting Buyer to review compensation data and job descriptions (if any) for any Employees at Buyer's reasonable request, (ii) Buyer may offer employment, on an "at will" basis, to any or all Employees effective as of the Closing, and (iii) Sellers and Buyer shall cooperate in good faith to effect an orderly transition of any Employee offered employment by Buyer.

(c)     Sellers shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any Employee, including hourly pay, commission, bonus, salary, accrued vacations, fringe, pension or profit sharing benefits, or severance pay payable to any Employee for any period relating to the service with Sellers at any time prior to the Closing Date and Sellers shall pay all such amounts to all entitled Employees on or prior to the Closing Date.

(d)     Sellers shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of Employees that relate to events occurring prior to the Closing Date. Sellers also shall remain solely responsible for all worker's compensation claims of any Employees that relate to events occurring prior to the Closing Date. Sellers shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

Section 5.08     <u>Public Announcements</u>. Other than pleadings filed in the Chapter 11 Case or in required regulatory filings, no party to this Agreement shall make any public announcements in respect of this Agreement or the Contemplated Transactions or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), and the parties shall cooperate as to the timing and contents of any such announcement, unless otherwise required by applicable Law or the rules and regulations of any securities exchange or national market system upon which the securities of such party are listed, based upon the reasonable advice of counsel, in which case such party shall use commercially reasonable efforts to provide the other party with sufficient time, consistent with such requirements, to review the nature of such requirements and to comment upon such disclosure prior to publication.

Section 5.09     <u>Confidentiality</u>. From and after the Closing, Sellers shall, and shall cause their Affiliates to, hold, and use commercially reasonable efforts to cause their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Sellers can show that such information (i) is generally available to and known by the public through no fault of Sellers, any of their Affiliates, or their respective Representatives, or (ii) is lawfully

acquired by Sellers, any of their Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Sellers or any of their Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Sellers shall promptly notify Buyer in writing and shall disclose only that portion of such information which Sellers are advised by their counsel in writing is legally required to be disclosed; *provided* that Sellers shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. From and after the Closing Date, Buyer and its Affiliates and Representatives shall have no further liability or obligation under the Confidentiality Agreement.

Section 5.10    INTENTIONALLY OMITTED.

Section 5.11    Wrong-Pockets.

(a)    If, following the Closing, Buyer becomes aware that it owns any Excluded Asset, Buyer shall promptly inform Sellers of that fact in writing. Thereafter, at the request of Sellers, Buyer undertakes (and shall reasonably cooperate with Buyer), as applicable, to execute such documents as may be reasonably necessary to procure the transfer (without further consideration) of any such Excluded Asset to Sellers or an Affiliate of Sellers, in each case such that each party is put into the same economic position as if such action had been taken on or prior to the Closing Date. The parties agree to use commercially reasonable efforts to structure any transfer of assets referred to in this subsection (a) in a manner that minimizes Taxes and is equitable from a legal perspective for the parties.

(b)    If, following Closing, Sellers or any of their Affiliates become aware that they own any Purchased Asset, Sellers shall, or shall cause such Affiliate of Sellers to, promptly inform Buyer of that fact in writing. Thereafter, at the request of Buyer, Sellers shall undertake (and Buyer shall reasonably cooperate with Sellers), as applicable, to execute and/or cause the relevant Affiliate of Sellers to execute such documents as may be reasonably necessary to procure the transfer of any such Purchased Asset (without further consideration) to Buyer, in each case such that each party is put into the same economic position as if such action had been taken on or prior to the Closing Date. The parties agree to use their commercially reasonable efforts to structure any transfer of assets referred to in this subsection 5.11(b) in a manner that minimizes Taxes and is equitable from a legal perspective for the parties.

Section 5.12    INTENTIONALLY OMITTED.

Section 5.13    Further Assurances. Following the Closing, each of the parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Contemplated Transactions.

Section 5.14    Transfer Taxes. Notwithstanding anything to the contrary in this Agreement, all transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with the Contemplated Transactions, including any interest or penalties in respect thereof, shall be borne and paid by Sellers when due, regardless of the Person liable for such obligations under applicable Law or the Person making payment to the applicable Governmental Authority or other third party. Sellers shall, at their own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

Section 5.15    <u>Tax Clearance Certificates</u>. If requested by Buyer, Sellers shall notify all of the taxing authorities in the jurisdictions that impose Taxes on Sellers or where Sellers have a duty to file Tax Returns of the Contemplated Transactions in the form and manner required by such taxing authorities, if the failure to make such notifications or receive any available tax clearance certificate could subject Buyer to any Taxes of Sellers. If any taxing authority asserts that Sellers are liable for any Tax, Sellers shall promptly pay any and all such amounts and shall provide evidence to Buyer that such liabilities have been paid in full or otherwise satisfied.

Section 5.16    <u>Bulk Sales Laws</u>. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any Liabilities arising out of the failure of Sellers to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

Section 5.17    <u>Tax Matters</u>.

(a)    All personal property taxes and similar ad valorem obligations levied or imposed with respect to the Business, the Purchased Assets and the Assumed Liabilities (individually or in the aggregate) for a taxable period which includes (but does not end on) the Closing Date (a "<u>Straddle Period</u>") will be apportioned among Sellers and Buyer (the "<u>Apportioned Obligations</u>") based on the number of days of such Straddle Period included in the period ending on (and including) the Closing Date and the number of days of such Straddle Period included in the period after the Closing Date. Sellers will be liable for the proportionate amount of such Apportioned Obligations that is attributable to such pre-Closing portion of such Straddle Period, and Buyer will be liable for the proportionate amount of such Apportioned Obligations that is attributable to such post-Closing portion of such Straddle Period. Sellers and Buyer shall cooperate to promptly pay or reimburse the other for any such Apportioned Obligations based on their respective proportionate amounts of such Apportioned Obligations as determined pursuant to this <u>Section 5.17(a)</u>. Any refunds of such Taxes with respect to a Straddle Period shall be apportioned between Sellers and Buyer in a similar manner.

(b)    Sellers and Buyer will reasonably cooperate with each other in connection with: (i) the preparation and filing of any Tax Return with respect to the Business and the Purchased Assets; (ii) any claim involving Taxes with respect to the Business and the Purchased Assets; and (iii) any other matter under this Agreement relating to Taxes.

Section 5.18    <u>Access to Purchased Assets</u>.

(a)    As an accommodation to Sellers, Buyer may agree to store certain equipment constituting Purchased Assets at a Buyer facility prior to the Closing Date. Sellers and Buyer acknowledge and agree that, unless and until title to such Purchased Assets is conveyed to Buyer at the Closing as contemplated by this Agreement: (i) title and risk of loss with respect to any such Purchased Assets shall remain with Sellers and (ii) Buyer shall have no Liability or responsibility to Sellers with respect to such Purchased Assets. In the event that this Agreement is terminated prior to the Closing, Sellers shall promptly retrieve any such Purchased Assets in Buyer's possession and Buyer shall use commercially reasonable efforts, at Sellers' expense, to cooperate with Sellers in connection with such retrieval.

(b)    For a period of thirty (30) days after the Closing Date, Sellers shall (i) afford Buyer and its Representatives, during normal business hours, full and free access to the locations at which the physical Purchased Assets are located for purposes of packing and shipping the Purchased Assets and

(ii) maintain their rights to use such locations, including by maintaining any applicable leases or other Contracts providing such rights.

Section 5.19    Reasonable Access to Records.

Until the closing of the Chapter 11 Case, Buyer shall permit Bankruptcy Court approved or appointed professionals of Yield10, its estate, or any future Chapter 11 or Chapter 7 Trustee (collectively, "Permitted Access Parties") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include the right of such Permitted Access Parties, at such Permitted Access Parties' expense, to access, receive and/or download copies of requested documents and records, consistent with the requirements of Local Bankruptcy Rule 6004. Any requests for access, copies or downloads of documents shall include a reasonably detailed written description of the requested materials and reimbursement to Buyer for the reasonable costs and expenses associated with Buyer's compliance with the request, including the reasonable costs incurred by Buyer in making its personnel available during regular business hours to assist Permitted Access Parties in connection with such requests.

Section 5.20    Bankruptcy Matters

(a)    No later than five (5) Business Days after the execution of this Agreement or December 6, 2024, Yield10 shall file the Petition with the Bankruptcy Court. Not less than three (3) days after the filing of the Petition, Yield10 shall file with the Bankruptcy Court a motion for approval of the Contemplated Transactions in accordance with the terms and conditions hereof as a private sale under Section 363 of the Bankruptcy Code without the requirement of an auction (the "Sale Motion").

(b)    Yield10 shall notify counterparties to Contracts set forth on Schedule 1.01(c) of Yield10's proposed Cure Costs not later than five (5) days after the filing of the Petition, which notice shall provide such counterparties the opportunity to object to Yield10's proposed Cure Costs no later than seven (7) business days before the Sale Hearing. In the event that Yield10 and any such counterparties are unable to agree on the Cure Costs with respect to such counterparties, then the Cure Costs with respect to such counterparties shall be determined by the Bankruptcy Court at the Sale Hearing or upon such other date as the parties may mutually agree. Notwithstanding anything to the contrary contained herein, to the extent that the Cure Costs with respect to any such counterparties have not been agreed upon or otherwise finally determined as of the Closing, Buyer shall be entitled to deduct from the Purchase Price the full amount of the potential Cure Costs with respect to such counterparties as determined in good faith by Buyer, pending final determination by the Bankruptcy Court or mutual agreement as to such Cure Costs.

## ARTICLE VI
## CONDITIONS TO CLOSING

Section 6.01    Closing Conditions of All Parties. The obligations of each party to consummate the Contemplated Transactions shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    The Sale Order shall have been approved and entered by the Bankruptcy Court.

(b)    No Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any Law or Governmental Order that is in effect and has the effect of making the Contemplated Transactions illegal, otherwise restraining or prohibiting consummation of the Contemplated Transactions, or causing any of the Contemplated Transactions to be rescinded following completion thereof.

Section 6.02    <u>Closing Conditions of Buyer</u>. The obligations of Buyer to consummate the Contemplated Transactions shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the Fundamental Representations of Sellers, the representations and warranties of Sellers contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The Fundamental Representations of Sellers shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date.

(b)    Sellers shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by them prior to or on the Closing Date.

(c)    There shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(d)    Between the date hereof and the Closing Date, there shall not have been any loss, damage, or destruction to or of any of the Purchased Assets in excess of $300,000 in the aggregate.

(e)    No Action by or before any Governmental Authority shall have been commenced or threatened in writing against Buyer or Sellers which seeks to prevent or restrain the consummation of the Contemplated Transactions.

(f)    Sellers shall have delivered to Buyer the deliverables pursuant to <u>Section 2.02(a)</u>.

(g)    Rothamsted shall not have exercised its right to object to the assignment of the Rothamsted Agreement to Buyer.

(h)    Buyer shall have received all permits that are necessary for it to conduct the Business as conducted by Sellers as of the Closing Date.

Section 6.03    <u>Closing Conditions of Sellers</u>. The obligations of Sellers to consummate the Contemplated Transactions shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:Other than the Fundamental Representations of Buyer, the representations and warranties of Buyer contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The Fundamental Representations of Buyer shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    Buyer shall have delivered to Sellers the deliverables pursuant to Section 2.02(b).

## ARTICLE VII
## TERMINATION

Section 7.01    Termination. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by Buyer by written notice to Sellers if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and, if capable of cure, such breach, inaccuracy, or failure has not been cured by Sellers within ten (10) Business Days of Sellers' receipt of written notice of such breach from Buyer;

(ii)    any of the conditions set forth in Section 6.01 or Section 6.02 shall not have been, or shall have become incapable of, being fulfilled by February 28, 2025 (the "Outside Date"), unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements, or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)    a Change of Recommendation has occurred; or

(iv)    Sellers have breached any of their covenants or agreements set forth in Section 5.03(b) or Section 5.05;

(c)    by Sellers by written notice to Buyer if:

(i)    Sellers are not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) Business Days of Buyer's receipt of written notice of such breach from Sellers;

(ii)    any of the conditions set forth in Section 6.01 or Section 6.03 shall not have been, or become incapable of being, fulfilled by the Outside Date, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants, agreements, or conditions hereof to be performed or complied with by it prior to the Closing; provided, however, that Sellers shall not have the right to terminate this Agreement pursuant to this Section 7.01(c)(ii) if Buyer has initiated an Action to specifically enforce this Agreement in accordance with Section 8.10 and such Action is still pending;

(iii)    the Bankruptcy Court has not, within thirty-five (35) calendar days after the date on which the Petition is filed with the Bankruptcy Court, approved the Contemplated Transactions as a private sale under Section 363 of the Bankruptcy Code without the requirement of an auction; or

(iv)      prior to the entry of the Sale Order: (A) Sellers have decided to terminate this Agreement in accordance with Section 5.03 in order to, concurrently with such termination, enter into a definitive agreement with respect to a Superior Proposal and (B) Sellers pay to Buyer the Seller Termination Fee in accordance with Section 7.03(a) prior to or substantially concurrently with such termination.

Section 7.02      Effect of Termination.

(a)      In the event of the termination of this Agreement in accordance with this Article VII, this Agreement shall forthwith become void and there shall be no Liability on the part of any party except:that the provisions of Section 5.09, this Article VII and Article VIII shall survive such termination; and

(ii)      that nothing herein shall relieve any party from Liability for any breach of any provision hereof.

Section 7.03      Seller Termination Fee.

(a)      In the event that this Agreement is terminated pursuant to Section 7.01(c)(iv), then as a condition to such termination of this Agreement, prior to or concurrently with such termination, Sellers shall pay to Buyer (or its designee) the Seller Termination Fee by wire transfer of immediately available funds to an account or accounts designated in writing by Buyer. "Seller Termination Fee" means an amount equal to $120,000.

(b)      In the event that this Agreement is terminated pursuant to (i) Section 7.01(b)(iii) or Section 7.01(b)(iv), or (ii) Section 7.01(b) and at the time Buyer could have terminated this Agreement pursuant to Section 7.01(b)(iii) or Section 7.01(b)(iv), then within two (2) Business Days after such termination of this Agreement, Sellers shall pay to Buyer (or its designee) the Seller Termination Fee by wire transfer of immediately available funds to an account or accounts designated in writing by Buyer.

(c)      In the event that (i) this Agreement is terminated by Buyer pursuant to Section 7.01(b), (ii) following the execution and delivery of this Agreement and prior to such termination, an Acquisition Proposal has been publicly announced, known or disclosed, and (iii) within twelve (12) months after such termination, Sellers have entered into a definitive agreement with respect to any Acquisition Proposal, then Sellers will, prior to or concurrently with the earlier of the execution of such definitive agreement and the consummation of such transaction, pay to Buyer (or its designee) the Seller Termination Fee by wire transfer of immediately available funds to an account or accounts designated in writing by Buyer.

(d)      The parties hereto acknowledge and hereby agree that in no event shall Sellers be required to pay the Seller Termination Fee on more than one occasion, whether or not the Seller Termination Fee may be payable under more than one provision of this Agreement at the same or at different times and the occurrence of different events.

(e)      Recovery. Buyer and Sellers hereby acknowledge and agree that the covenants set forth in this Section 7.03 are an integral part of this Agreement and the Contemplated Transactions, and that, without these agreements, Buyer and Sellers would not have entered into this Agreement. Accordingly, if Sellers fail to pay the Seller Termination Fee pursuant to Section 7.03 within five (5) Business Days after it becomes due and, in order to obtain such payment, Buyer commences an Action that results in a judgment against Sellers for such payment or any portion thereof, Sellers will pay to Buyer its out of pocket costs and expenses (including reasonable attorneys' and experts' fees and costs) in connection with such Action,

together with interest on such amount or portion thereof at a rate per annum equal to five percent (5%) through the date that such payment or portion thereof was actually received, or a lesser rate that is the maximum permitted by applicable Law.

(f)      Acknowledgement. Each of the parties acknowledges and agrees that, subject to Section 7.01(c)(iv), the damages resulting from termination of this Agreement under circumstances where a Seller Termination Fee is payable are uncertain and incapable of accurate calculation and therefore, the amounts payable in accordance with Section 7.03 are not a penalty but rather constitute liquidated damages in a reasonable amount that will compensate Buyer in those circumstances for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Contemplated Transactions.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01      Rules of Construction.

(a)      When the context in which words are used in this Agreement indicates that such is the intent, words used in the singular shall have a comparable meaning when used in the plural, and vice versa; pronouns stated in the masculine, feminine, or neuter shall include each other gender.

(b)      The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

(c)      The term "including" is not limiting and means "including, without limitation."

(d)      References herein to "default under," "violation of," or other expressions of similar import shall be deemed to be followed by the phrase "with or without notice or lapse of time, or both."

(e)      Financial terms shall have the meanings given to such terms under GAAP unless otherwise specified herein.

(f)      Unless otherwise expressly provided herein (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications have been made available to Buyer at least two (2) Business Days prior to the date of this Agreement, (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing, or interpreting such statute or regulation, except that for purposes of determining the accuracy of any representation and warranty, such reference shall only be to such statute or regulation as in effect on the date the representation and warranty was made, (iii) references to the "parties" are to the parties to this Agreement, and (iv) references to "Sections," "Schedules" or "Exhibits" are to sections, schedules or exhibits, as applicable, of this Agreement.

(g)      Unless otherwise expressly provided herein, "dollars" or "$" means the currency of the U.S. that, as at the time of payment, is legal tender for the payment of public and private debts.

(h)      This Agreement is between financially sophisticated and knowledgeable parties and is entered into by such parties in reliance upon the economic and legal bargains contained herein. The language used in this Agreement has been negotiated by the parties and their Representatives and shall be

interpreted and construed in a fair and impartial manner without regard to such factors as the party who prepared, or caused the preparation of, this Agreement or the relative bargaining power of the parties.

(i)      All references to materials being "made available" by Sellers means documents posted and accessible to Buyer, its Affiliates and their Representatives in the VDR at least two (2) Business Days prior to the date of this Agreement.

(j)      The principles of interpretation set forth in this <u>Section 8.01</u> shall apply equally to all Transaction Documents.

Section 8.02      <u>Seller Disclosure Schedule</u>. The Seller Disclosure Schedule referred to herein and delivered pursuant to and attached to this Agreement is an integral part of this Agreement. Nothing in the Seller Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein, unless the applicable section of the Seller Disclosure Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail, including by explicit cross-reference to another section of the Seller Disclosure Schedule. If any information required by this Agreement to be furnished in any section of the Seller Disclosure Schedule is contained in any section of the Seller Disclosure Schedule, such information shall be deemed to be included in any other such section of the Seller Disclosure Schedule solely to the extent it is reasonably apparent on the face of the actual text of such disclosure without reference to extrinsic documentation or independent knowledge regarding the matter disclosed that such information is applicable to such other section of the Seller Disclosure Schedule. Without limiting the generality of the foregoing, the mere listing, or inclusion of a copy, of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein, unless the representation or warranty is being made as to the existence of the document or other item itself. Sellers are responsible for preparing and arranging the Seller Disclosure Schedule.

Section 8.03      <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (i) when delivered by hand (with written confirmation of receipt), (ii) one (1) Business Day after being delivered to a nationally recognized overnight courier, (iii) on the date sent by e-mail if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (iv) on the third (3rd) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 8.03</u>):

If to Buyer:                    Nuseed Nutritional US Inc.
                               990 Riverside Parkway, Suite 140
                               West Sacramento, CA 95605
                               Attention: Bill Robison
                               E-mail: bill.robison@nuseed.com with a copy (which shall not
                               constitute notice) to legal@nufarm.com

with a copy to:                K&L Gates LLP
                               599 Lexington Avenue
                               New York, NY 10022
                               Attention: Whitney John Smith
                               E-mail: whitney.smith@klgates.com

If to Sellers:                 Yield10 Bioscience, Inc.
                               19 Presidential Way
                               Woburn, MA 01801

Attention: Oliver Peoples
E-mail: peoples@yield10bio.com

with a copy to:

Pearne & Gordon LLP
1801 East 9th Street, Suite 1200
Cleveland, OH 44114
Attention: Gregory M. York
E-mail: gyork@pearne.com

and

The Rosner Law Group LLC
824 Market Street, Suite 810
Wilmington, Delaware 19801
Attn: Frederick Rosner

Section 8.04    Entire Agreement. This Agreement, including Annexes, Schedules, and Exhibits, and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter (including the Original Agreement). In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, and the Seller Disclosure Schedule (other than an exception expressly set forth as such in the Seller Disclosure Schedule), the statements in the body of this Agreement will control.

Section 8.05    Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No course of dealing between the parties shall be deemed to modify, amend, or discharge any provision or term of this Agreement. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

Section 8.06    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed; *provided*, *however*, that Buyer may assign or delegate any or all of its rights or obligations hereunder to an Affiliate, to any of its lenders as collateral security, or to any subsequent purchaser of all or substantially all of Buyer's business or assets.

Section 8.07    No Third-party Beneficiaries. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.08    Severability. If in any jurisdiction any term or provision hereof is determined to be invalid or unenforceable, (i) the remaining terms and provisions hereof shall be unimpaired, (ii) any such

invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and (iii) the invalid or unenforceable term or provision shall, for purposes of such jurisdiction, be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 8.09    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Agreement and any and all Actions (whether in contract or tort or otherwise) arising out of or relating to this Agreement and the Contemplated Transactions shall be governed by and construed in accordance with the applicable substantive and procedural Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would require or permit the application of the Law of any other jurisdiction.

(b)    Any Action arising out of or based upon this Agreement, the Ancillary Documents, or the Contemplated Transactions may be instituted only in the Federal Courts of the United States of America located in the State of Delaware or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such Action. Service of process, summons, notice, or other document as provided in <u>Section 8.03</u> shall be effective service of process for any Action brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any Action in such courts and irrevocably waive and agree not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY ACTION WHICH MAY ARISE UNDER THIS AGREEMENT, THE ANCILLARY DOCUMENTS, OR THE CONTEMPLATED TRANSACTIONS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS, OR THE CONTEMPLATED TRANSACTIONS. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF AN ACTION, (II) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>Section 8.09(c)</u>.

Section 8.10    <u>Specific Performance</u>. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity, without the posting of a bond or other security.

Section 8.11    <u>Counterparts</u>. This Agreement may be executed in multiple original, PDF, DocuSign and/or similar electronic signature technology counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 8.12    <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection

with this Agreement and the Contemplated Transactions shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Amended and Restated Asset Purchase Agreement to be executed as of the date first written above by their respective duly authorized officers.

**YIELD10 BIOSCIENCE, INC.**

By _____
_Oliver Peoples_
3E57908444BA4ED
Name: Oliver Peoples
Title: President and CEO

**YIELD10 OILSEEDS INC.**

By _____
_Oliver Peoples_
3E57908444BA4ED
Name: Oliver Peoples
Title: Director

**NUSEED NUTRITIONAL US INC.**

By _____
_Brent Zacharias_
Name: Brent Zacharias
Title: Group Executive, Nuseed

*[Signature Page to Amended and Restated Asset Purchase Agreement]*

## ANNEX A

## Definitions

"Access Limitations" has the meaning set forth in Section 2.03(c)(i).

"Acquisition Proposal" has the meaning set forth in Section 5.03(a).

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, internal investigation, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 1.07.

"Ancillary Documents" means the Bill of Sale, the Assignment and Assumption Agreement, the Patent Assignment Agreement, and all other agreements and certificates executed and delivered by or on behalf of Buyer or Sellers in connection with this Agreement or the Contemplated Transactions.

"Annual Financial Statements" has the meaning set forth in Section 3.03(a).

"Anti-corruption Laws" has the meaning set forth in Section 3.14(b).

"Apportioned Obligations" has the meaning set forth in Section 5.17(a).

"Assigned Contracts" has the meaning set forth in Section 1.01(c).

"Assignment and Assumption Agreement" means an assignment and assumption agreement in the form of Exhibit B hereto effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities.

"Assumed Liabilities" has the meaning set forth in Section 1.03.

"Assumed Payables" means (i) with respect to a Pre-Petition Assigned Contract, all amounts owed pursuant to such Pre-Petition Assigned Contract and unpaid as of the time of assumption of such Pre-Petition Assigned Contract by Buyer and (ii) with respect to any other Assigned Contract, all amounts owed pursuant to such Assigned Contract that arose after the filing of the Petition and remain unpaid as of the Closing.

"Assumed Payables Amount" has the meaning set forth in Section 2.03(b).

"Balance Sheet" has the meaning set forth in Section 3.03(a).

"Balance Sheet Date" has the meaning set forth in Section 3.03(a).

"<u>Bankruptcy Code</u>" has the meaning set forth in the Background.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Background.

"<u>Base Purchase Price</u>" means $5,000,000.

"<u>Benefit Plan</u>" means each pension, benefit, retirement, compensation, employment, consulting, advisory, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, equity or equity-based, option, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, cafeteria (whether or not subject to Section 125 of the Tax Code), fringe benefit, and other similar agreement, plan, policy, program, or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Sellers for the benefit of any current or former Employee, Independent Contractor, officer, or of Sellers or any spouse or dependent of such Person, or under which Sellers or any of their ERISA Affiliates has or may have any Liability in relation to the Business, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise.

"<u>Bill of Sale</u>" means a bill of sale in the form of <u>Exhibit A</u> hereto transferring the tangible personal property included in the Purchased Assets to Buyer.

"<u>Business</u>" has the meaning set forth in the Background.

"<u>Business Day</u>" means any day except Saturday, Sunday, or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"<u>Business Intellectual Property</u>" means any and all Business Owned Intellectual Property and Business Licensed Intellectual Property.

"<u>Business IP Agreements</u>" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions, and other Contracts Related to the Business (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to Intellectual Property to which Sellers are a party, beneficiary or otherwise bound.

"<u>Business IP Registrations</u>" means all Business Owned Intellectual Property that is subject to any issuance registration, application, or other filing by, to, or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names, and registered copyrights, issued and reissued patents, and pending applications for any of the foregoing.

"<u>Business Licensed Intellectual Property</u>" means any and all Intellectual Property Related to the Business that is licensed, or for which rights are otherwise granted, to Sellers by a third party.

"<u>Business Owned Intellectual Property</u>" means any and all Intellectual Property Related to the Business that is owned by, purported to be owned by, or exclusively licensed to Sellers (either exclusively or jointly with another Person or Persons).

"<u>Buyer</u>" has the meaning set forth in the preamble.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"Chapter 11 Case" has the meaning set forth in the Background.

"Closing" has the meaning set forth in Section 2.01(a).

"Closing Amounts" has the meaning set forth in Section 2.03(b).

"Closing Consideration Amount" means the cash amount that is equal to (i) the Base Purchase Price, *minus* (ii) the Assumed Payables Amount.

"Closing Date" has the meaning set forth in Section 2.01(a).

"Closing Statement" has the meaning set forth in Section 2.03(b).

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of January 12, 2024, by and between Yield10 and Buyer.

"Contemplated Transactions" means the transactions contemplated by this Agreement, including (i) the execution, delivery, and performance of the Ancillary Documents and (ii) the payment of fees and expenses relating to such transactions.

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral, and any amendments thereto.

"Copyleft License" means any license that requires, as a condition of use, that any Software subject to such license that is distributed or modified (or any other Software incorporated into, derived from, used, or distributed with any such Software or content) (i) be made available to any third-party recipient in a form other than binary form (*e.g.*, in source code form), (ii) be made available to any third-party recipient under terms that allow preparation of derivative works, (iii) be made available to any third-party recipient under terms that allow Software or interfaces thereto to be reverse engineered, reverse assembled, or disassembled (other than to the extent any contrary restriction would be unenforceable under applicable Law), or (iv) be made available to any third-party recipient at no license fee. Copyleft Licenses include the GNU General Public License, the GNU Lesser General Public License, the GNU Affero General Public License, the Mozilla Public License, the Common Development and Distribution License, and the Eclipse Public License.

"Cure Costs" has the meaning set forth in Section 1.03(a).

"Designated Accounting Firm" has the meaning set forth in Section 2.03(c)(v).

"Dispute Notice" has the meaning set forth in Section 2.03(c)(ii).

"Dispute Submissions" has the meaning set forth in Section 2.03(c)(v).

"Disputed Item" has the meaning set forth in Section 2.03(c)(ii).

"Employee" means any employee of Sellers who performs services in connection with the Business.

"<u>Encumbrance</u>" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, license, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"<u>Enforceable</u>" means, with respect to any Contract stated to be enforceable by or against any Person, that such Contract is a legal, valid, and binding obligation enforceable by or against such Person in accordance with its terms and in full force and effect, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium, and other similar Law of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"<u>Environmental Claim</u>" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification, and injunctive relief) arising out of, based on, or resulting from (i) the presence, Release of, or exposure to, any Hazardous Materials or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"<u>Environmental Law</u>" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata) or (ii) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal, or remediation of any Hazardous Materials. The term "Environmental Law" includes the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"<u>Environmental Notice</u>" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"<u>Environmental Permit</u>" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision, or other action required under or issued, granted, given, authorized by, or made pursuant to Environmental Law.

"<u>Equity Interest</u>" means, with respect to any Person, (i) any capital stock, partnership or membership interest, unit of participation or other similar interest (however designated), in such Person or any security or evidence of indebtedness convertible into or exchangeable therefor (ii) any option, warrant, purchase right, conversion right, exchange right, or other Contract which would entitle any other Person to

acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses, or gains of such Person, including stock appreciation, restricted stock unit, phantom stock, profit participation, or other similar rights.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with the Business or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Tax Code.

"Estimated Closing Consideration Amount" means the cash amount that is equal to (i) the Base Purchase Price, *minus* (ii) the Estimated Assumed Payables Amount.

"Estimated Assumed Payables Amount" has the meaning set forth in Section 2.03(a).

"Estimated Closing Statement" has the meaning set forth in Section 2.03(a).

"Excess Amount" has the meaning set forth in Section 2.03(d)(i).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Liabilities" has the meaning set forth in Section 1.04.

"Expert Calculations" has the meaning set forth in Section 2.03(c)(v).

"Financial Statements" has the meaning set forth in Section 3.03(a).

"Fraud" means a material misrepresentation in the representations and warranties of Sellers in this Agreement or in any written materials (other than estimates, forecasts, projections, and other forward-looking statements) provided by or Sellers or their Representatives to Buyer, its Affiliates, or Representatives in connection with the Contemplated Transactions, which was known to be false by Sellers or their Representatives, or a knowing omission of a material fact necessary to make any such representation or warranty or such written materials not materially misleading. For the avoidance of doubt, "Fraud" does not include any claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts based on negligence.

"Fundamental Representations" means the representations and warranties set forth in Section 3.01 (Organization and Authority; Due Execution.), Section 3.05 (Title to Purchased Assets; Real Property), Section 3.07 (Intellectual Property), Section 3.15 (Taxes), Section 3.20 (Brokers), Section 4.01 (Organization and Authority of Buyer; Due Execution), and Section 4.03 (Brokers).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any Governmental Authority.

"Harmful Code" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing, any of the following functions: (i) disrupting, disabling, harming, or otherwise materially impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed or (ii) damaging or destroying any data or file without the user's consent.

"Hazardous Materials" means (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, PFAS (per- and polyfluoroalkyl) and polychlorinated biphenyls.

"Independent Contractor" means any Person, other than an Employee, who is or has been engaged by Sellers or a third Person to provide services in connection with the Business, including any consultant, advisory board member, staffing agency, professional employer organization or independent contractor agent and any of their respective employees or sub-contractors.

"Insurance Policies" has the meaning set forth in Section 3.12.

"Intellectual Property" means any and all rights of Sellers in, arising out of, or associated with any of the following in any jurisdiction throughout the world (i) issued patents (including plant patents) and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("Patents"), (ii) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("Trademarks"), (iii) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("Copyrights"), (iv) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights, (v) mask works and all registrations, applications for registration, and renewals thereof, (vi) industrial designs and all Patents, registrations, applications for registration, and renewals thereof, (vii) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information, and all rights therein ("Trade Secrets"), (viii) Software, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof, (ix) rights of publicity, (x) plant breeder rights and plant variety protection rights, (xi) all other intellectual or industrial property and proprietary rights that is Related to the Business, and (xii) all rights to sue at law or in equity for any past or future infringement or other impairment of any of the foregoing, including the right to receive all proceeds and damages therefrom.

"Interim Balance Sheet" has the meaning set forth in Section 3.03(a).

"<u>Interim Balance Sheet Date</u>" has the meaning set forth in <u>Section 3.03(a)</u>.

"<u>Interim Financial Statements</u>" has the meaning set forth in <u>Section 3.03(a)</u>.

"<u>Inventory</u>" has the meaning set forth in <u>Section 1.01(a)</u>.

"<u>IT Systems</u>" has the meaning set forth in <u>Section 3.08(a)</u>.

"<u>Law</u>" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, or decree of any Governmental Authority.

"<u>Liabilities</u>" means any debts, liabilities, commitments or obligations, whether absolute or contingent, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, fixed or unfixed.

"<u>Material Adverse Effect</u>" means any event, occurrence, fact, condition, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (i) the results of operations or condition (financial or otherwise) of the Business, the Purchased Assets or the Assumed Liabilities or (ii) the ability of Sellers to perform its obligations hereunder and consummate the Contemplated Transactions on a timely basis; *provided*, *however*, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition, or change, directly or indirectly, to the extent arising out of or attributable to (A) general economic or political conditions, (B) conditions generally affecting the industries in which the Business is operated, (C) any changes in financial or securities markets in general, (D) acts of war (whether or not declared), armed hostilities, or terrorism or the escalation or worsening thereof, (E) acts of God, pandemics, earthquakes, hurricanes, or other natural disasters, (F) any changes in applicable Laws or accounting rules, including GAAP, or (G) the public announcement, pendency, or completion of the Contemplated Transactions; *provided further*, however, that any event, occurrence, fact, condition, or change referred to in clauses (A) through (F) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition, or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business is conducted.

"<u>Off-the-Shelf Software</u>" means Software licensed from a third party in the Ordinary Course of Business and uncustomized for the Business by the third party that is generally commercially available, other than Software obtained from a third party under licenses that obligate Sellers to pay continuing payments, including royalties or annual maintenance fees.

"<u>Oilseeds</u>" has the meaning set forth in the preamble.

"<u>Open Source License</u>" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative. For the avoidance of doubt, Open Source Licenses include Copyleft Licenses.

"<u>Open Source Materials</u>" means any Software subject to an Open Source License.

"<u>Operating Loan</u>" means that certain Secured Promissory Note, dated September 5, 2024, issued by Sellers and Yield10 Bioscience Securities Corp. to Buyer.

"<u>Ordinary Course of Business</u>" means the conduct of the Business in accordance with Sellers' normal day-to-day customs, practices, and procedures, consistent with past practice (including with respect to quantity and frequency).

"<u>Organizational Documents</u>" means, with respect to any Person (other than an individual), (i) the certificate or articles of incorporation or organization and any limited liability company, operating, or partnership agreement adopted or filed in connection with the creation, formation or organization of such Person and (ii) all by-laws and equity holders agreements to which such Person is a party relating to the organization or governance of such Person, in each case, as amended or supplemented.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 7.01(b)(ii)</u>.

"<u>Patent Assignment Agreement</u>" means the Patent Assignment Agreement by and between Buyer and Sellers, substantially in the form of <u>Exhibit C</u> hereto.

"<u>Payment Schedule</u>" has the meaning set forth in <u>Section 2.02(a)(iii)</u>.

"<u>Permits</u>" means all permits, licenses, franchises, certifications, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities.

"<u>Permitted Access Parties</u>" has the meaning set forth in <u>Section 5.19</u>.

"<u>Permitted Encumbrances</u>" means (i) liens for Taxes not yet due and payable, (ii) mechanics, carriers', workmen's, repairmen's, or other like liens arising or incurred in the Ordinary Course of Business or amounts that are not delinquent and which are not, individually or in the aggregate, material to the Business, or (iii) easements, rights of way, zoning ordinances, and other similar encumbrances affecting Real Property which do not, individually or in the aggregate, materially and adversely affect the operations of the Business.

"<u>Person</u>" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"<u>Personal Devices</u>" has the meaning set forth in <u>Section 3.09(a)</u>.

"<u>Personal Information</u>" means any information that identifies or, alone or in combination with any other information, could reasonably be used to identify, locate, or contact a natural Person, including name, street address, telephone number, email address, identification number issued by a Governmental Authority, credit card number, bank information, customer or account number, online identifier, device identifier, IP address, browsing history, search history, or other website, application, or online activity or usage data, location data, biometric data, medical or health information, or any other information that is considered "personally identifiable information," "personal information," or "personal data" under any applicable Law.

"<u>Petition</u>" has the meaning set forth in the Background.

"<u>Post-Closing Consideration</u>" means the Excess Amount, if any, that is actually payable to Sellers pursuant to the terms of this Agreement.

"<u>Pre-Closing Period</u>" has the meaning set forth in <u>Section 5.01(a)</u>.

"Pre-Petition Assigned Contracts" means all Assigned Contracts that Buyer and Sellers mutually agree shall be assigned to Buyer prior to the filing of the Petition.

"Privacy and Data Security Policies" means all past or present, internal or public-facing policies, notices, and statements concerning the privacy, security, or Processing of Personal Information.

"Privacy Laws" means all applicable Laws, Governmental Orders, and binding guidance issued by any Governmental Authority concerning the privacy, security, or Processing of Personal Information (including Laws of jurisdictions where Personal Information was collected), including, as applicable, data breach notification Laws, consumer protection Laws, Laws concerning requirements for website and mobile application privacy policies and practices, social security protection Laws, data security Laws, and Laws concerning email, text message, or telephone communications. Without limiting the foregoing, Privacy Laws include: The Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, the Children's Online Privacy Protection Act, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act the Health Insurance Portability and Accountability Act of 1996, as amended and supplemented by the Health Information Technology for Economic and Clinical Health Act of the American Recovery and Reinvestment Act of 2009, the Gramm-Leach-Bliley Act, the Family Educational Rights and Privacy Act, the General Data Protection Regulation, and all other similar international, federal, state, provincial, and local Laws.

"Pro Rata Portion" means, with respect to each Seller, the percentage set forth in the Payment Schedule under the column labeled "Pro Rata Portion."

"Processing" (or words of correlative meaning) has the meaning set forth in Section 3.09(b).

"Proposed Acquisition" has the meaning set forth in the Background.

"Purchase Price" has the meaning set forth in Section 1.05.

"Purchased Assets" has the meaning set forth in Section 1.01.

"Qualified Benefit Plan" has the meaning set forth in Section 3.17(a)

"Real Property" means the real property leased, subleased, licensed, sublicensed, or occupied by the Business, together with all buildings, structures, and facilities located thereon.

"Related to the Business" means arising from, related to or used or held for use in, required for the conduct of, or otherwise necessary for or material to the operation of, the Business as currently conducted, the ownership and use of the Purchased Assets, or the satisfaction and discharge of the Assumed Liabilities.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing, or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata, or within any building, structure, facility, or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, managers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"Review Materials" has the meaning set forth in Section 2.03(c)(i).

"<u>Review Period</u>" has the meaning set forth in <u>Section 2.03(c)(i)</u>.

"<u>Rothamsted</u>" means Rothamsted Research Limited, a company limited by guarantee and registered in England and Wales under registration no. 2393175 and a charity registered in England with number 802038.

"<u>Rothamsted Agreement</u>" means the Licence Agreement, dated June 12, 2024, between Yield10 and Rothamsted.

"<u>Sale Hearing</u>" means the hearing conducted by the Bankruptcy court to approve the transactions contemplated by this Agreement.

"<u>Sale Motion</u>" has the meaning set forth in <u>Section 5.20(a)</u>.

"<u>Sale Order</u>" means a final order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, approving, authorizing, and directing the sale of the Purchased Assets to Buyer in accordance with this Agreement and containing customary buyer protections including, without limitation, that the sale is free of all interests, liens, claims and encumbrances to the full extent permitted under Section 363 of the Bankruptcy Code and a "good faith" finding under subsection 363(m) of the Bankruptcy Code, for which no appeal has been filed, all applicable appeal periods have expired and no stay pending appeal has been granted.

"<u>Security Incident</u>" has the meaning set forth in <u>Section 3.09(c)</u>.

"<u>Seller Board</u>" means the board of directors of Yield10.

"<u>Seller Disclosure Schedule</u>" means the disclosure schedule delivered by Sellers concurrently with the execution and delivery of this Agreement.

"<u>Seller Termination Fee</u>" has the meaning set forth in <u>Section 7.03(a)</u>.

"<u>Sellers</u>" has the meaning set forth in the preamble.

"<u>Sellers' Knowledge</u>" means, when used with respect to the Business, any facts or other information actually known by Oliver Peoples, Kristi Snell, Meghna Malik, Benjamin Locke, or any other senior manager of the Business, or which a prudent individual in such position could be expected to discover in the course of conducting a reasonable investigation of the relevant subject matter.

"<u>Shortfall Amount</u>" has the meaning set forth in <u>Section 2.03(d)(ii)</u>.

"<u>Software</u>" means any and all software of any type (including programs, applications, middleware, interfaces, utilities, tools, drivers, firmware, microcode, scripts, batch files, JCL files, instruction sets and macros) and in any form (including source code, object code and executable code), databases, associated data, and related documentation, and all rights therein.

"<u>Straddle Period</u>" has the meaning set forth in <u>Section 5.17(a)</u>.

"<u>Superior Proposal</u>" means a bona fide written Acquisition Proposal that did not result from a breach of Section 5.03 and if consummated would result in a Person owning, directly or indirectly, (i) more than fifty percent (50%) of either Seller's outstanding shares of capital stock or (ii) more than fifty percent (50%) of the assets of Sellers, taken as a whole, in either case, which Sellers determine in good faith, after

consultation with their financial advisors and outside legal counsel, (A) to be reasonably likely to be consummated if accepted, and (B) if consummated, would result in a transaction more favorable to Yield10's stockholders from a financial point of view than the Contemplated Transactions, in each case, taking into account at the time of determination (1) any changes to the terms of this Agreement offered by Buyer in writing in response to such Acquisition Proposal and (2) the financial, regulatory, legal, certainty, timing and other aspects of such Acquisition Proposal (including the likelihood of such Acquisition Proposal to be consummated on a timely basis).

"Tangible Personal Property" has the meaning set forth in Section 1.01(e).

"Tax" or "Taxes" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, Liability under unclaimed property or escheat Laws, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, whether computed on a separate or consolidated, affiliated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement, or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trait" means any biochemical, physiological, physical or other attribute or phenotype of a plant, plant part, plant cell, plant tissue, breeding material, seed product or other plant material.

"Transaction Documents" means this Agreement and the Ancillary Documents.

"Treasury Regulations" means the temporary and final regulations promulgated under the Tax Code, revenue rulings and other public interpretations of the Tax Code by the IRS, as such regulations, rulings and interpretations may be amended or otherwise revised from time to time.

"Union" has the meaning set forth in Section 3.16(c).

"VDR" means the virtual data room for "Yield10 Bioscience" prepared by Sellers and hosted by ShareVault.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs, and employment losses.

"Yield10" has the meaning set forth in the preamble.

CONFIDENTIAL

**SCHEDULE 1.01(c)**

**ASSIGNED CONTRACTS**

| Name | Counterparty | Effective date |
|---|---|---|
| Mutual Confidentiality Agreement | A.G.P./Alliance Global Partners | 11/10/2023 |
| Confidential Disclosure Agreement | AdFarm US Inc. | 06/16/2022 |
| 2023-24 Field Experiment Plan | Ag-Quest Holdings Ltd. | 08/15/2023 |
| Master Services Agreement | Ag-Quest Holdings Ltd. | 09/22/2022 |
| Confidential Disclosure Agreement | Ag-Quest Holdings Ltd. | 10/20/2021 |
| 2024 Field Experiment Plan | AgraServ, LLC | 04/24/2024 |
| Master Services Agreement | AgraServ, LLC | 08/23/2023 |
| Work Order \| 2024 Field Experiment Plan | AgraServ, LLC | 04/22/2024 |
| Master Services Agreement | AgriThority LLC | 08/22/2023 |
| Work Order \| 2024 Spring Camelina Trials | AgriThority LLC | 04/29/2024 |
| Mutual Confidential Disclosure Agreement | AgriThority LLC | 06/16/2021 |
| Mutual Non-disclosure Agreement | American Airlines, Inc. | 12/15/2022 |
| Confidential Disclosure Agreement | Analome Inc | 06/25/2021 |
| Confidentiality Agreement - Appendix | APAGROU SAS | 08/22/2022 |
| Confidentiality Agreement | Archer-Daniels-Midland Company (ADM) | 08/03/2022 |
| Confidential Disclosure Agreement | ARE-MA Region No. 20, LLC | 12/04/2023 |
| Confidential Disclosure Agreement | Ash Creek Renewables LLC. | 08/31/2022 |
| Confidential Disclosure Agreement | Atmospheric and Environmental Research, Inc. (AER) | 03/08/2023 |
| Confidential Disclosure Agreement \| Amendment 1 | Atmospheric and Environmental Research, Inc. (AER) | 05/05/2023 |
| Confidentiality Agreement | Bartlett and Company, LP | 08/26/2022 |
| Materials Transfer Agreement | BASF Agricultural Solutions Seed US LLC | 02/29/2024 |
| Confidentiality Agreement | BASF Agricultural Solutions Seed US LLC | 05/20/2023 |
| Confidentiality Agreement - Amendment 1 | BASF Agricultural Solutions Seed US LLC | 05/20/2024 |
| Mutual Non-disclosure Agreement | Bayer CropScience LP (BCS) | 01/05/2024 |
| Confidentiality Agreement | BP Products North America Inc. | 06/04/2024 |

| Name | Counterparty | Effective date |
|---|---|---|
| Confidentiality Agreement | Bunge North America, Inc | 10/03/2022 |
| Confidential Disclosure Agreement | Camelina Company Espana S.L. | 02/25/2021 |
| Yield10 Camelina Stewardship Management Program[1] | Campbell Farms & Livestock LLC (Jeff Campbell) | 04/30/2024 |
| Confidential Disclosure Agreement | CAMSTAR, INC. | 02/01/2022 |
| Confidential Disclosure Agreement | Canaccord Genuity LLC | 06/10/2024 |
| Confidential Disclosure Agreement | Canary Biofuels, Inc. | 10/21/2021 |
| Mutual Non-disclosure Agreement | Canopy Growth Corporation | 10/31/2023 |
| Confidential Disclosure Agreement | Canpressco | 03/19/2024 |
| Mutual Confidentiality Agreement | Cargill, Incorporated | 10/13/2023 |
| Mutual Confidentiality Agreement | Cargill, Incorporated | 01/19/2024 |
| Mutual Confidentiality Agreement | Cargill, Incorporated | 07/14/2022 |
| Confidential Disclosure Agreement | CBIZ MHM, LLC | 08/15/2022 |
| Confidential Disclosure Agreement | Cermaq Group AS | 11/14/2023 |
| Confidential Disclosure Agreement | CGB Enterprises, Inc. | 01/23/2024 |
| Confidential Disclosure Agreement | Critereon Company, LLC | 11/21/2022 |
| Confidential Disclosure Agreement | Delek US Energy, Inc. | 01/23/2023 |
| Confidential Disclosure Agreement | Deveron UAS Corp. | 06/05/2020 |
| Materials Transfer Agreement | DSM Nutritional Products, LLC | 01/10/2024 |
| Mutual Confidentiality Agreement | DSM Nutritional Products, LLC | 11/13/2023 |
| Confidential Disclosure Agreement | Duane Johnson (Clearskies Biolubricants, Inc.) | 10/07/2019 |
| Confidential Disclosure Agreement | Elementa Foods | 12/19/2023 |
| Materials Transfer Agreement | ENEOS Corporation | 04/12/2023 |
| Confidential Disclosure Agreement | ENEOS Corporation | 02/03/2023 |
| Confidential Disclosure Agreement | Evogene Ltd. | 01/10/2024 |
| Confidentiality Agreement | Exxon Mobil Corporation | 03/23/2023 |
| Confidentiality Agreement | ExxonMobil Technology and Engineering Company | 03/15/2024 |
| Non-disclosure Agreement | Farmer's Business Network, Inc. | 09/08/2021 |

[1] This contract will be excluded from the Assumed Payables calculation.

| Name | Counterparty | Effective date |
|---|---|---|
| 2023-24 Field Experiment Plan | G2 Ag Research LLC | 08/15/2023 |
| Master Services Agreement | G2 Ag Research LLC | 08/22/2023 |
| Confidential Disclosure Agreement | GDM Argentina S.A | 02/26/2024 |
| First Amendment To The Research License Agreement | GDM Seeds | 09/05/2023 |
| ARM Full Bundle License | GDM Seeds | 10/13/2023 |
| Mutual Nondisclosure Agreement | GENEWIZ, LLC | 09/22/2021 |
| Confidential Disclosure Agreement | Global Agricultural Development Corporation | 02/12/2020 |
| Confidential Disclosure Agreement | HATCH Blue Holding Ltd | 11/15/2023 |
| Confidential Disclosure Agreement | Hawaii Agriculture Research Center | 10/06/2022 |
| 2023-24 Field Experiment Plan | ICMS | 09/08/2023 |
| Master Services Agreement | ICMS | 09/05/2023 |
| Gross Sublease | Innovation Saskatchewan | 11/19/2024 |
| Confidential Disclosure Agreement | Jeremy Scott Tax Law | 09/08/2023 |
| Confidential Disclosure Agreement | Joseph Gunnar & Co. LLC | 08/26/2022 |
| Master Services Agreement | KayJay Ag Services | 04/22/2024 |
| Work Order \| 2024 Field Experiment Plan | KayJay Ag Services | 04/22/2024 |
| Confidential Disclosure Agreement | KD Pharma Group SA | 11/03/2023 |
| Non-disclosure Agreement | knoell USA, LLC | 09/22/2022 |
| Confidential Disclosure Agreement | Koch Engineered Solutions LLC. | 11/08/2021 |
| Confidential Disclosure Agreement | KWS SAAT SE & Co. KGaA | 02/13/2020 |
| Mutual Confidentiality Agreement | Lake Street Capital Markets, LLC | 08/26/2023 |
| Mutual Non-disclosure Agreement | LG Chem, Ltd. | 02/06/2023 |
| Mutual Non-disclosure And Confidentiality Agreement | Louis Dreyfus Company LLC | 06/12/2024 |
| Non-disclosure Agreement | Marcum LLP | 02/19/2024 |
| Non-Disclosure Agreement | Maxim Group LLC | 11/06/2023 |
| Mutual Nondisclosure Agreement | Mazars USA LLP | 02/19/2024 |
| Confidential Disclosure Agreement | Millborn Seeds, Inc. | 09/26/2022 |

| Name | Counterparty | Effective date |
|---|---|---|
| Non-Exclusive License for a Plant Variety | Minister of Agriculture and Agri-Food (AAFC) | 01/27/2020 |
| Amendment No. 1 To Variety Licencing Agreement | Minister of Agriculture and Agri-Food (AAFC) | 03/24/2021 |
| Material Transfer Agreement | Minister of Agriculture and Agri-Food (AAFC) | 04/08/2022 |
| Material Transfer Agreement | Minister of Agriculture and Agri-Food (AAFC) | 02/01/2020 |
| Standard Material Transfer Agreement | Minister of Agriculture and Agri-Food (AAFC) | 02/12/2024 |
| Four-way Confidentiality And Non-disclosure Agreement | Mitsubishi Corporation (Americas) | 09/08/2023 |
| Mutual Non-disclosure Agreement | Mitsui & Co. (U.S.A.), Inc. | 04/10/2024 |
| Material Transfer Agreement | National Research Council of Canada (NRC) | 11/18/2021 |
| Confidential Disclosure Agreement | Nissui Corporation | 03/07/2024 |
| Confidential Disclosure Agreement | North Dakota State University | 04/18/2024 |
| Confidential Disclosure Agreement | NorthStar Genetics | 08/17/2022 |
| License Agreement | Nuseed Nutritional US Inc. | 07/12/2024 |
| Confidentiality Agreement | Nuseed Nutritional US Inc. | 01/12/2024 |
| Confidential Disclosure Agreement | Nutreco | 09/27/2023 |
| Confidential Disclosure Agreement | Nyrasta LLC | 11/03/2021 |
| Confidential Disclosure Agreement | Par Pacific Holdings, Inc. | 05/02/2023 |
| Confidential Disclosure Agreement | Peaker Energy Group, LLC | 01/12/2021 |
| 2023-24 Field Experiment Plan | Performance Crop Research, LLC | 08/17/2023 |
| Master Services Agreement | Performance Crop Research, LLC | 08/23/2023 |
| Materials Transfer Agreement | Petro-Lubricant Testing Laboratories, Inc. | 12/22/2021 |
| Confidential Disclosure Agreement | Petro-Lubricant Testing Laboratories, Inc. | 12/21/2021 |
| Framework Agreement On The Provision Of Contract Services | Platform Genetics Inc. | 04/25/2022 |
| Materials Transfer Agreement | POS Biosciences Corp. | 02/15/2024 |
| First Amendment To Plant Material Testing Agreement | Regents of the University of Minnesota | 02/15/2023 |
| First Amendment To Plant Material Testing Agreement | Regents of the University of Minnesota | 02/28/2023 |
| Plant Material Testing Agreement | Regents of the University of Minnesota | 08/25/2021 |
| Plant Material Testing Agreement | Regents of the University of Minnesota | 08/27/2021 |

| Name | Counterparty | Effective date |
|---|---|---|
| Plant Material Testing Agreement | Regents of the University of Minnesota | 08/27/2021 |
| Confidential Disclosure Agreement | Richter LLP | 03/30/2022 |
| Yield10 Camelina Stewardship Management Program[2] | Robert Kostek | 04/19/2024 |
| License Agreement | Rothamsted Research Limited | 06/12/2024 |
| Materials Transfer Agreement | Rothamsted Research Limited | 05/03/2022 |
| Non-Disclosure Agreement | Rothamsted Research Limited | 07/24/2024 |
| Material Transfer Agreement | S&W Seed Company | 05/11/2021 |
| 2023-24 Field Experiment Plan | Saskatchewan Conservation Learning Centre (CLC) | 08/29/2023 |
| Confidential Disclosure Agreement | SNPsaurus LLC | 03/16/2022 |
| Confidential Disclosure Agreement | SNPsaurus LLC | 02/07/2022 |
| Confidentiality Agreement | Société des Produits Nestlé SA | 03/03/2022 |
| Master Services Agreement | South East Research Farm (SERF) | 08/29/2023 |
| Confidential Disclosure Agreement | Strategic Vision Consulting Ltd | 03/14/2023 |
| Consulting Agreement | Strategic Vision Consulting Ltd | 3/31/2023 |
| Mutual Confidentiality Agreement | Suntory Holdings Limited | 05/01/2024 |
| Mutual Non-disclosure Agreement | Sustainable Oils, Inc. | 01/18/2024 |
| Mutual Non-disclosure Agreement | The Broad Institute, Inc. | 11/22/2022 |
| Confidential Disclosure Agreement | Thenell & Associates LLC | 11/19/2019 |
| Transportation and Storage Agreement | Tobin & Sons Moving and Storage, LLC | 11/25/2024 |
| Biorepository Services Agreement | Tobin Scientific | 11/25/2024 |
| Exclusive License Agreement | University of Missouri (Curators of the) | 05/17/2018 |
| Exclusive License Agreement - Amendment 1 | University of Missouri (Curators of the) | 04/08/2019 |
| Material Transfer Agreement | University of Nebraska (Board of Regents) | 07/16/2021 |
| Confidential Disclosure Agreement | USDA-ARS-WRRC | 04/08/2020 |
| Confidential Disclosure Agreement | vCPO LLC | 02/22/2021 |
| License And Service Fee Agreement | Vision Bioenergy Oilseeds LLC | 02/09/2024 |

[2] This contract will be excluded from the Assumed Payables calculation.

| Name | Counterparty | Effective date |
|------|-------------|----------------|
| Stewardship Management Program | Vision Bioenergy Oilseeds LLC | 03/13/2024 |
| Confidential Disclosure Agreement | Vision Bioenergy Oilseeds LLC | 10/11/2023 |
| Mutual Confidential Disclosure Agreement | Washington State University | 02/21/2024 |
| 2023-24 Field Experiment Plan | Western Applied Research Corporation (WARC) | 08/29/2023 |
| Master Services Agreement | Western Applied Research Corporation (WARC) | 08/29/2023 |
| 2023-24 Field Experiment Plan | Wheatland Conservation Area (WCA) | 08/28/2023 |
| Master Services Agreement | Wheatland Conservation Area (WCA) | 08/28/2023 |
| Confidential Disclosure Agreement | Wincrest Capital | 08/09/2023 |
| Confidential Disclosure Agreement | Wolf & Co. | 02/05/2024 |
| Master Services Agreement | 2010282 AB Ltd. (Kerschbaumer) | 09/27/2023 |
| Master Services Agreement | AgGro Innovations LLC | 11/14/2022 |
| 2023 PNT Camelina Trial | Ag-Quest Holdings Ltd. | 04/25/2023 |
| 2021 Camelina Seed & Germplasm Eval | AgraServ, LLC | 06/15/2021 |
| 2023-24 Field Experiment Plan | AgraServ, LLC | 07/31/2023 |
| Master Services Agreement | AgraServ, LLC | 05/05/2023 |
| Master Services Agreement | Conservation Learning Centre (CLC) | 08/29/2023 |
| Master Services Agreement | Cropwise Research LLC | 09/15/2022 |
| Camelina Germplasm Evaluation & Herbicide Tolerance Trials | G2 Ag Research LLC | 03/20/2021 |
| Master Services Agreement | G2 Ag Research LLC | 08/29/2022 |
| Research License Agreement | GDM Seeds | 08/10/2020 |
| 2023-24 Field Experiment Plan | Mackenzie Applied Research Association (MARA) | 09/08/2023 |
| 2023-24 Field Experiment Plan | Mackenzie Applied Research Association (MARA) | 09/08/2023 |
| Master Services Agreement | Mackenzie Applied Research Association (MARA) | 09/08/2023 |
| Collaborative Research And Development Agreement Amendment No. 1 | Minister of Agriculture and Agri-Food (AAFC) | 01/27/2017 |
| Yield10 Camelina Stewardship Management Program[3] | Mortenson Farm partners | 04/29/2024 |

---

[3] This contract will be excluded from the Assumed Payables calculation.

| Name | Counterparty | Effective date |
|------|-------------|----------------|
| Camelina Sativa (Winter Type) Non-Regulated Seed Increase | Rakochy Farms | 09/07/2021 |
| Confirmation of Seed Destruction | Regents of the University of Minnesota | 07/12/2024 |
| Work Agreement | Research Designed for Agriculture (RD4AG) | 04/23/2018 |
| RNA-Sequencing Project SOW | Rothamsted Research Limited | 07/05/2021 |
| Seed Production And Processing Services Agreement | S&W Seed Company | 04/20/2021 |
| Master Services Agreement | SGS North America Inc | 09/20/2022 |
| Work Order | 2022-23 Field Experiment Plan | SGS North America Inc | 09/15/2022 |
| Master Services Agreement | South Dakota State University | 08/26/2022 |
| Work Order | 2022-23 Field Experiment Plan | South Dakota State University | 08/31/2022 |
| 2022 Field Experiment Plan - Camelina | South East Research Farm (SERF) | 05/04/2022 |
| 2023-24 Field Experiment Plan | South East Research Farm (SERF) | 08/28/2023 |
| Master Services Agreement | South East Research Farm (SERF) | 08/19/2022 |
| Work Order | 2022-23 Field Experiment Plan | South East Research Farm (SERF) | 09/01/2022 |
| License Side Letter | The Broad Institute, Inc. | 04/04/2024 |
| 2019 PNT Soybean Trials | Wellington Agricultural Research Ltd. | 04/26/2019 |
| 2021 Camelina Germplasm Evaluation | Wellington Agricultural Research Ltd. | 06/21/2021 |
| Master Services Agreement | Westman Agricultural Diversification Organization | 09/07/2022 |

**SCHEDULE 1.01(e)**

**TANGIBLE PERSONAL PROPERTY**

[*See attached*]

| Asset Tag # | Category | Description | Brand | Model | Serial Number | Woburn/Amherst location |
|---|---|---|---|---|---|---|
| 002117 | Balance | Balance, 630 g | Sartorius | BCE622I-1S, Entris II Precision Balance | 0043501992 | WMA 310 Bench 20 |
| 01049 | Balance | Balance, Analytical | Sartorius | BA 110 S | 30406108 | WMA 307 Stock Room |
| 01046 | Balance | Balance, Two-pan | Ohaus | Havard Trip, 1400/1500 SERIES | | WMA 307 Bench 11 |
| 01050 | Balance | Balance, Ultramicro | Mettler Toledo | XP - 6 | 1129203974 | WMA 307 Stock Room |
| 002074 | Balance | Scale, 200 lb | Pelouze | 10B200 | | WMA 310 Bench 19 |
| 01045 | Balance | Scale, 410 g (0.9 lb) | Denver | XS-410 | N0095627 | WMA 310 Bench 19 |
| 002024 | Balance | Scale, 6000 g (15 lb) | Ohaus | R31P6 | 8341515724 | WMA 310 Bench 19 |
| 01047 | Balance | Balance, Analytical | Mettler Toledo | AG245 | 1116150938 | WMA 310 Bench 19 |
| 01328 | Balance | Balance, Analytical | Mettler Toledo | XS105DU | 1129063874 | WMA 307 Bench 10 Window |
| 001722 | Balance | Balance, Analytical | Mettler Toledo | XPR206DR | C048539137 | WMA 307 Bench 08 Window |
| 01312 | Bioanalyzer | Bioanalyzer 2100 | Agilent | G2939A | DE 72901829 | WMA 310 Bench 20D |
| 001781 | Cart | Gas cylinder truck | Uline | H-3192 | n/a | WMA 307 Stock Room |
| 01695 | Centrifuge | Centrifuge, Benchtop Swinging Bucket | Eppendorf | 5810 | 5810DM363984 | WMA 310 Bench 17 |
| 01471 | Electroporator | Electroporator | Eppendorf | 2510 | EC - 1897 | WMA 307 Stock Room |
| 01320 | Electroporator | Electroporator: 2-500V | BTX Harvard Apparatus | ECM 399 | 3990596 | WMA 307 Bench 09 |
| 01470 | Freeze Dryer | Lyophilizer | Labconco | 77S3020 | 100829443 D | WMA 307 Bench 11 Wall |
| 01003 | Freezer | -20C freezer | Kenmore Frost free | 253.23024104 | WB42122969 | WMA 307 Bench 03 Wall |
| 01005 | Freezer | -20C freezer | VWR by Revco | U2020GA14 | U2IH39205?UH | WMA 307 Stock Room |
| 01075 | Freezer | -20C freezer | Kenmor Elite | 253 - 26082100 | WB 61821949 | WMA 307 Bench 13 Wall |
| 01693 | Freezer | -20C freezer | So-Low | ABT-EP-1720-S | WB 20764476-1305 | WMA 307 Bench 02 Wall |
| 002021 | Freezer | -20C freezer | Electrolux | FFUE2022AW6 | BB23818410 | WMA 307 Seed Room |
| 001724 | Growth chamber | Plant Growth Chamber | Conviron | Gen2000 | 200517 | WMA 310 Bench 15 |
| 001725 | Growth chamber | Plant Growth Chamber | Conviron | Gen2000 | 200518 | WMA 310 Bench 15 |
| 01436 | Heat block | Heat block, Digital, 4 blocks | VWR Scientific | VWR Digital 4 Heatblock 949306 | 90210007 | WMA 307 Bench 04 |
| 002108 | Heat Block | Heat block, Digital, 4 blocks | VWR Scientific | VWR Digital 4 Heatblock 949306 | 100216002 | WMA 307 Bench 04 |
| 01790 | Ice machine | Ice machine | Hoshizaki | F-330BAH | C33565 | WMA Boiler Room |
| 01291 | Imaging system | Gel Doc XR/ChemiDoc XRS | Bio-Rad | 170-8070 WS, Universal Hood II | 76 S 04744 | WMA 307 Bench 13 Window |
| 01083 | Incubator | Incubator, Benchtop | VWR Scientific | 1545 | 300593 | WMA 307 Bench 07 |
| 01084 | Incubator | Incubator, Benchtop | VWR Scientific | 1545 | 1101094 | WMA 307 Bench 06 |
| 01444 | Microscope | Microscope (Leica) camera | Leica | DFC310 FX | 467941910 BZ 02 | WMA 310 Bench 20C |
| 01444 | Microscope | Microscope (Leica) Fluorescence Illuminator | Excelitas Technologies | XMP5 | XMP5-08845 | WMA 310 Bench 20C |
| 01444 | Microscope | Microscope (Leica) light source | Volpi | Intralux 6000-1, 10257 | 4000206 | WMA 310 Bench 20C |
| 01444 | Microscope | Microscope (Leica), Fluorescece | Leica | MZ16F | 10446157 | WMA 310 Bench 20C |
| 01443 | Microscope | Microscope (Zeiss) camera | Leica | DFC310 FX | 464461610 BZ 02 | WMA 310 Bench 20C |
| 01443 | Microscope | Microscope (Zeiss) Halogen lamp housing | Zeiss | HBO 100 | 1007-980 | WMA 310 Bench 20C |
| 01443 | Microscope | Microscope (Zeiss) Power Supply | Leistung | LEJ ebq 100, D-07745 | 1003-928/K35245288 | WMA 310 Bench 20C |
| 01443 | Microscope | Microscope (Zeiss), Fluoresence | Zeiss | Axiolab E re, 4S 09 07 | 7701028 | WMA 310 Bench 20C |
| 002104 | Microscope | Microscope camera | Zeiss | MC80DX | 29347 | WMA 310 Bench 20C |
| 002105 | Microscope | Microscope camera | Leica | DFC500 | 1454705 | WMA 310 Bench 20A |
| 002107 | Microscope | Microscope Power Supply | LEISTUNG | D-07745 | S4380801226 | WMA 310 Bench 20C |
| 01150 | microscope | Microscope, Dissecting | Olympus | SZ2-ILST | 7C18306 | WMA Tissue culture room |
| 01151 | microscope | Microscope, Dissecting | Olympus | SZ2-ILST | 8B13516 | WMA Tissue culture room |
| 002020 | Microscope | Microscope, Dissecting | Olympus | SZ2-ILST | 3F41799 | WMA 307 Bench 11 Window |
| n/a | Microscope | Stereo microscope | Swift Instruments | TriPower M27 | 9.80E+05 | WMA 310 Bench 20A |
| 01723 | Oil press | Oil press | Oilpress Co | M70.2 | | WMA Tissue culture room |
| 01014 | Orbital shaker | Incubator shaker, Benchtop | Barnstead | MAX Q4000, SHKE-4000-5 | 1412070458126 | WMA Tissue culture room |
| 002019 | pH meter | pH meter | Mettler Toledo | SevenDirect SD20 | C201290351 | WMA 307 Bench 11 |
| 002077 | Pump | Vacuum pump | Welch | 2511B01 | 31100000884 | WMA Tissue culture room |
| 002086 | Pump | Vacuum pump | Welch Thomas | 2545B-01 | 6000027 20 | WMA 310 Bench 20 |
| 002116 | Seed Analyzer | Seed Analyzer | MARVIN | Proline II | 1100-350 | WMA 310 Bench 20 |
| 002023 | Seed Blower | Seed Cleaner, Small column | Agriculex | CB-1 | CB12010 | Umass CNS Greenhouse |
| 002115 | Seed Blower | Seed Cleaner, Small column | Agriculex | CB-1 | CB123006 | WMA 307 Seed Room |
| 002118 | Seed Counter | Seed Counter | Elmor | C1 | 56398 | WMA 310 Bench 20 |
| 001721 | Spectrophotometer | Spectrophotometer, Cuvette and microplate | Molecular Devices | SpectraMax ABS Plus | ABPO0858 | WMA 307 Bench 07 |
| 01620 | Thermal Cycler | Thermal cycler, Dual block | Bio-Rad | C1000 Touch Thermal Cycler | CT001428 | WMA 307 Bench 07 |
| n/a | UV Lamp | Handheld UV Lamp | ID Technologies | UVG 54 | | WMA 307 Bench 20A |
| 01268 | Vortexer | Vortexer | VWR Scientific | VM - 3000 | 090323036 | WMA 307 Bench 04 |
| 01295 | Vortexer | Vortexer | Ika Lab | MV - 1 | 03 - 010551 | WMA 307 Bench 12 |
| 01298 | Vortexer | Vortexer | Ika Lab | MS 3 | 03 300851 | WMA 310 Bench 20D |
| 01361 | Vortexer | Vortexer | VWR Scientific | VM-3000, 94S300, S8816-121 | 60119017 | WMA 307 Bench 01 |
| 01376 | Vortexer | Vortexer | VWR Scientific | G - 560 | 2 - 257658 | WMA 307 Bench 05 |
| 01446 | Vortexer | Vortexer with adaptor for 1.5mL tubes | Scientific Industries, Inc. | G 560 | 2.352609 | WMA 307 Bench 12 |
| 01382 | Vortexer | Vortexer | VWR Scientific | G - 560 | 2 - 227178 | WMA 307 Bench 08 |
| 01380 | Water Bath | Water Bath, 2.liter | Fisher Scientific | 2LS water bath | 310735 | WMA 307 Stock Room |

**Woburn Pipets**

| Pipet size & style* | 2 µL | | 10 µL | | 20 µL | 100 µL | 200 µL | 1000 µL | | | 5 mL | Multi- | Misc pipets*** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SL | XLS | SL | XLS | SL | SL | SL | SL | XLS | LTS | XLS | XLS | Electronic |
| Quantity | 5 | 1 | 3 | 1 | 5 | 3 | 5 | 5 | 2 | 1 | 1 | 1 | 2 |

**\*Pipet style** SL, XLS, LTS = Rainin: newer styles

**\*\* Multi-channel pipets** 0.5-10 µL LTS 8-channel multi (Rainin)
5-50 µL 12-channel multi (VWR)
5-100 µL 12-channel multi (BioHit)

**\*\*\*Misc pipets** LTS 1 and 10 mL electronic pipets (old model)

Saskatoon Equipment

| Asset Tag # | Description | Make | Model | Country of Origin | Serial Number | Dimensions WxDxH | Location |
|---|---|---|---|---|---|---|---|
| 1589 | Analytical Balance | Mettler Toledo | XS105DU | Switzerland | B049095158 | | NRC lab |
| 2033 | Centrifuge | Eppendorf | 5810R | Germany | 5811LQ299271 | | NRC lab |
| 1760 | King Fisher Flex | Thermo Scientific | 5400630 | Finland | 711-328 | | NRC lab |
| 1766 | plate stacker | Caliper Life Sciences | 126864/E | USA | T21121N0583 | | NRC lab |
| 1599 | Column Blower Seed Cleaner | Ariculex | CB1 | Canada | CB110014 | | IP_Seed lab |
| 1704 | Elmor seed counter | Elmor | C1 | Switzerland | 56329 | | IP_Seed lab |
| 1717 | Marvin 1000 weight seed analyzer | | | | | | IP_Seed lab |
| 1752 | Leaf porometer | Decagon Devices Inc | SC-1 | USA | LPS1767 | | NRC lab |
| 2030 | Barcode/Tag printer | Toshiba | B-EX6 | Indonesia | 2322A290738 | | NRC lab |
| 2031 | Column Blower Seed Cleaner | Agriculex | CB-1 | Canada | CB123001 | | IP_Seed lab |
| 1289 | minus 20 freezer | VWR | SCBMF-2020 | | SYM-WB03359476-1009 | 32x29x70 | NRC lab |
| 1349 | minus 20 freezer | VWR | U2020GA15 | USA | T03T-627456-TT | 34x29x67 | IP_Seed lab |
| 1701 | -20C upright freezer | Whirlpool | EV201NZTQ03 | USA | U41202372 | | IP_Seed lab |
| 1702 | -20C upright freezer | Whirlpool | WZF79R20DW00 | USA | U73803835 | | IP_Seed lab |
| 1703 | -20C upright freezer | Whirlpool | WZF79R20DW00 | USA | U73803834 | | IP_Seed lab |
| 1757 | -20 Freezer | VWR | R134A | USA | DGK57C8RRPU | | NRC lab |
| 2034 | -20C freezer | VWR | HCMFS-20 | USA | VWR-21032621-2109 | | NRC lab |
| 1285 | bench centrifuge | Eppendorf | 5417R | | 5407-13603 | | NRC lab |
| 1324 | centrifuge | Eppendorf | 5810R | Germany | 0039168 | 28x24x13 | NRC lab |
| 1336 | centrifuge | Eppendorf | 5430 | Germany | 5427WR905297 | 13x16x10 | NRC lab |
| 1339 | centrifuge | Eppendorf | 5417R | Germany | 5407XG225485 | 13x24x10 | NRC lab |
| 1767 | power supply | VWR | AccuPower 500 | USA | G38086 | | NRC lab |
| 1768 | power supply | Life Technologies | PS0300 | Taiwan | 0300591157 | | NRC lab |
| 1275 | small refrigerator | LG | GR-151RCW | | 23RE3039 | 24x24x36 | NRC lab |
| 1276 | mini vortex | VWR | VM-3000 | | 18945 | 5x7x7 | NRC lab |
| 1277 | mini vortex | VWR | VM-3000 | | 19547 | 5x7x7 | NRC lab |
| 1281 | flow bench | Microzone | H6-MW-99-C30 | | 804-4815B | | NRC lab |
| 1284 | floor shaker | New Brunswick | C-24 | | 200937424 | 28x28x18 | NRC lab |
| 1288 | RO system | Barnstead | D11931 | | 1193020960396 | | NRC lab |
| 1290 | Sterilizer Dry Glass Bead | VWR | IS-350 | | 14558 | | NRC lab |
| 1322 | electroporator | Eppendorf | 2510 | Germany | EC1617 | 9x11x3.5 | NRC lab |
| 1326 | incubator/shaker | New Brunswick | Excella E24 | USA | 800432434 | 23x30x24 | NRC lab |
| 1330 | water bath | VWR | 89032-216 | USA | WK0817001 | 13x15x17 | NRC lab |
| 1333 | incubator/oven | VWR | 1545 | USA | 04021608 | 25x28x37.5 | NRC lab |
| 1335 | microwave oven | GE Profile | PEB2060DM1BB | China | DR900333U | 24x18x13.5 | NRC lab |
| 1337 | vortex mixer | Vortex Genie 2 | G560 | USA | 2-403693 | 5x7x7 | NRC lab |
| 1338 | vortex mixer | Vortex Genie 2 | G560 | USA | 2-403688 | 5x7x7 | NRC lab |
| 1340 | hot plate | Barnstead Cimarec | S131125 | Malaysia | 1760080562637 | 8x12x4 | NRC lab |
| 1342 | pH meter | Fisher | AB15 | Singapore | AB92329277 | 9x8x4 | NRC lab |
| 1350 | minus 4 freezer | VWR | R421GA15 | USA | S28T-627329-TT | 34x29x67 | IP_Seed lab |
| 1583 | light meter | Li Cor | LI-250A | USA | LM2-2831 | | IP_Seed lab |
| 1584 | photometric sensors | Li Cor | LI-1905 | USA | Q44070 | | IP_Seed lab |
| 1586 | 4 C refrigerator | VWR | SCGP-1804 | | SYM-WA04001992-1011 | 25x20x56 | NRC lab |
| 1587 | minus 86 freezer | Thermo Scientific | 5604 | USA | 822397-372 | 33x37x 78 | NRC lab |
| 1588 | Balance | Ohaus | EP2102 | Switzerland | 0327B0410706115P | | IP_Seed lab |
| 1590 | 10X10 CER Hotplate/stirrer | VWR | 97042-674 | USA | 110225002 | | NRC lab |
| 1591 | incubator/oven | VWR | 1380FM | USA | 1207310 | | NRC lab |
| 1592 | Growth Chamber | Percival | AR36L3X | USA | 10696.01.07K | | NRC lab |
| 1593 | growth chamber | Percival | AR41L3 | USA | 11130.02.08D | | NRC lab |
| 1594 | Stereomicroscope | Leica | L5 Fl | Germany | 62548 | | NRC lab |
| 1597 | Vacuum pump | Welsch | 2522B-01 | USA | 101000004780 | | NRC lab |
| 1598 | Vacuum pump | Welsch | 2534B-01 | USA | 011100002574 | | IP_Seed lab |
| 1600 | Growth Chamber | Conviron | CMP6050 | Canada | 100240 | | IP_Seed lab |
| 1601 | Blender T010S | Waring Commercial | WF2211214 | USA | 110330 | | NRC lab |
| 1602 | Dryer | Binder | 720 | Germany | 11-03701 | | IP_Seed lab |
| 1604 | Inverted microscope | Motic | AE2000 | | 1290000435 | | NRC lab |
| 1605 | Sterilizer Dry Glass Bead | VWR | IS-350 | | 11-14'362 | | NRC lab |
| 1609 | digital camera | Kodak | Z990 | Vietnam | KVYNW113K0595 | | NRC lab |
| 1706 | microwave | Panasonic | NN-SG626W | China | EB06128400218713112887 | | NRC lab |
| 1708 | Fluorometer | Invitrogen | Qubit 4 | Singapore | 2322619026573 | | NRC lab |
| 1709 | digital caliper | Aurora | TLV181 | | 31180941711 | | NRC lab |
| 1710 | Ohaus Valor 4000 large capacity balance | Ohaus | V41PWE15T | China | 8340025725 | | IP_Seed lab |
| 1714 | platefuge (microplate microcentrifuge) | Benchmark Scientific | C2000 | USA | A08190441 | | NRC lab |
| 1716 | Thermal printer | Mitsubishi Electric | P95DW | Malaysia | 776C413610 | | NRC lab |
| 1718 | analytical balance | | | | | | IP_Seed lab |
| 1751 | SPAD Chlorophyll Meter | Konica Minolta | 2900PDL | Japan | 20003831 | | NRC lab |
| 1754 | microwave oven | Panasonic | NN-ST651B | China | F00067603CP | | NRC lab |
| 1755 | top loading balance | Ohaus | EX2202 | Switzerland | B639089858 | | NRC lab |
| 1758 | Mini bead beater | BioSpec Products | Minibeadbeater 96, Cat#1001 | USA | none | | NRC lab |
| 1761 | centrifuge | Sigma | 4-16 | Germany | 140262 | | NRC lab |
| 1769 | SPAD Chlorophyll Meter | Konica Minolta | 2900P | Japan | 20009595 | | NRC lab |
| 1770 | -80C freezer | VWR | VWR32086A | USA | 300199801 | | NRC lab |
| 2032 | top loading balance | Ohaus | AX2202 | China | C244196041 | | NRC lab |
| 2037 | Fridge/Freezer | Whirlpool | WRS312SNHW05 | | HRC2611172 | | NRC lab |

**American Falls Equipment**

| Description | Make | Model | Location |
|---|---|---|---|
| Seed cleaner | Clipper AGM 224 | https://www.hoffmanmfg.com/products/clipper-agm-224/ | American Falls at Agraserv (CRO) |

**Other Equipment**

| ID | Name |
|---|---|
| FAM000044 | Centrifuge |
| FAM000111 | Seed Counter (5718,00 CHF) |
| FAM000128 | Control Chambers CMP6060 |
| FAM000135 | XPR Analytical Balance |
| FAM000136 | XPR Analytical Balance |
| FAM000143 | Seed cleaner system |
| FAM000149 | M70.2 Precision Cold Screw oil press |

**SCHEDULE 1.01(f)**

**CURRENT AND EXPIRED PERMITS/NOTIFICATIONS**

*for transfer of obligations of volunteer monitoring to Nuseed*

**CURRENT PERMITS**

| Permit/Notification Type | Issuing Authority | Permit/Notification # |
|---|---|---|
| Confined Field Release Permit | CFIA | 21-MET1-415-CAM |
| Confined Field Release Permit | CFIA | 21-MET1-415-CAM02 |
| Confined Field Release Permit | CFIA | 22-MET1-656-CAM |
| Confined Field Release Permit | CFIA | 23-YOS-656-CAM |
| Confined Field Release Permit | CFIA | 23-YOS1-656-CAM |
| Planting Environmental Release and Interstate Movement Notification | USDA-APHIS | 20-084-102n |
| Planting Environmental Release and Interstate Movement Notification | USDA-APHIS | 20-268-103n |
| Interstate Movement Notification | USDA-APHIS | 21-091-102n |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000221513 |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000273034 |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000237210 |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | 20-357-102rm |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH - 0000204861 |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH - 0000221513 |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | 21-005-102rm |

| Permit/Notification Type | Issuing Authority | Permit/Notification # |
|---|---|---|
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000205408 |

## EXPIRED PERMITS

*for transfer of obligations for seed storage and inventory required for shipment of seed to Nuseed*

| Permit Type | Issuing Authority | Permit # |
|---|---|---|
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | 21-005-102rm |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000205408 |
| Confined Field Release Permit | CFIA | 18-MET1-415_CAN |
| Confined Field Release Permit | CFIA | 20-MET1-415_CAN |
| Confined Field Release Permit | CFIA | 18-MET1-415_CAM |
| Confined Field Release Permit | CFIA | 19-MET1-415_CAM |
| Confined Field Release Permit | CFIA | 20-MET1-415_CAM |
| Importation Permit | CFIA | P-2022-03642 |
| Importation Permit | CFIA | P-2022-00896 |
| Importation Permit | CFIA | P-2023-01329 |
| Importation Permit | CFIA | P-2023-01330 |
| Importation Permit | CFIA | P-2023-00273 |
| Importation Permit | CFIA | P-2023-01294 |
| Importation Permit | CFIA | P-2024-00605 |

**SCHEDULE 1.07**

**ALLOCATION METHODOLOGY**

For U.S. federal and applicable state and local income tax purposes, and for purposes of the *Income Tax Act* (Canada), Buyer, Sellers, and their respective Affiliates shall allocate the Purchase Price (and the agreed value of any Assumed Liabilities or other capitalized costs treated as part of the Purchase Price for applicable income tax purposes) among the Purchased Assets, and among the Sellers (and on a basis consistent with the foregoing shall allocate the agreed value of any Assumed Liabilities or other capitalized costs treated as part of the Purchase Price for applicable income tax purposes among the Assumed Liabilities) in accordance with the allocation methodology set forth below:

| Assets | Allocation Methodology |
|---|---|
| Class I (generally, cash and general deposit accounts (other than CDs) held in depositary institutions) | N/A |
| Class II (certain actively traded personal property, certificates of deposit, and foreign currency) | N/A |
| Class III (assets marked-to-market at least annually for federal income tax purposes and certain debt instruments) | N/A |
| Class IV (certain inventory type-assets) | N/A |
| Class V (all assets not included in Classes I-IV) | Fair market value will equal net book value as of the Closing Date |
| Class VI (Section 197 intangibles except goodwill and going concern value) | Fair market value will equal present value of future cash flows as of the Closing Date |
| Class VII (goodwill and going concern value) | Fair market value will equal the Purchase Price (plus Assumed Liabilities or other capitalized costs treated as part of the Purchase Price for applicable income Tax purposes) less the fair market value of the assets described in the junior classes III-VI |

The final Purchase Price will be further allocated among the Purchased Assets within each Class.

**SCHEDULE 2.02**

**REQUIRED CONSENTS**

1.  Consent of Vision Bioenergy Oilseeds LLC under the License and Service Fee Agreement, dated February 9, 2024, between Vision Bioenergy Oilseeds LLC and Yield10.

2.  Consent of the University of Missouri under the Exclusive License Agreement, dated May 17, 2018, between The Curators of the University of Missouri and Yield10.

3.  Notice to the Minister of Agriculture and Agri-Food ("AAFC") pursuant to Section 9.1.1 of the Collaborative Research and Development Agreement, dated October 1, 2021, between AAFC and Oilseeds.

4.  Consent of AAFC pursuant to Sections 4.7.1 and 9.6 of the Collaborative Research and Development Agreement, dated October 1, 2021, between AAFC and Oilseeds.

5.  Notice to Rothamsted pursuant to Section 5.04(b)(ii)(A).

**SCHEDULE 5.01(b)(v)**

**MAINTAINED EMPLOYEES**

1.  Nirmala Sharma

2.  Tengsheng Zhou

3.  Martha Sholl

4.  Venkatesh Bollina

**SELLER DISCLOSURE SCHEDULE**

**to the**

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**NUSEED NUTRITIONAL US INC.,**

**YIELD10 BIOSCIENCE, INC.**

**and**

**YIELD10 OILSEEDS INC.**

**DATED AS OF**

**DECEMBER 4, 2024**

This Seller Disclosure Schedule (this "**Disclosure Schedule**") is being delivered in accordance with, and is incorporated and made part of, the Amended and Restated Asset Purchase Agreement referred to above (the "**Agreement**"). Capitalized terms used in this Disclosure Schedule but not otherwise defined herein will have the respective meanings given to such terms in the Agreement.

Nothing in this Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made in the Agreement, unless the applicable section of this Disclosure Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail, including by explicit cross-reference to another section of this Disclosure Schedule. If any information required by the Agreement to be furnished in any section of this Disclosure Schedule is contained in any section of this Disclosure Schedule, such information shall be deemed to be included in any other such section of this Disclosure Schedule solely to the extent it is reasonably apparent on the face of the actual text of such disclosure without reference to extrinsic documentation or independent knowledge regarding the matter disclosed that such information is applicable to such other section of this Disclosure Schedule. Without limiting the generality of the foregoing, the mere listing, or inclusion of a copy, of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein, unless the representation or warranty is being made as to the existence of the document or other item itself. Sellers are responsible for preparing and arranging this Disclosure Schedule.
.

**Section 3.01(c)**
Officers and Directors

<u>Yield10</u>

**Directors:**

      Oliver P. Peoples
      Robert van Nostrand
      Sherri Brown
      Willie Loh
      Richard Hamilton
      Anthony Sinskey

**Officers:**

      Oliver P. Peoples (President and Chief Executive Officer)
      Lynne H. Brum (Vice President, Planning and Corporate Communications)
      Charles Haaser (Vice President, Finance, Chief Accounting Officer and Treasurer)
      Kristi Snell (Vice President, Research and Chief Science Officer)

<u>Oilseeds</u>

**Directors**:    Meghna Malik
           Oliver P. Peoples

**Officers**:

      Charles Haaser (Treasurer)
      Lynne H. Brum (President, Secretary)

**Section 3.02(a)**
No Conflicts

1. Notice to the Minister of Agriculture and Agri-Food ("AAFC") regarding the Contemplated Transaction pursuant to the Collaborative Research and Development Agreement, dated September 13, 2021, as amended July 6, 2022, between AAFC and Oilseeds.

2. Consents of the counterparties under the following Assigned Contracts:

   a. License and Service Fee Agreement, dated February 9, 2024, between Vision Bioenergy Oilseeds LLC and Yield10.

   b. Exclusive License Agreement, dated May 17, 2018, as amended April 2019, between The Curators of the University of Missouri and Yield10.

   c. Consent of AAFC under the Collaborative Research and Development Agreement, dated September 13, 2021, as amended July 6, 2022, between AAFC and Oilseeds.

   d. Mutual Confidentiality Agreement, dated November 10, 2023, between A.G.P./Alliance Global Partners and Yield10.

   e. Mutual Non-disclosure Agreement, dated December 15, 2022, between American Airlines, Inc. and Yield10.

   f. Confidentiality Agreement, dated August 3, 2022, between Archer-Daniels-Midland Company (ADM) and Yield10.

   g. Confidentiality Agreement, dated May 20, 2023, between BASF Agricultural Solutions Seed US LLC and Yield10.

   h. Mutual Non-disclosure Agreement, dated January 5, 2024, between Bayer CropScience LP (BCS) and Yield10.

   i. Confidentiality Agreement, dated June 4, 2024, between BP Products North America Inc. and Yield10.

   j. Confidentiality Agreement, dated October 3, 2022, between Bunge North America, Inc and Yield10.

   k. Mutual Non-disclosure Agreement, dated October 31, 2023, between Canopy Growth Corporation and Yield10.

   l. Mutual Confidentiality Agreement, dated January 19, 2024, between Cargill, Incorporated and Yield10.

   m. Mutual Confidentiality Agreement, dated November 13, 2023, between DSM Nutritional Products, LLC and Yield10.

n.  Confidential Disclosure Agreement, dated January 10, 2024, between Evogene Ltd. and Yield10.

o.  Confidentiality Agreement, dated March 23, 2023, between Exxon Mobil Corporation and Yield10.

p.  Non-disclosure Agreement, dated September 22, 2022, between knoell USA, LLC and Yield10.

q.  Confidential Disclosure Agreement, dated February 13, 2020, between KWS SAAT SE & Co. KGaA and Yield10.

r.  Mutual Confidentiality Agreement, dated August 26, 2023, between Lake Street Capital Markets, LLC and Yield10.

s.  Mutual Non-disclosure Agreement, dated February 6, 2023, between LG Chem, Ltd. and Yield10.

t.  Mutual Non-disclosure And Confidentiality Agreement, dated June 12, 2024, between Louis Dreyfus Company LLC and Yield10.

u.  Non-Disclosure Agreement, dated November 6, 2023, between Maxim Group LLC and Yield10.

v.  Mutual Nondisclosure Agreement, dated February 19, 2024, between Mazars USA LLP and Yield10.

w.  Four-way Confidentiality And Non-disclosure Agreement, dated September 8, 2023, between Mitsubishi Corporation (Americas) and Yield10.

x.  Mutual Non-disclosure Agreement, dated April 10, 2024, between Mitsui & Co. (U.S.A.), Inc. and Yield10.

y.  Non-Disclosure Agreement, dated July 24, 2024, between Rothamsted Research Limited and Yield10.

z.  Mutual Confidentiality Agreement, dated May 1, 2024, between Suntory Holdings Limited and Yield10.

aa. Mutual Non-disclosure Agreement, dated January 18, 2024, between Sustainable Oils, Inc. and Yield10.

bb. Non-Exclusive License for a Plant Variety, dated January 27, 2020, between Minister of Agriculture and Agri-Food (AAFC) and Oilseeds.

cc. Stewardship Management Program, dated March 13, 2024, between Vision Bioenergy Oilseeds LLC and Yield10.

dd. Material Transfer Agreement, dated February 1, 2020, between Minister of Agriculture and Agri-Food (AAFC) and Oilseeds.

ee. Standard Material Transfer Agreement, dated February 12, 2024, between Minister of Agriculture and Agri-Food (AAFC) and Oilseeds.

ff. Material Transfer Agreement, dated May 11, 2021, between S&W Seed Company and Yield10.

gg. Material Transfer Agreement, dated July 16, 2021, between University of Nebraska (Board of Regents) and Yield10.Notice of assignment of the Exclusive License Agreement, dated June 30, 2015, as amended April 13, 2021 and May 2, 2022, between the University of Massachusetts and Yield10.

**Section 3.05(b)**
Real Property

| Street Address | Applicable Lease(s) or Sublease(s) | Landlord | Current Rent | Expiration Date | Current Use of the Property |
|---|---|---|---|---|---|
| 19 Presidential Way Woburn, MA 01801 | Provided:  ARE master Lease and CJ sublease | ARE | $69,680/mo YTEN portion | Nov. 2026 | Office and Lab Negotiation about exit from the space is in progress. |
| NRC Plant Biotechnology Institute 110 Gymnasium Place Saskatoon, Saskatchewan S7N 0W9 | NRC lease provided. Oilseeds has given Notice to vacate on Sept. 30, 2024 | NRC | $7,993.83/mo | Sept. 30, 2024 | Office and Lab Lease ending 9/30/24 |
| Innovation Place 410 Downey Road Saskatoon, SK S7N 5B5 | Lease provided. Oilseeds has given Notice to vacate on Sept. 30, 2024 | Innovation Saskatchewan | $25,169/mo | Sept. 30, 2024 | Lab and Greenhouses Lease ending 9/30/24 Sellers have extended the lease on Lab 2 for 2 months to enable safe storage of equipment and biological materials that would be transferred to Nuseed upon completion of the Contemplated Transactions |

**Section 3.07(a)**

Business Owned Intellectual Property

*[See attachment]*

**Seller's Disclosure Schedule Section 3.07(a)**

**3.07(a)(i): Business IP Registrations, including, as applicable: the title, mark, or design; the record owner and inventor(s), if any; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; the issue, registration, or filing date; and the current status**

**(1) Yield10 in-house patent families**

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 001 (ALL ABANDONED/EXPIRED) | | Multi-Gene Expressions Constructs Containing Modified Inteins | US | Utility | 2/9/2001 | 9/779,957 | Abandoned | 7,026,526 | 4/11/2006 | 6/5/2021 | | Kristi D. Snell |
| | 60191US0 | Multi-Gene Expressions Constructs Containing Modified Inteins | US | Div Con | 4/21/2010 | 12/764,516 | Expired | 8,293,971 | 10/23/2012 | 10/23/2020 | Yield10 Bioscience, Inc. | Kristi D. Snell |
| | 60192US0 | Multi-Gene Expressions Constructs Containing Modified Inteins | US | Div | 6/8/2005 | 11/147,546 | Expired | 7,741,530 | 6/22/2010 | 10/11/2021 | Yield10 Bioscience, Inc. | Kristi D. Snell |
| YTEN 002 (ALL ABANDONED/EXPIRED) | | Stable, Fertile, High Polyhyroxyalkanoate Producing Plants and Methods of Producing Same | Europe | Utility | | | Abandoned | | | 3/5/2030 | | |
| | | Stable, Fertile, High Polyhyroxyalkanoate Producing Plants and Methods of Producing Same | US | DIV | 3/5/2010 | 12/718,498 | Expired | 9,096,861 | 4/4/2015 | 8/4/2019 | Metabolix, Inc. | Karen Bohmert-Tatarev, Susan McAvoy, Oliver P. Peoples, Kristi D. Snell |
| YTEN 003 | 60124US0 | Transcriptional Regulation for Improved Plant Productivity | US | Provisional | 12/18/2012 | 61/738,675 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124WO | Transcriptional Regulation for Improved Plant Productivity | PCT | Utility | 12/18/2013 | PCT/US2013/076308 | National Phase | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124AU | Transcriptional Regulation for Improved Plant Productivity | Australia | Utility | 12/18/2013 | 2013361456 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124BR | Transcriptional Regulation for Improved Plant Productivity | Brazil | Utility | 12/18/2013 | BR112015014488-8 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124CN | Transcriptional Regulation for Improved Plant Productivity | China | Utility | 12/18/2013 | 2.0138E+11 | Abandoned | 104981481 | 5/14/2019 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124DE | Transcriptional Regulation for Improved Plant Productivity | Germany | Utility | 12/18/2013 | 13818142.5 | Expired | 2935315 | 5/6/2020 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60124EP | Transcriptional Regulation for Improved Plant Productivity | Europe | Utility | 12/18/2013 | 13818142.5 | Expired | 2935315 | 5/6/2020 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124EP1 | Transcriptional Regulation for Improved Plant Productivity | Europe | DIV | 12/18/2013 | 20166622.9 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124FR | Transcriptional Regulation for Improved Plant Productivity | France | Utility | 12/18/2013 | 13818142.5 | Expired | 2935315 | 5/6/2020 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124GB | Transcriptional Regulation for Improved Plant Productivity | United Kingdom | Utility | 12/18/2013 | 13818142.5 | Expired | 2935315 | 5/6/2020 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124US1 | Transcriptional Regulation for Improved Plant Productivity | US | Utility | 6/18/2015 | 14/653,431 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124US2 | Transcriptional Regulation for Improved Plant Productivity | US | CON | 2/15/2018 | 15/897,958 | Granted | 10,450,580 | 10/22/2019 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124US3 | Transcriptional Regulation for Improved Plant Productivity | US | CON | 9/13/2019 | 16/570,489 | Granted | 11,072,798 | 07/27/2021 | 12/18/2033 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| | 60124US4 | Transcriptional Regulation for Improved Plant Productivity | US | CON | 3/24/2021 | 17/210,962 | Granted | 11,746,356 | 09/05/2023 | 9/11/2034 | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Mariya Somleva |
| YTEN 004 | 60322US0 | Plants with Enhanced Yield and Methods of Construction | US | Provisional | 4/8/2015 | 62/144,727 | Abandoned | | | | | Meghna Malik, Jihong Tang, Kristi Snell |
| | 60322US1 | Plants with Enhanced Yield and Methods of Construction | US | Provisional | 4/10/2015 | 62/145,757 | Abandoned | | | | | Meghna Malik, Jihong Tang, Kristi Snell |
| | 60322US2 | Plants with Enhanced Yield and Methods of Construction | US | Provisional | 7/9/2015 | 62/190,281 | Abandoned | | | | | Meghna Malik, Jihong Tang, Kristi Snell |
| | 60322WO | Plants with Enhanced Yield and Methods of Construction | PCT | Utility | 4/8/2016 | PCT/US2016/026767 | National Phase | | | | Yield10 Bioscience, Inc. | Meghna Malik, Jihong Tang, Kristi Snell |
| | 60322US3 | Plants with Enhanced Yield and Methods of Construction | US | Utility | 10/6/2017 | 15/565,086 | Granted | 11,174,467 | 11/16/2021 | 11/25/2036 | Yield10 Bioscience, Inc. | Meghna Malik, Jihong Tang, Kristi Snell |
| | 60322US4 | Plants with Enhanced Yield and Methods of Construction | US | Utility | 10/11/2021 | 17/498,240 | Granted | 11,965,182 | 04/23/2024 | 4/8/2036 | Yield10 Bioscience, Inc. | Meghna Malik, Jihong Tang, Kristi Snell |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 005 (MBX-118) (ALL ABANDONED) | 55463US0 | Transgenic Land Plants Comprising A Bicarbonate Transporter Protein Of An Edible Eukaryotic Algae | US | Provisional | 2/4/2016 | 62/291,341 | Abandoned | | | | | Oliver P. Peoples, Kristi D. Snell, Meghna Malik |
| | 55463WO | Transgenic Land Plants Comprising A Bicarbonate Transporter Protein Of An Edible Eukaryotic Algae | PCT | Utility | 2/3/2017 | PCT/US2017/016421 | National Phase | | | | Yield10 Bioscience, Inc. | Oliver P. Peoples, Kristi D. Snell, Meghna Malik |
| | 55463US1 | Transgenic Land Plants Comprising A Bicarbonate Transporter Protein Of An Edible Eukaryotic Algae | US | Utility | 8/2/2018 | 16/074,812 | Abandoned | | | | Yield10 Bioscience, Inc. | Oliver P. Peoples, Kristi D. Snell, Meghna Malik |
| YTEN 006 | 60449US0 | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | US | Provisional | 7/11/2019 | 62/859,244 | Abandoned | | | | Yield10 Bioscience, Inc. | Meghna Malik, Nii Patterson, Jihong Tang, Matthew Martino, Nirmala Sharma, Oliver P. Peoples, Kristi D. Snell |
| | 60449WO | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | PCT | Utility | 6/9/2020 | PCT/US2020/036786 | National Phase | | | | Yield10 Bioscience, Inc. | Matthew Martino, Meghna Malik, Nii Patterson, Oliver P. Peoples, Nirmala Sharma, Frank Anthony Skraly, Kristi D. Snell, Jihong Tang |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60449AU | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | Australia | Utility | 6/9/2020 | 2020293986 | Pending | | | | Yield10 Bioscience, Inc. | Matthew Martino, Meghna Malik, Nii Patterson, Oliver P. Peoples, Nirmala Sharma, Frank Anthony Skraly, Kristi D. Snell, Jihong Tang |
| | 60449CA | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | Canada | Utility | 6/9/2020 | 3,141,340 | Pending | | | | Yield10 Bioscience, Inc. | Matthew Martino, Meghna Malik, Nii Patterson, Oliver P. Peoples, Nirmala Sharma, Frank Anthony Skraly, Kristi D. Snell, Jihong Tang |
| | 60449EP | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | Europe | Utility | 6/9/2020 | 20822454.3 | Pending | | | | Yield10 Bioscience, Inc. | Matthew Martino, Meghna Malik, Nii Patterson, Oliver P. Peoples, Nirmala Sharma, Frank Anthony Skraly, Kristi D. Snell, Jihong Tang |
| | 60449US1 | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | United States | Utility | 12/10/2021 | 17/596,110 | Pending | | | | Yield10 Bioscience, Inc. | Matthew Martino, Meghna Malik, Nii Patterson, Oliver P. Peoples, Nirmala Sharma, Frank Anthony Skraly, Kristi D. Snell, Jihong Tang |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 007 | 57171US0 | TRANSGENIC LAND PLANTS COMPRISING ENHANCED LEVELS OF MITOCHONDRIAL TRANSPORTER PROTEIN | US | Provisional | 2/22/2017 | 62/462,074 | Abandoned | | | | Yield10 Bioscience, Inc. | Oliver P. Peoples, Kristi D. Snell, Meghna Malik, Madana M.R. Ambavaram |
| | 57171WO | TRANSGENIC LAND PLANTS COMPRISING ENHANCED LEVELS OF MITOCHONDRIAL TRANSPORTER PROTEIN | PCT | Utility | 2/22/2018 | PCT/US2018/019105 | National Phase | | | | Yield10 Bioscience, Inc. | Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Kristi D. Snell |
| | 57171AU | TRANSGENIC LAND PLANTS COMPRISING ENHANCED LEVELS OF MITOCHONDRIAL TRANSPORTER PROTEIN | AU | Utility | 2/22/2018 | 2018224065 | Granted | 2018224065 | 2/24/2022 | 2/22/2038 | Yield10 Bioscience, Inc. | Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Kristi D. Snell |
| | 57171CA | TRANSGENIC LAND PLANTS COMPRISING ENHANCED LEVELS OF MITOCHONDRIAL TRANSPORTER PROTEIN | CA | Utility | 2/22/2018 | 3054060 | Granted | 3054060 | 9/26/2023 | 2/22/2038 | Yield10 Bioscience, Inc. | Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Kristi D. Snell |
| | 57171EP | TRANSGENIC LAND PLANTS COMPRISING ENHANCED LEVELS OF MITOCHONDRIAL TRANSPORTER PROTEIN | EP | Utility | 2/22/2018 | 18756996 | Abandoned | | | | Yield10 Bioscience, Inc. | Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Kristi D. Snell |
| | 57171US2 | TRANSGENIC LAND PLANTS COMPRISING ENHANCED LEVELS OF MITOCHONDRIAL TRANSPORTER PROTEIN | US | Utility | 8/21/2019 | 16/487,494 | Abandoned | | | | Yield10 Bioscience, Inc. | Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Kristi D. Snell |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 008 | 57557US0 | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | US | Provisional | 6/16/2017 | 62/520,785 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Oliver P. Peoples, Kristi D. Snell, Meghna Malik |
| | 57557WO | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | PCT | Utility | 6/15/2018 | PCT/US2018/037740 | National Phase | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Meghna Malik, Kristi D. Snell, Oliver P. Peoples |
| | 57557AU | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | AU | Utility | 6/15/2018 | 2018283286 | Abandoned - per instruction to let application lapse | 2018283286 | 5/26/2022 | 6/15/2038 | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Meghna Malik, Kristi D. Snell, Oliver P. Peoples |
| | 57557BR | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | BR | Utility | 6/15/2018 | BR 112019026301-2 | Abandoned - per instruction to let application lapse | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Meghna Malik, Kristi D. Snell, Oliver P. Peoples |
| | 57557CA | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | CA | Utility | 6/15/2018 | 3066220 | Abandoned - per instruction to let application lapse | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Meghna Malik, Kristi D. Snell, Oliver P. Peoples |
| | 57557EP | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | EP | Utility | 6/15/2018 | 18816558.3 | Abandoned - per instruction to not pay annuity | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Meghna Malik, Kristi D. Snell, Oliver P. Peoples |
| | 57557US1 | Genetically Engineered Land Plants that Express a Plant CCP1-Like Mitochondrial Transporter Protein | US | Utility | 12/12/2019 | 16/622,000 | Granted | 11834666 | 12/5/2023 | 6/15/2038 | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Meghna Malik, Kristi D. Snell, Oliver P. Peoples |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 009 (ALL ABANDONED) | 57727US0 | Methods, Genes and Systems for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter Genes | US | Provisional | 6/23/2017 | 62/524,134 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727US1 | Methods, Genes and Systems for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes and Proteins | US | Provisional | 8/16/2017 | 62/546,268 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727WO | Methods and Genes for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes | PCT | Utility | 6/22/2018 | PCT/US2018/038927 | National Phase | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727AU | Methods and Genes for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes | AU | Utility | 6/22/2018 | 2018290308 | Abandoned - per instruction to let application lapse | 2018290308 | 6/16/2022 | 6/22/2038 | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727BR | Methods, Genes and Systems for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes and Proteins | BR | Utility | 6/22/2018 | BR 112019026873-1 | Abandoned - per instruction to let application lapse | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727CA | Methods, Genes and Systems for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes and Proteins | CA | Utility | 6/22/2018 | 3066470 | Abandoned - per instruction to let application lapse | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727EP | Methods and Genes for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes | EP | Utility | 6/22/2018 | 18821327.6 | Abandoned - per instruction to not pay annuity | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57727US2 | Methods and Genes for Producing Land Plants With Increased Expression of Mitochnodrial Metabolite Transporter and/or Plastidial Dicarboxylate Transporter Genes | US | Utility | 12/19/2019 | 16/624,637 | Abandoned - per instruction to let application lapse | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| YTEN 010 (ALL ABANDONED) | 1000 | Genes and Gene Combinations for Enhanced Crops | US | Provisional | 11/2/2017 | 62/580,959 | Abandoned | | | | | Madana M.R. Ambavaram, Jihong Tang, Mariya Somleva, Kieran Ryan, Oliver P. Peoples, Kristi D. Snell |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 59975WO | Genes and Gene Combinations for Enhanced Crops | PCT | Utility | 11/2/2018 | PCT/US2018/058840 | National Phase | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Jihong Tang, Kristi D. Snell, Kieran Ryan, Oliver P. Peoples, Mariya Somleva |
| | 59975US1 | Genes and Gene Combinations for Enhanced Crops | US | Utility | 4/30/2020 | 16/760,639 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Jihong Tang, Kristi D. Snell, Kieran Ryan, Oliver P. Peoples, Mariya Somleva |
| YTEN 011 (ALL ABANDONED) | 57558US0 | GENETICALLY ENGINEERED LAND PLANTS THAT EXPRESS AN LCID/E PROTEIN | US | Provisional | 11/27/2017 | 62/590,793 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57588US1 | GENETICALLY ENGINEERED LAND PLANTS THAT EXPRESS AN LCID/E PROTEIN | US | Provisional | 6/26/2018 | 62/690,148 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57588WO | GENETICALLY ENGINEERED LAND PLANTS THAT EXPRESS AN LCID/E PROTEIN | PCT | Utility | 11/26/2018 | PCT/US2018/062468 | National Phase | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| | 57558US2 | GENETICALLY ENGINEERED LAND PLANTS THAT EXPRESS AN LCID/E PROTEIN | US | Utility | 5/26/2020 | 16/766,789 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Kristi D. Snell |
| YTEN 012 (ALL ABANDONED) | 58988US0 | GENES AND GENE COMBINATIONS FOR ENHANCED CORN PERFORMANCE | US | Provisional | 4/2/2018 | 62/651,451 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Jihong Tang, Kristi D. Snell, Oliver P. Peoples |
| | 58988US1 | GENES AND GENE COMBINATIONS FOR ENHANCED CORN PERFORMANCE | US | Provisional | 5/10/2018 | 62/669,662 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Jihong Tang, Kristi D. Snell, Oliver P. Peoples |
| | 58988WO | GENES AND GENE COMBINATIONS FOR ENHANCED CORN PERFORMANCE | PCT | Utility | 4/1/2019 | PCT/US2019/025163 | National Phase | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Oliver P. Peoples, Kristi D. Snell, Jihong Tang |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 58988US2 | GENES AND GENE COMBINATIONS FOR ENHANCED CORN PERFORMANCE | US | Utility | | 17/044,015 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Oliver P. Peoples, Kristi D. Snell, Jihong Tang |
| YTEN 013 | P59704US0 | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | US | Provisional | 9/4/2018 | 62/726,653 | Abandoned | | | | Yield10 Bioscience, Inc. | Jihong Tang, Meghna Malik, Nirmala Sharma, Claire Burkitt, Yuanyuan Ji, Madana M.R. Ambavaram, Kieran Ryan, Oliver P. Peoples, Kristi D. Snell |
| | P59704US1 | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | US | Provisional | 10/12/2018 | 62/744,932 | Abandoned | | | | Yield10 Bioscience, Inc. | Jihong Tang, Meghna Malik, Nirmala Sharma, Claire Burkitt, Yuanyuan Ji, Madana M.R. Ambavaram, Kieran Ryan, Oliver P. Peoples, Kristi D. Snell, Frank Anthony Skraly |
| | P59704US2 | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | US | Provisional | 4/16/2019 | 62/834,766 | Abandoned | | | | Yield10 Bioscience, Inc. | Jihong Tang, Meghna Malik, Nirmala Sharma, Claire Burkitt, Yuanyuan Ji, Madana M.R. Ambavaram, Kieran Ryan, Oliver P. Peoples, Kristi D. Snell, Frank Anthony Skraly, Venkatesh Bollina |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 59704WO | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | PCT | Utility | 9/3/2019 | PCT/US2019/049281 | National Phase | | | | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |
| | P59704US3 | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | US | Utility | 3/3/2021 | 17/273,159 | Granted | 12084672 | 9/10/2024 | 11/22/2040 | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |
| | P59704US4 | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | US | Utility | 8/30/2024 | 18/821,276 | Pending | | | | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | P59704AU | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | AU | Utility | 9/3/2019 | 2019335193 | Granted | 2019335193 | 8/3/2023 | 9/3/2039 | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |
| | P59704BR | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | BR | Utility | 9/3/2019 | BR 112021004034-0 | Pending | | | | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |
| | P59704CA | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | CA | Utility | 9/3/2019 | 3111368 | Pending | | | | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | P59704EP | Genetically Engineered Land Plants that Express an Increased Seed Yield Protein | EP | Utility | 9/3/2019 | 19858165.4 | Pending | | | | Yield10 Bioscience, Inc. | Jihong Tang, Oliver P. Peoples, Madana M.R. Ambavaram, Meghna Malik, Claire Burkitt, Frank Anthony Skraly, Kieran Ryan, Nirmala Sharma, Venkatesh Bollina, Kristi D. Snell, Yuanyuan Ji |
| YTEN 014 (ALL ABANDONED) | 61543 | MQO Expression in Plants | US | Provisional | 10/12/2018 | 62745134 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Skraly, Jihong Tang, Kristi D. Snell |
| | 61543WO | GENETICALLY ENGINEERED PLANTS THAT EXPRESS A QUINONE-UTILIZING MALATE DEHYDROGENASE | PCT | Utility | 10/10/2019 | PCT/US2019/055575 | National Phase | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Frank Skraly, Jihong Tang, Meghna Malik |
| | 61543US1 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS A QUINONE-UTILIZING MALATE DEHYDROGENASE | US | Utility | 4/9/2021 | 17/284,135 | Abandoned | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Frank Skraly, Jihong Tang, Meghna Malik |
| YTEN 015 (ALL ABANDONED) | 60941US0 | GENES AND GENE COMBINATIONS FOR ENHANCED SEED YIELD AND OIL CONTENT | US | Provisional | 5/14/2019 | 62/847,625 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Venkatesh Bollina, Frank Anthony Skraly, Meghna Malik, Kristi D. Snell |
| | 60941US1 | GENES AND GENE COMBINATIONS FOR ENHANCED SEED YIELD AND OIL CONTENT | US | Provisional | 7/11/2019 | 62/873,014 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Venkatesh Bollina, Frank Anthony Skraly, Meghna Malik, Kristi D. Snell |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 016 | 60942US0 | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | US | Provisional | 5/14/2019 | 62/847,658 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Venkatesh Bollina, Frank Anthony Skraly, Meghna Malik, Kristi D. Snell |
| | 60942US1 | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | US | Provisional | 7/11/2019 | 62/873,018 | Abandoned | | | | Yield10 Bioscience, Inc. | Madana M.R. Ambavaram, Venkatesh Bollina, Frank Anthony Skraly, Meghna Malik, Kristi D. Snell |
| | 60942WO | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | PCT | Utility | 5/13/2020 | PCT/US2020/032696 | National Phase | | | | Yield10 Bioscience, Inc. | Venkatesh Bollina, Madana M.R. Ambavaram, Kristi D. Snell, Meghna Malik, Frank Anthony Skraly |
| | 60942US2 | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | US | Utility | 10/18/2021 | 17/594,475 | Pending | | | | Yield10 Bioscience, Inc. | Venkatesh Bollina, Madana M.R. Ambavaram, Kristi D. Snell, Meghna Malik, Frank Anthony Skraly |
| | 60942AU | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | AU | Utility | 5/13/2020 | 2020274996 | Granted | 2020274996 | 5/16/2024 | 5/13/2040 | Yield10 Bioscience, Inc. | Venkatesh Bollina, Madana M.R. Ambavaram, Kristi D. Snell, Meghna Malik, Frank Anthony Skraly |
| | 60942CA | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | CA | Utility | 5/13/2020 | 3138204 | Pending | | | | Yield10 Bioscience, Inc. | Venkatesh Bollina, Madana M.R. Ambavaram, Kristi D. Snell, Meghna Malik, Frank Anthony Skraly |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60942EP | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | EP | Utility | 5/13/2020 | 20804868.6 | Pending | | | | Yield10 Bioscience, Inc. | Venkatesh Bollina, Madana M.R. Ambavaram, Kristi D. Snell, Meghna Malik, Frank Anthony Skraly |
| YTEN 017 | 61224US0 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | US | Provisional | 7/23/2019 | 62/877,591 | Abandoned | | | | Yield10 Bioscience, Inc. | Meghna Malik, Jihong Tang, Yuanyuan Ji, Kristi D. Snell |
| | 61224WO | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | PCT | Utility | 7/22/2020 | PCT/US2020/043063 | National Phase | | | | Yield10 Bioscience, Inc. | Meghna Malik, Kristi D. Snell, Yuanyuan Ji, Jihong Tang |
| | 61224US1 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | US | Utility | 1/19/2022 | 17/597,707 | Pending | | | | Yield10 Bioscience, Inc. | Meghna Malik, Kristi D. Snell, Yuanyuan Ji, Jihong Tang |
| | 61224AU | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | AU | Utility | 7/22/2020 | 2020316428 | Abandoned | | | | Yield10 Bioscience, Inc. | Meghna Malik, Kristi D. Snell, Yuanyuan Ji, Jihong Tang |
| | 61224AU1 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | AU | Utility | 7/22/2020 | 2024205702 | Pending | | | | Yield10 Bioscience, Inc. | Meghna Malik, Kristi D. Snell, Yuanyuan Ji, Jihong Tang |
| | 61224CA | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | CA | Utility | 7/22/2020 | 3148212 | Pending | | | | Yield10 Bioscience, Inc. | Meghna Malik, Kristi D. Snell, Yuanyuan Ji, Jihong Tang |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YTEN 018 (MBX078) | | Generation of High Polyhydroxybutyrate Producing Seeds | US | Provisional | 9/15/2009 | 61/242,522 | Abandoned | | | | | Jixiang Han, Oliver P. Peoples, Kristi D. Snell |
| | | Generation of High Polyhydroxybutyrate Producing Seeds | PCT | Utility | 9/15/2010 | PCT/US2010/048963 | National Phase | | | | Yield10 Bioscience, Inc. | Jihong Tang, Thomas Martin Ramseier, Karen Bohmert-Tatarev, Zhigang Zhang, Nii Patterson, Jixiang Han, Oliver P. Peoples, Andrew Hertig, Venkata Tavva, Kristi D. Snell |
| | 61672 | Generation of High Polyhydroxybutyrate Producing Seeds | US | Utility | 3/13/2012 | 13/395,702 | Granted | 9,181,559 | 11/10/2015 | 12/24/2031 | Yield10 Bioscience, Inc. | Jihong Tang, Thomas Martin Ramseier, Karen Bohmert-Tatarev, Zhigang Zhang, Nii Patterson, Jixiang Han, Oliver P. Peoples, Andrew Hertig, Venkata Tavva, Kristi D. Snell |
| YTEN 019 | 62241US0 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | US | Provisional | 2/20/2020 | 62/979,198 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Jihong Tang, Kristi D. Snell |
| | 62241WO | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | PCT | Utility | 2/19/2021 | PCT/US2021/018743 | National Phase | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Jihong Tang, Kristi D. Snell |
| | 62241US1 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | US | Utility | 8/16/2022 | 17/904,343 | Pending | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Jihong Tang, Kristi D. Snell |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 62241AU | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | AU | Utility | 2/19/2021 | 2021224206 | Pending | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Jihong Tang, Kristi D. Snell |
| | 62241CA | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | CA | Utility | 2/19/2021 | 3170510 | Pending | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Jihong Tang, Kristi D. Snell |
| YTEN 020 | 63059 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST BIOTIN ATTACHMENT DOMAIN-CONTAINING (BADC) GENE HOMOZYGOUS FOR A WILD-TYPE ALLELE, A SECOND BADC GENE HOMOZYGOUS FOR A MUTANT ALLELE, AND HOMOLOGS OF THE FIRST AND SECOND BADC GENES | US | Provisional | 8/12/2020 | 63/064,796 | Abandoned | | | | Yield10 Bioscience, Inc. | Meghna Malik, Jihong Tang, Yuanyuan Ji, Venkatesh Bollina |
| | 63059WO | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST BIOTIN ATTACHMENT DOMAIN-CONTAINING (BADC) GENE HOMOZYGOUS FOR A WILD-TYPE ALLELE, A SECOND BADC GENE HOMOZYGOUS FOR A MUTANT ALLELE, AND HOMOLOGS OF THE FIRST AND SECOND BADC GENES | PCT | Utility | 8/12/2021 | PCT/US2021/045717 | National Phase | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Jihong Tang, Venkatesh Bollina, Lifeng Chen, Marie Mykytyshyn, Yuanyuan Ji, Meghna Malik |
| | 63059US1 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST BIOTIN ATTACHMENT DOMAIN-CONTAINING (BADC) GENE HOMOZYGOUS FOR A WILD-TYPE ALLELE, A SECOND BADC GENE HOMOZYGOUS FOR A MUTANT ALLELE, AND HOMOLOGS OF THE FIRST AND SECOND BADC GENES | US | Utility | 1/12/2023 | 18/005,302 | Pending | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Jihong Tang, Venkatesh Bollina, Lifeng Chen, Marie Mykytyshyn, Yuanyuan Ji, Meghna Malik |
| | 63059AU | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST BIOTIN ATTACHMENT DOMAIN-CONTAINING (BADC) GENE HOMOZYGOUS FOR A WILD-TYPE ALLELE, A SECOND BADC GENE HOMOZYGOUS FOR A MUTANT ALLELE, AND HOMOLOGS OF THE FIRST AND SECOND BADC GENES | AU | Utility | 8/12/2021 | 2021324821 | Pending | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Jihong Tang, Venkatesh Bollina, Lifeng Chen, Marie Mykytyshyn, Yuanyuan Ji, Meghna Malik |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 63059CA | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST BIOTIN ATTACHMENT DOMAIN-CONTAINING (BADC) GENE HOMOZYGOUS FOR A WILD-TYPE ALLELE, A SECOND BADC GENE HOMOZYGOUS FOR A MUTANT ALLELE, AND HOMOLOGS OF THE FIRST AND SECOND BADC GENES | CA | Utility | 8/12/2021 | 3188488 | Pending | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Jihong Tang, Venkatesh Bollina, Lifeng Chen, Marie Mykytyshyn, Yuanyuan Ji, Meghna Malik |
| | 63059EP | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST BIOTIN ATTACHMENT DOMAIN-CONTAINING (BADC) GENE HOMOZYGOUS FOR A WILD-TYPE ALLELE, A SECOND BADC GENE HOMOZYGOUS FOR A MUTANT ALLELE, AND HOMOLOGS OF THE FIRST AND SECOND BADC GENES | EP | Utility | 8/12/2021 | 21856715.4 | Pending | | | | Yield10 Bioscience, Inc. | Kristi D. Snell, Jihong Tang, Venkatesh Bollina, Lifeng Chen, Marie Mykytyshyn, Yuanyuan Ji, Meghna Malik |
| YTEN 021 (ALL ABANDONED) | 65953 | TRANSGENIC LAND PLANTS THAT PRODUCE POLYHYDROXYALKANOATE COPOLYMERS | US | Provisional | 4/6/2022 | 63/362,541 | Abandoned | | | | Yield10 Bioscience, Inc. | Frank Anthony Skraly, Martha Sholl, Kristi D. Snell |
| YTEN 022 | 66877 | TRANSGENIC CAMELINA PLANTS GENETICALLY MODIFIED TO BE TOLERANT TO GLUFOSINATE WITHOUT EXHIBITING A DECREASE IN SEED YIELD | US | Provisional | 11/11/2022 | 63/383,353 | Abandoned | | | | Yield10 Bioscience, Inc. | Jihong Tang, Meghna Malik, Nirmala Sharma, Lauren Rakochy, Kristi D. Snell |
| | 66877WO | TRANSGENIC CAMELINA PLANTS GENETICALLY MODIFIED TO BE TOLERANT TO GLUFOSINATE WITHOUT EXHIBITING A DECREASE IN SEED YIELD | PCT | Utility | 11/9/2023 | PCT/US2023/079186 | Pending | | | | Yield10 Bioscience, Inc. | Jihong Tang, Meghna Malik, Nirmala Sharma, Lauren Rakochy, Kristi D. Snell |
| YTEN 023 (ALL ABANDONED) | 67803 | GENOME-EDITED PLANTS COMPRISING INACTIVATED BADC1, BADC2, AND/OR BADC3 GENES | US | Provisional | 2/13/2023 | 63/484,717 | Abandoned | | | | Yield10 Bioscience, Inc. | Meghna Malik, Jihong Tang, Yuanyuan Ji, Venkatesh Bollina, Lifeng Chen, Marie Mykytyshyn, Kristi D. Snell |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

## (2) Yield10 in-licensed patent families

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NCSU1 (LICENSE DROPPED) | | Synthetic Pathway for Biological Carbon Dioxide Sequestration | US | | 1/22/2013 | 20140150135 | License Dropped | | | | | |
| | | Synthetic Pathway for Biological Carbon Dioxide Sequestration | Canada | | | 2892551 | License Dropped | | | | | |
| | | | | | | | | | | | | |
| NCSU2 (CWII) (LICENSE DROPPED) | NCSU13058 5051-834 | Method and Compositions for Improvement in Seed Yield | US | Provisional | 6/24/2013 | 61/838,789 | License Dropped | | | | | |
| | | Method and Compositions for Improvement in Seed Yield | PCT | International | 6/20/2014 | PCT/US2014/043407 | License Dropped | | | | | |
| | | Method and Compositions for Improvement in Seed Yield | US | Utility | 12/22/2015 | 14/900,799 20160138038 | License Dropped | | | | | |
| | | | | | | | | | | | | |
| NCSU3 (LICENSE DROPPED) | NCSU15250 5051-884 | (Biotin-Ferredoxin) Methods and Compositions for Enhanced Biomass Production and Increased Abiotic Stress Tolerance | US | Provisional | 7/20/2015 | 62/194,550 | License Dropped | | | | | |
| | | (Biotin-Ferredoxin) Methods and Compositions for Enhanced Biomass Production and Increased Abiotic Stress Tolerance | PCT | International | 7/20/2016 | PCTUS16043064 | License Dropped | | | | | |
| | | (Biotin-Ferredoxin) Methods and Compositions for Enhanced Biomass Production and Increased Abiotic Stress Tolerance | US | Utility | 1/19/2018 | 15/875,272 | License Dropped | | | | | |
| | | | | | | | | | | | | |
| NCSU4 (LICENSE DROPPED) | NCSU15290 5051-887 | Synthetic Pathway for Biological Carbon Dioxide Sequestration | US | Provisional | 7/20/2015 | 62/194,446 | License Dropped | | | | | |
| | | Synthetic Pathway for Biological Carbon Dioxide Sequestration | PCT | International | 7/20/2016 | PCT/US2016/043064 | License Dropped | | | | | |
| | | Synthetic Pathway for Biological Carbon Dioxide Sequestration | US | Utility | 1/19/2018 | 15/875,313 | License Dropped | | | | | |
| | | | | | | | | | | | | |
| UMASS | | | | | | | | | | | | |
| UMA 13-040 | UMA0050US | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | US | Provisional | 12/31/2013 | 61/922,141 | Expired | | | | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UMA 13-040 | UMA0050US2 | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | US | Utility | 6/30/2016 | 15/109,349 | Granted | 10337024 | 7/2/2019 | 12/24/2034 | The University of Massachusetts | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA 13-040 | UMA0050USC | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | US | Con | 5/24/2019 | 16/421,599 | Granted | 10865422 | 12/15/2020 | 12/24/2034 | The University of Massachusetts | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA 13-040 | UMA0050PCT | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | PCT | International | 12/24/2014 | PCT/US2014/072347 | National Phase | | | | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA 13-040AU | UMA0050AU | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | Australia | | 12/24/2014 | 2014374057 | Granted | 2014374057B2 | 8/27/2020 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA 13-040BR | UMA0050BR | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | Brazil | | 6/30/2016 | BR 112016015424.0 | Abandoned | | | | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA-13-040CA | UMA0050CA | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | Canada | | 6/22/2016 | 2,934,997 | Granted | 2,934,997 | 6/13/2023 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA13-040CN | UMA0050CN | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | China | | 12/24/2014 | 201480071736.6 | Granted | 201480071736.6 | 10/12/2021 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA13-040EP | UMA0050EP | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | EP | | 12/24/2014 | EP 14877312 | Granted | 3090057 | 10/30/2019 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UMA13-040EP | UMA0050FR | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | France | | 12/24/2014 | 14877312.0 | Abandoned | 3090057 | 10/30/2019 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA13-040EP | UMA0050DE | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | Germany | | 12/24/2014 | 14877312.0 | Abandoned | 60 2014 056 109.8 | 10/30/2019 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA13-040EP | UMA0050GB | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | UK/Great Britian | | 12/24/2014 | 14877312.0 | Validated | 3090057 | 10/30/2019 | 12/24/2034 | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| UMA13-040IN | UMA0050IN | Plants with Enhanced Photosynthesis and Methods of Manufacture Thereof | India | | 6/25/2016 | 201617021874 | Abandoned | | | | | Danny J. Schnell, Mine O. Canakci, Bibin Paulose, Michelle DaCosta Inguagiato |
| | | | | | | | | | | | | |
| **UMASS/NCSU (ALL ABANDONED)** | | | | | | | | | | | | |
| | | Compositions and Methods for Enhanced Plant Growth and Seed Yield | US | Provisional | 10/21/2016 | 62/245,502 | Abandoned | | | | | |
| | | | | | | | | | | | | |
| **U.MISSOU 15UMC023** | UVMO:115USP1 | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | US | Provisional | 8/28/2015 | 62/211,371 | Expired | | | | | Jay Thelen, Matthew Salie |
| | UVMO:115US | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | US | Utility | 2/28/2018 | 15/756,468 | Granted | 10883113 | 1/5/2021 | 8/17/2036 | | Jay Thelen, Matthew Salie |
| | UVMO:115USC1 | INCREASING PLANT OIL CONTENT BY ALTERING A NEGATIVE REGULATOR OF ACETYL-COA CARBOXYLASE | US | Con | 11/4/2020 | 17/089,241 | Granted | 11959087 | 4/16/2024 | 7/7/2036 | | Jay Thelen, Matthew Salie |
| | UVMO:115WO | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | PCT | International | 7/7/2016 | PCT/US2016/041386 | National Phase | | | | | Matthew Salie, Jay Thelen |
| | UVMO:115AU | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | Australia | | 7/7/2016 | 2016317094 | Granted | 2016317094B2 | 3/31/2022 | 7/7/2036 | | Matthew Salie, Jay Thelen |
| | UVMO:115BR | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | Brazil | | 7/7/2016 | BR112018003576-9 | Abandoned | | | | | Matthew Salie, Jay Thelen |
| | UVMO:115CA | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | Canada | | 7/7/2016 | 2995573 | Pending | | | | | Matthew Salie, Jay Thelen |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UVMO:115CN | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | China | | 4/2/2018 | CN 201680057571.6 | Abandoned | | | | | Matthew Salie, Jay Thelen |
| | UVMO:115CND1 | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | China | | 3/10/2023 | CN 202310229890.2 | Abandoned | | | | | Matthew Salie, Jay Thelen |
| | UVMO:115EP | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | Europe | | 7/7/2016 | 16842484.4 | Abandoned | | | | | Matthew Salie, Jay Thelen |
| | UVMO:115IN | BADC Increasing Plant Oil Content By Altering Negative Regulators of ACCase | India | | 7/7/2016 | 201817006061 | Abandoned | | | | | Matthew Salie, Jay Thelen |
| U.MISSOU 17UMC003 | UVMO:116USP1 | Increasing Plant Oil increasing alphaCT | US | Provisional | 7/7/2016 | 62/359,635 | Expired | | | | | Jay Thelan |
| | UVMO:116WO | Increasing Plant Oil increasing alphaCT | PCT | International | 7/6/2017 | PCT/US2017/040851 | National Phase | | | | | Jay Thelan |
| | UVMO:116US | Increasing Plant Oil increasing alphaCT | US | Utility | 1/3/2019 | 16/315,140 | Granted | 11802286 | 10/31/2023 | 9/14/2037 | | Jay Thelan, Matthew Salie |
| | UVMO:116CA | Increasing Plant Oil increasing alphaCT | Canada | | 7/6/2017 | 3030170 | Pending | | | | | Jay Thelan |
| | UVMO:116USC1 | Increasing Plant Oil increasing alphaCT | US | Con | 9/12/2023 | 18/465,802 | Pending | | | | | Jay Thelan, Matthew Salie |
| U.MISSOU 18UMCO62 | | Methods of Altering Seed Weight and Seed Oil Content by Manipulating Alpha-Carboxyltransferase (A-CT) Activity Via Carboxyltrasferase Interactor (CTI) Protein Expression | US | Provisional | 5/30/2018 | 62/678,212 | Abandoned | | | | | Jay Thelan, Yajin Ye |
| | 40451-PCT (31458-39) | Methods of Altering Seed Weight and Seed Oil Content by Manipulating Alpha-Carboxyltransferase (A-CT) Activity Via Carboxyltrasferase Interactor (CTI) Protein Expression | PCT | International | 5/30/2019 | PCT/US2019/034754 | National Phase | | | | | Yajin Ye, Jay Thelan |
| | 40451-CA (31458-42) | Methods of Altering Seed Weight and Seed Oil Content by Manipulating Alpha-Carboxyltransferase (A-CT) Activity Via Carboxyltrasferase Interactor (CTI) Protein Expression | CA | | 5/30/2019 | 3101203 | Pending | | | | | Yajin Ye, Jay Thelan |
| | 40451-US (31458-43) | Methods of Altering Seed Weight and Seed Oil Content by Manipulating Alpha-Carboxyltransferase (A-CT) Activity Via Carboxyltrasferase Interactor (CTI) Protein Expression | US | Utility | 11/30/2020 | 17/250,117 | Pending | | | | | Jay Thelan, Yajin Ye |
| RR213 | | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | PCT | International | 4/12/2013 | PCT/GB2013/050955 | National Phase | | | | Rothamsted Research Ltd | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PC930586US | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | US | Utility | | 14/391,818 | Granted | 10881631 | 1/5/2021 | 10/13/2035 | Rothamsted Research Ltd | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586USA | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | US | Utility | 12/31/2020 | 17/139,232 | Pending | | | | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC30586AU | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | AU | | 4/12/2013 | 2013246661 | Granted | 2013246661B2 | 4/4/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586AUA | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | AU | | 4/12/2013 | 2019201875 | Granted | 2019201875B2 | 12/23/2021 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586AUB | Pr+C64:L64oduction of Omega-3 Long Chain Polyunsaturated Fatty Acids | AU | | 4/12/2013 | 2021282443 | Pending | | | | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586BR | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | BR | | 4/12/2013 | BR112014025265-3 | Abandoned | | | | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586CA | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | CA | | 4/12/2013 | 2869738 | Granted | 2869738 | 4/5/2022 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586CAA | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | CA | | 4/12/2013 | 3148246 | Allowed | | | | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PC930586CL | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | CL | | 4/12/2013 | 02723-2014 | Granted | 63.327 | ??? | ??? | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586EP | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | EP | | 4/12/2013 | 13718360 | Granted | 2836599B1 | 11/6/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586DE | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | DE | | 4/12/2013 | 13718360 | Validated | 2836599B1 | 11/6/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586ES | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | ES | | 4/12/2013 | 13718360 | Validated | 2836599B1 | 11/6/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586FR | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | FR | | 4/12/2013 | 13718360 | Validated | 2836599B1 | 11/6/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586GB | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | GB | | 4/12/2013 | 13718360 | Validated | 2836599B1 | 11/6/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| | PC930586NO | Production of Omega-3 Long Chain Polyunsaturated Fatty Acids | NO | | 4/12/2013 | 13718360 | Validated | 2836599B1 | 11/6/2019 | 4/12/2033 | | Johnathan Napier, Olga Sayanova, Noemi Ruiz Lopez, Richard Haslam |
| RR230 (EXCLUDED BY YIELD10 IN 2022) | | Recombinant Organisms | PCT | International | 10/1/2003 | PCT/GB2013/052553 | License Dropped | | | | | |
| | | Transgenic Microalgae with Increased Production of at Least One Omega-3 Long Chain Polyunsaturated Fatty Acid | US | Utility | 3/31/2015 | 14/432,579 | License Dropped | 10017796 | 7/10/2018 | | | |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PC926590USA | Transgenic Microalgae with Increased Production of at Least One Omega-3 Long Chain Polyunsaturated Fatty Acid | US | Utility | 6/11/2018 | 16/004,840 | License Dropped | | | | | |
| | | Recombinant Organisms | AU | | 10/1/2003 | 2013326297 | License Dropped | 2013326297B2 | 10/24/2019 | | | |
| | | Recombinant Organisms | BR | | 10/1/2003 | BR112015007329 | License Dropped | | | | | |
| | | Recombinant Organisms | CN | | 10/1/2003 | 201380062580.0 | License Dropped | | | | | |
| | | Recombinant Organisms | EP | | 10/1/2003 | 2013774228 | License Dropped | 2904091B1 | 11/20/2019 | | | |
| | | Recombinant Organisms | JP | | 10/1/2003 | 2015533701 | License Dropped | | | | | |
| | | Recombinant Organisms | KR | | 10/1/2003 | 1020157011412 | License Dropped | | | | | |
| RR304 (ALL ABANDONED) | PC93142SLU | Optimisation & Improvement of Omega 3 LC PUFA Composition in Transgenic Camelina | LX | | 12/18/2020 | 102307 | Abandoned | | | | | |
| RR305 | PC931426LU | Increasing the Accumulation of EPA and DHA in Transgenic Camelina | LX | | 12/18/2020 | 102308 | Abandoned | | | | | |
| | PC931426WO | Increasing the Accumulation of EPA and DHA in Transgenic Camelina | PCT | | 12/17/2021 | PCT/EP2021/086663 | National Phase | | | | Rothamsted Research Limited | Johnathan Andrew Napier, Lihua Han, Olga Vladimirovna Sayanova, Richard Philip Haslam, Susana Silvestre |
| | PC931426AU | Increasing the Accumulation of EPA and DHA in Transgenic Camelina | AU | | 12/17/2021 | 2021399149 | Pending | | | | Rothamsted Research Limited | Johnathan Andrew Napier, Lihua Han, Olga Vladimirovna Sayanova, Richard Philip Haslam, Susana Silvestre |

| FILE # | ATTY CASE FILE # | TITLE | COUNTRY | CASE TYPE | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUE DATE | EXPIRATION DATE | RECORD OWNER | INVENTORS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PC931426CA | Increasing the Accumulation of EPA and DHA in Transgenic Camelina | CA | | 12/17/2021 | 3202599 | Pending | | | | Rothamsted Research Limited | Johnathan Andrew Napier, Lihua Han, Olga Vladimirovna Sayanova, Richard Philip Haslam, Susana Silvestre |
| | PC931426EP | Increasing the Accumulation of EPA and DHA in Transgenic Camelina | EP | | 12/17/2021 | 21839552.3 | Pending | | | | Rothamsted Research Limited | Johnathan Andrew Napier, Lihua Han, Olga Vladimirovna Sayanova, Richard Philip Haslam, Susana Silvestre |
| | PC931426US | Increasing the Accumulation of EPA and DHA in Transgenic Camelina | US | | 6/15/2023 | 18/267,536 | Pending | | | | Rothamsted Research Limited | Johnathan Andrew Napier, Lihua Han, Olga Vladimirovna Sayanova, Richard Philip Haslam, Susana Silvestre |

**(3) Yield10 other Business IP Registrations**

Yield10 has no registered trademarks, design registrations, copyrights, or other Business IP Registrations.

**3.07(a)(ii) Unregistered Trademarks included in the Business Owned Intellectual Property**

Yield10 Bioscience, the Yield10 Bioscience logo, Yield10 Oilseeds company name, and Yield10 Oilseeds logo

**3.07(a)(iii) Proprietary Software used or held for use in connection with the Business**

None

**3.07(a)(iv) Other Business Owned Intellectual Property used or held for use in the Business that is material to the conduct of the Business**

Yield10's GRAIN gene discovery platform; Seed database

**Section 3.07(b)**
Business IP Agreements

*(i)*

1. Commercial license to Vision Bioenergy for HT technology.
2. Research license to GDM dated August 10, 2020, as amended August 10, 2020, for testing traits in soybean.

*(ii)*

1. Rothamsted Research Ltd:  Commercial license to Omega-3 IP
2. University of Missouri:  Research and Commercial license to BADC IP
3. University of Massachusetts:  Research license to IP involving C3003, C3004
4. Broad/Corteva:   Research and Commercial license to IP for using Crispr/Cas9 technology
5. AAFC: License to Camelina variety WDH3.
6. Yield10 has rights to License new Camelina lines based on a CRADA with AAFC for breeding of targeted traits in Camelina (e.g. downy mildew resistance)

*(iii)*

1. No additional licenses.

**Section 3.07(d)**
Business IP Registrations Filings and Fees

*[See attachment]*

320500398.4

**Seller's Disclosure Schedule Section 3.07(d)**

**3.07(d): Filings and fees due in the next ninety (90) days with respect to the Business IP Registrations**

**(1) Yield10 in-house patent families**

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| P61224US1 | YTEN 017 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 ( SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | US | 17/597,707 | 1/19/2022 | | RESPONSE TO OA | 9/20/2024 | 12/20/2024 | PUBLISHED |
| P60449US1 | YTEN 006 | TRANSGENIC LAND PLANTS THAT EXPRESS A POLYHYDROXYALKANOATE SYNTHASE SEED SPECIFICALLY WITH CYTOSOLIC LOCALIZATION | US | 17/596,110 | 12/3/2021 | | RESPONSE TO OA | 9/27/2024 | 9/27/2024 | PUBLISHED |

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| P61224CA0 | YTEN 017 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | Canada | 3,148,212 | 7/22/2020 | | INSTRCT ASSC RE: DIVISIONAL | 11/8/2024 | 11/8/2024 | PENDING |
| P61224CA0 | YTEN 017 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | Canada | 3,148,212 | 7/22/2020 | | INSTRUCT ASSC RE: OA | 11/8/2024 | 11/8/2024 | PENDING |
| P59704US3 | YTEN-013 | GENETICALLY ENGINEERED LAND PLANTS THAT EXPRESS AN INCREASED SEED YIELD PROTEIN AND/OR AN INCREASED SEED YIELD RNA | US | 17/273,159 | 3/3/2021 | 12,084,672 | REPORT PATENT DOC | 11/10/2024 | 11/10/2024 | ISSUED |

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| P62241US1 | YTEN 019 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | US | 17/904,343 | 8/16/2022 | | RESPONSE TO OA | 11/13/2024 | 2/13/2025 | PUBLISHED |
| P62241CA0 | YTEN 019 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | Canada | 3,170,510 | 2/19/2021 | | INSTRUCT ASSC RE: OA | 11/14/2024 | 11/14/2024 | PENDING |
| P59704BR0 | YTEN-013 | GENETICALLY ENGINEERED LAND PLANTS THAT EXPRESS AN INCREASED SEED YIELD PROTEIN | Brazil | BR 112021004034-0 | 9/3/2019 | | ANNUITY DUE | 12/3/2024 | 6/3/2025 | PUBLISHED |
| P60942US2 | YTEN-016 | MODIFIED PLANTS COMPRISING A POLYNUCLEOTIDE COMPRISING A NON-COGNATE PROMOTER OPERABLY LINKED TO A CODING SEQUENCE THAT ENCODES A TRANSCRIPTION FACTOR | US | 17/594,475 | 10/18/2021 | | CONTINUATION DEADLINE | 12/5/2024 | 12/5/2024 | ALLOWED |

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| P61224CA0 | YTEN 017 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD COMPRISING A FIRST HOMEOLOG OF SUGAR-DEPENDENT1 (SDP1) HOMOZYGOUS FOR A WILD-TYPE ALLELE AND A SECOND HOMEOLOG OF SDP1 HOMOZYGOUS FOR A MUTANT ALLELE | Canada | 3,148,212 | 7/22/2020 | | RESPONSE TO OA | 12/8/2024 | 12/8/2024 | PENDING |
| P63059AU0 | YTEN 020 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD | Australia | 2021324821 | 8/12/2021 | | INSTRUCT ASSC RE: OA | 12/14/2024 | 12/14/2024 | PENDING |
| P63059AU0 | YTEN 020 | GENETICALLY MODIFIED PLANTS THAT EXHIBIT AN INCREASE IN SEED YIELD | Australia | 2021324821 | 8/12/2021 | | RESPONSE TO OA | 12/14/2024 | 12/14/2024 | PENDING |
| P62241CA0 | YTEN 019 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | Canada | 3,170,510 | 2/19/2021 | | RESPONSE TO OA | 12/15/2024 | 12/15/2024 | PENDING |

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| P62241AU0 | YTEN 019 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | Australia | 2021224206 | 2/19/2021 | | INSTRUCT ASSC RE: OA | 12/17/2024 | 12/17/2024 | PENDING |
| P62241AU0 | YTEN 019 | GENETICALLY ENGINEERED PLANTS THAT EXPRESS 6-PHOSPHOGLUCONATE DEHYDRATASE AND/OR 2-KETO-3-DEOXY-6-PHOSPHOGLUCONATE ALDOLASE | Australia | 2021224206 | 2/19/2021 | | RESPONSE TO OA | 12/17/2024 | 12/17/2024 | PENDING |

**(2) Yield10 in-licensed patent families**

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| UVMO.116USC1 | 17UMC003 | INCREASING PLANT OIL CONTENT BY IMPROVING ACTIVITY OF ACETYL-COA CARBOXYLASE | US | 18/465,802 | 9/12/2023 | | RESPONSE TO RR | 9/18/2024 | 12/18/2024 | PENDING |
| PC931426AU | RR305 | INCREASING THE ACCUMULATION OF EPA AND DHA IN TRANSGENIC CAMELINA | Australia | 2021399149 | 12/17/2021 | | DEADLINE FOR OPTIONAL CLAIM AMENDMENT TO REDUCE CLAIM FEES | 09/25/2024 | 09/25/2024 | PENDING |

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| PC931426US | RR305 | INCREASING THE ACCUMULATION OF EPA AND DHA IN TRANSGENIC CAMELINA | US | 18/267,536 | 6/15/2023 | | FILE INFORMATION DISCLOSURE | 10/17/2024 | 10/17/2024 | PENDING |
| 40451-US (31458-43) | 18UMC062 | METHODS OF ALTERING SEED WEIGHT AND SEED OIL CONTENT BY MANIPULATING ALPHA-CARBOXYLTRANSFERASE (A-CT) ACTIVITY VIA CARBOXYLTRANSFERASE INTERACTOR (CTI) PROTEIN EXPRESSION | US | 17/250,117 | 11/30/2020 | | RESPONSE TO OA | 9/22/2024 | 11/22/2024 | PENDING |
| UVMO:116CA | 17UMC003 | INCREASING PLANT OIL CONTENT BY IMPROVING ACTIVITY OF ACETYL-COA-CARBOXYLASE | Canada | 3,030,170 | 7/6/2017 | | RESPONSE TO OA | 10/28/2024 | 12/28/2024 | PENDING |
| PC931426CA | RR305 | INCREASING THE ACCUMULATION OF EPA AND DHA IN TRANSGENIC CAMELINA | Canada | 3202599 | 12/17/2021 | | ANNUITY DUE | 12/17/2024 | 12/17/2024 | PENDING |
| PC931426EP | RR305 | INCREASING THE ACCUMULATION OF EPA AND DHA IN TRANSGENIC CAMELINA | Europe | 21839552.3 | 12/17/2021 | | ANNUITY DUE | 12/17/2024 | 12/17/2024 | PENDING |
| UMA0050AU | UMA 13-040AU | PLANTS WITH ENHANCED PHOTOSYNTHESIS AND METHODS OF MANUFACTURE THEREOF | Australia | 2014374057 | 12/24/2014 | 2014374057B2 | ANNUITY DUE | 12/24/2024 | 12/24/2024 | ISSUED |

| ATTY CASE FILE # | FILE # | TITLE | COUNTRY | SERIAL NO. | FILING DATE | PATENT NO. | ACTION NAME | CURRENT DUE DATE | FINAL DUE DATE | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| UMA0050CA | UMA-13-040CA | PLANTS WITH ENHANCED PHOTOSYNTHESIS AND METHODS OF MANUFACTURE THEREOF | Canada | 2,934,997 | 6/22/2016 | 2,934,997 | ANNUITY DUE | 12/24/2024 | 12/24/2024 | ISSUED |
| UMA0050CN | UMA13-040CN | PLANTS WITH ENHANCED PHOTOSYNTHESIS AND METHODS OF MANUFACTURE THEREOF | China | 201480071736.6 | 12/24/2014 | 201480071736.6 | ANNUITY DUE | 12/24/2024 | 12/24/2024 | ISSUED |
| UMA0050GB | UMA13-040EP | PLANTS WITH ENHANCED PHOTOSYNTHESIS AND METHODS OF MANUFACTURE THEREOF | United Kingdom | 14877312.0 | 12/24/2014 | 3090057 | ANNUITY DUE | 12/24/2024 | 12/24/2024 | ISSUED |
| PC930586AUB | RR213 | PRODUCTION OF OMEGA-3 LONG CHAIN PUFAS | Australia | 2021282443 | 4/12/2013 | | DEADLINE FOR OBTAINING ALLOWANCE | 1/16/2025 | 1/16/2025 | PENDING |

## (3) Yield10 Other Business IP Registrations

None

### Section 3.07(j)
Governmental Authority Involvement in Business Owned Intellectual Property

**(1) Government funding for Yield10 in-house patent families**

The following Yield10 in-house patent families were developed with funding from the United States government.

**YTEN 004 patent family**

U.S. Provisional Appl. No. 62/144,727; Filed 4/8/2015; Status: Abandoned

    Statement of Government Support included in this application as filed:

    This invention was made in part with government support from the United States ARPA-e program.  The government has certain rights in this invention

U.S. Provisional Appl. No. 62/145,757; Filed 4/10/2015; Status: Abandoned
U.S. Provisional Appl. No. 62/190,281; Filed 7/9/2015; Status: Abandoned

    Statement of Government Support included in these applications as filed:

    This invention was made in part with government support from the United States DOE, ARPA-e PETRO program Grant Number DE-AR0000201.  The government has certain rights in this invention

PCT International Appl. No. PCT/US2016/026767; Filed 4/8/2016; Status: National Phase
U.S. Appl. No. 15/565,086; Filed 10/6/2017; Status: Granted
U.S. Appl. No. 17/498,240; Filed 10/11/2021; Status: Granted

    Statement of Government Support included in these applications as filed:

    This invention was made in part with government support under Grant Number DE-AR0000201 from the United States DOE, ARPA-e PETRO program.  The government has certain rights in this invention

**YTEN 017 patent family**

U.S. Provisional Appl. No. 62/877,591; Filed 7/23/2019; Status: Abandoned
PCT International Appl. No. PCT/US2020/043063; Filed 7/22/2020; Status: National Phase
U.S. Appl. No. 17/597,707; Filed 1/19/2022; Status: Pending

    Statement of Government Support included in these applications as filed:

    This invention was made with government support under Contract No. DE-EE0007003 awarded by the United States Department of Energy.  The government has certain rights in the invention

**YTEN 016 patent family**

U.S. Provisional Appl. No. 62/847,658; Filed 5/14/2019; Status: Abandoned
U.S. Provisional Appl. No. 62/873,018; Filed 7/11/2019; Status: Abandoned
PCT International Appl. No. PCT/US2020/032696; Filed 5/13/2020; Status: National Phase
U.S. Appl. No. 17/594,475; Filed 10/18/2021; Status: Pending

> Applications entered into i-Edison post-filing on May 21, 2024.  This was done post-filing because the awardee did not inform Yield10 about the government funding until after Yield10 had filed the applications.

> Statement of Government Support added to U.S. Appl. No. 17/594,475 by amendment on August 12, 2024.

> This invention was made with government support under Contract No. DE-SC0018269 awarded by the United States Department of Energy. The government has certain rights in the invention.

**YTEN 019 patent family**

U.S. Provisional Appl. No. 62/979,198; Filed 2/20/2020; Status: Abandoned
PCT International Appl. No. PCT/US2021/018743; Filed 2/19/2021; Status: National Phase
U.S. Appl. No. 17/904,343; Filed 8/16/2022; Status: Pending

> Applications entered into i-Edison post-filing on May 23, 2024.  This was done post-filing because the awardee did not inform Yield10 about the government funding until after Yield10 had filed the applications.

> Statement of Government Support added to U.S. Appl. No. 17/904,343 by amendment on July 1, 2024.

> This invention was made with government support under Contract No. DE-SC0018269 awarded by the United States Department of Energy. The government has certain rights in the invention.

**(2) Government funding for Yield10 in-licensed patent families**

**UMASS 13-040**

U.S. Provisional Appl. No. 61/922,141; Filed 12/31/2013; Status: Abandoned
PCT International Appl. No. PCT/US2014/072347; Filed 12/24/2014; Status: National Phase
U.S. Appl. No. 15/109,349; Filed 6/30/2016; Status: Granted
U.S. Appl. No. 16/421,599; Filed 5/24/2019; Status: Granted

> Statement of Government Support included in these applications as filed:

> This invention was made in part with government support from the United States Department of Energy.  The government has certain rights in this invention.

## U MISSOU 15UMC023

U.S. Provisional Appl. No. 62/211,371; Filed 8/28/2015; Status: Abandoned
PCT International Appl. No. PCT/US2016/041386; Filed 7/7/2016; Status: National Phase
U.S. Appl. No. 15/756,468; Filed 2/28/2018; Status: Granted
U.S. Appl. No. 17/089,241; Filed 11/4/2020; Status: Granted

Statement of Government Support included in these applications as filed:

This invention was made with Government support under Grant No. PGRP IOS-1339385 awarded by National Science Foundation and Grant No. T32 GM008396 by the National Institutes of Health. The Government has certain rights in the invention.

## U MISSOU 17UMC003

U.S. Provisional Appl. No. 62/359,635; Filed 7/7/2016; Status: Abandoned

Statement of Government Support included in this application as filed:

This invention was made with Government support under Grant No. _____ awarded by National Science Foundation. The Government has certain rights in the invention.

PCT International Appl. No. PCT/US2017/040851; Filed 7/6/2017; Status: National Phase
U.S. Appl. No. 16/315,140; Filed 1/3/2019; Status: Granted
U.S. Appl. No. 18/465,802; Filed 9/12/2023; Status: Pending

Statement of Government Support included in this application as filed:

This invention was made with Government support under contract No. 1339385 awarded by National Science Foundation (NSF). The Government has certain rights in the invention.

## U MISSOU 18UMCO62

U.S. Provisional Appl. No. 62/678,212; Filed 5/30/2018; Status: Abandoned
PCT International Appl. No. PCT/US2019/034754; Filed 5/30/2019; Status: National Phase
U.S. Appl. No. 17/250,117; Filed 11/30/2020; Status: Pending

Statement of Government Support included in these applications as filed:

This invention was made with government support under Grant No. IOS-1339385 awarded by National Science Foundation. The Government has certain rights in the invention.

## ROTHAMSTED RR213 and RR305

The In-License from Rothamsted Research Institute was funded by The Biotechnology and Biological Sciences Research Council (BBSRC) which is part of UKRI, a non-departmental public body funded by a grant-in-aid from the UK government.

**(3) Government funding for Yield10 other Business Owned IP**

None

**Section 3.12**
Insurance

| Policy | Insurer | Occurrence-Based or Claims-Made |
|--------|---------|--------------------------------|
| D&O-$10M ELU19395023 | XL Specialty Ins. Co | Claims Made |
| Excess D&O V1322731201 | Beazley | Claims Made |
| Excess D&O ORPRO12104393 | Old Republic Ins. Co | Claims Made |
| Excess Side A 016933588 | National Union Fire Ins. Co | Claims Made |
| Crime 016933593 | National Union Fire Ins. Co | Occurrence/Loss Discovered |
| Fiduciary ML42632362 | Argonaut Ins. Co | Claims Made |
| Cyber Liability C4MBQ171454CYBER2023 | Coalition Ins. Solutions | Claims Made |
| Excess D&O BPRO8101222 | Berkley Ins. Co. | Claims Made |
| EPLI-ML42632352 | Argonaut Ins. Co | Claims Made |
| Excess side A ORPRO012104426 | Old Republic Ins. Co | Claims Made |
| CAN D&O ELU193952-23 | XL Specialty Ins. Co | Claims Made |
| US Worker's Comp C55919082 | Indemnity Ins. Co of NA | Claims Made or Occurance? |
| Canadian Worker's Comp | Thru Saskatchewan and Alberta Workers' Comp Boards | Claims Made? |

**Section 3.14(d)**
Permits

| Permit | Issuing Authority | Issuance Date | Expiration Date* |
|---|---|---|---|
| AUTH – 0000273034 (Movement & Release) | USDA APHIS BRS | 04/10/2024 | 4/15/2025 |
| AUTH – 0000273592 (Importation) | USDA APHIS BRS | 03/08/2024 | 03/08/2027 |
| AUTH – 0000273622 (Importation) | USDA APHIS BRS | 03/05/2024 | 03/05/2027 |
| AUTH – 0000273662 (Importation) | USDA APHIS BRS | 03/07/2024 | 03/08/2027 |
| P-2022-01152 (Import of non PNT) | CFIA | 03/38/2022 | 03/38/2025 |
| P-2022-03240 (Import of non PNT) | CFIA | 11/09/2022 | 11/09/2025 |
| P-2022-02543 (Import of non PNT) | CFIA | 08/09/2022 | 08/09/2025 |
| P-2023-03387 (Import of PNT) | CFIA | 12/01/2023 | 12/01/2024 |
| P-2024-00687 (Import of PNT) | CFIA | 02/16/2024 | 02/16/2025 |
| P-2024-00794 (Import of PNT) | CFIA | 02/23/2024 | 02/23/2025 |
| P-2024-00605 (Import of PNT) | CFIA | 02/09/2024 | 02/09/2025 |

*\* USDA-APHIS and CFIA field release permits, including permits that have expired, have monitoring and storage requirements that are not listed in this table. This is detailed in the tables below.  See tables below. This information has been formatted as required by the regulatory agencies to transfer the permits upon completion of the Contemplated Transaction.*

.

**Section 3.14(d) (continued)**

**CURRENT AND EXPIRED PERMITS/NOTIFICATIONS**
*for transfer of obligations of volunteer monitoring to Nuseed.*
*(Yield10 is working with regulatory agencies to formally transfer these permits to Nuseed)*

| Permit/Notification Type | Issuing Authority | Permit/Notification # |
|---|---|---|
| Confined Field Release Permit | CFIA | 21-MET1-415-CAM |
| Confined Field Release Permit | CFIA | 21-MET1-415-CAM02 |
| Confined Field Release Permit | CFIA | 22-MET1-656-CAM |
| Confined Field Release Permit | CFIA | 23-YOS-656-CAM |
| Confined Field Release Permit | CFIA | 23-YOS1-656-CAM |
| Planting Environmental Release and Interstate Movement Notification | USDA-APHIS | 20-084-102n |
| Planting Environmental Release and Interstate Movement Notification | USDA-APHIS | 20-268-103n |
| Interstate Movement Notification | USDA-APHIS | 21-091-102n |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | 19-391-103rm |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000221513 |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000273034 |
| | | |
| Planting Environmental Release and Interstate Movement | USDA-APHIS | 20-357-102rm |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH - 0000204861 |

**EXPIRED PERMITS**

*for transfer of obligations for seed storage and inventory required for shipment of seed to Nuseed*
*(Yield10 is working with regulatory agencies  to formally transfer these permits to Nuseed)*

| Permit Type | Issuing Authority | Permit # |
|---|---|---|
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | 21-005-102rm |
| Planting Environmental Release and Interstate Movement Permit | USDA-APHIS | AUTH – 0000205408 |
| Confined Field Release Permit | CFIA | 18-MET1-415_CAN |
| Confined Field Release Permit | CFIA | 20-MET1-415_CAN |
| Confined Field Release Permit | CFIA | 18-MET1-415_CAM |
| Confined Field Release Permit | CFIA | 19-MET1-415_CAM |
| Confined Field Release Permit | CFIA | 20-MET1-415_CAM |
| Importation Permit | CFIA | P-2022-03642 |
| Importation Permit | CFIA | P-2022-00896 |
| Importation Permit | CFIA | P-2023-01329 |
| Importation Permit | CFIA | P-2023-01330 |
| Importation Permit | CFIA | P-2023-00273 |
| Importation Permit | CFIA | P-2023-01294 |
| Importation Permit | CFIA | P-2024-00605 |

## Section 3.16 Employment Matters

(a)

On September 9, 2024, Yield10 provided Working Termination Notice to 6 Employees. Each employee was presented with a termination letter setting forth the terms of their separation in accordance with their offer letter.  A release is required to obtain payment for separation beyond the statutory minimum.

| Name | Start Date | Notice Date | Years of Service | Minimum Weeks of Written Notice |
|------|-----------|-------------|------------------|--------------------------------|
| Armstrong, Denise | 11/1/2021 | 9/9/2024 | 2.9 | 4 |
| Chen, Lifeng | 5/1/2019 | 9/9/2024 | 5.4 | 6 |
| Heath, Julian | 12/6/2021 | 9/9/2024 | 2.8 | 4 |
| Mykytyshyn, Marie | 11/17/2010 | 9/9/2024 | 13.8 | 8 |
| Ranasinghe, Swarna | 2/19/2019 | 9/9/2024 | 5.6 | 6 |
| Schaan, Rachel | 7/25/2022 | 9/9/2024 | 2.1 | 4 |
| Lauren Rakochy | 10/02/2013 | 09/19/2024 | 10.9 | 6 |
| Baxter, Tiera (on leave) * | 1/3/2023 | TBD | 1.7 | 4 |

*Ms. Baxter is on maternity/parental leave, so it is not practical to provide her with Working Notice.  Our plan is to provide her with a termination and lump sum payment.

(b)

Section 3.16(a) above is incorporated herein by reference.

**Section 3.18(b)**

Environmental Permits

1. In 2024, UPL obtained from EPA a label amendment for (HT-glufosinate) Camelina to the label of their Interline® glufosinate product in states where it is registered.

**Section 3.18(e)**
Storage Tanks

1.  None.

**Section 3.18(f)**
Hazardous Materials

1. In Woburn, Sellers use 2 vendors to remove chemical and biohazardous waste. In our Canadian facilities, there are communal areas for waste disposal. Sellers have also used GFL Environmental for chemical waste disposal in Sellers' Canadian facilities.

Woburn Vendors.
**Chemical waste removal**
Veolia
53 State St #14
Boston, MA 02109
(617) 849-6600

**Biohazardous waste removal**
Stericycle
2355 Waukegan Rd,
Bannockburn, IL 60015
866-783-7422

Canadian Vendors.
**Chemical waste removal**
GFL Environmental, Inc.
100 New Park Place
Vaughan, On. L4K 0H9
800-263-8602

320500398.4

**Section 3.18(h)**
Environmental Documents

1.  None.

**Section 5.01(b)**
Conduct of Business Prior to the Closing

*(i)*

    1.  None.

*(ii)*

    1.  None.

*(iii)*

    1.  None.

*(iv)*

    1.  Sellers plan to terminate employees in conjunction with Sellers' wind down of Canadian operations.   As of Sept. 10, 2024, Sellers have provided Notice of Termination to 6 employees (Armstrong 10/4/24; Chen 11/1/24; Heath 10/4/24; Mykytyshyn 11/1/24; Ranasinghe 11/1/24; Rakochy 09/19/2024; Schaan 10/4/24). Sellers expect to terminate 2 additional Canadian employees in the near future (Baxter, Greenfield).   Sellers have not terminated 3 Canadian employees (Sharma, Zhou, , Malik).

*(v)*

    1.  None.

*(vi)*

    1.  None.

*(vii)*

    1.  None.

*(viii)*

    1.  None.

*(ix)*

    1.  None.

*(x)*

    1.  None.

*(xi)*

1. None.

**EXHIBIT A**

**BILL OF SALE**

**THIS BILL OF SALE** (this "<u>Bill of Sale</u>") is executed as of [DATE], by Yield10 Bioscience, Inc., a Delaware corporation ("<u>Yield10</u>"), and Yield10 Oilseeds Inc., a Canadian federal corporation ("<u>Oilseeds</u>", and together with Yield10, "<u>Sellers</u>"), in favor of Nuseed Nutritional US Inc., a Delaware corporation ("<u>Buyer</u>"). This Bill of Sale is being delivered in connection with the Closing under the Amended and Restated Asset Purchase Agreement dated as of December 4, 2024 (the "<u>Purchase Agreement</u>"), by and among Sellers and Buyer. Capitalized terms used but not defined in this Bill of Sale have the meanings given such terms in the Purchase Agreement.

**I.**

**<u>BILL OF SALE</u>**

1.1.    <u>Purchased Assets</u>. In accordance with and subject to the terms of the Purchase Agreement and for the consideration set forth in the Purchase Agreement, the receipt and sufficiency of which Sellers and Buyer hereby acknowledge, Sellers do hereby irrevocably sell, transfer, assign, convey, and deliver to Buyer, effective as of the Closing, all of Sellers' respective right, title, and interest in, to, and under the Purchased Assets consisting of tangible personal property, free and clear of all Encumbrances other than Permitted Encumbrances, as contemplated by Section 1.01 of the Purchase Agreement.

**II.**

**<u>MISCELLANEOUS</u>**

2.1.    <u>Purchase Agreement</u>. This Bill of Sale is expressly made subject to the terms of the Purchase Agreement. The delivery of this Bill of Sale shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive, or otherwise impair any of the representations, warranties, covenants, terms, or provisions of the Purchase Agreement or any of the rights, remedies, or obligations of Sellers or Buyer provided for therein or arising therefrom in any way. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Bill of Sale, the terms of the Purchase Agreement shall control.

2.2.    <u>Incorporation By Reference</u>. The terms set forth in Article IX of the Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references to "this Agreement" shall mean and refer to this Bill of Sale.

*[Signature Page Follows]*

320173005.3

**IN WITNESS WHEREOF**, Sellers have executed this Bill of Sale to be effective as of the Closing.

**SELLERS**:

**YIELD10 BIOSCIENCE, INC.**

By: _____
Name:
Title:

**YIELD10 OILSEEDS INC.**

By: _____
Name:
Title:

*[Signature Page to Bill of Sale]*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "<u>Agreement</u>") is executed as of [DATE], by and among Yield10 Bioscience, Inc., a Delaware corporation ("<u>Yield10</u>"), Yield10 Oilseeds Inc., a Canadian federal corporation ("<u>Oilseeds</u>", and together with Yield10, "<u>Assignors</u>"), and Nuseed Nutritional US Inc., a Delaware corporation ("<u>Assignee</u>"). Assignors and Assignee may be referred to herein individually as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>." This Agreement is being delivered in connection with the Closing under the Amended and Restated Asset Purchase Agreement dated as of December 4, 2024 (the "<u>Purchase Agreement</u>"), by and among Assignors and Assignee. Capitalized terms used but not defined in this Agreement have the meanings given such terms in the Purchase Agreement.

## I.

## ASSIGNMENT AND ASSUMPTION

1.1.    <u>Purchased Assets</u>. In accordance with and subject to the terms of the Purchase Agreement and for the consideration set forth in the Purchase Agreement, the receipt and sufficiency of which Assignors and Assignee hereby acknowledge, Assignors do hereby irrevocably sell, transfer, assign, convey, and deliver to Assignee, effective as of the Closing, all of Assignors' respective right, title, and interest in, to, and under the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances, as contemplated by Section 1.01 of the Purchase Agreement.

1.2.    <u>Excluded Assets</u>. Assignors do not, and in no event shall Assignors be deemed to, sell, transfer, assign, convey, or deliver, and Assignors do hereby retain, all right, title, and interest in, to, and under the Excluded Assets, as contemplated by Section 1.02 of the Purchase Agreement.

1.3.    <u>Assumed Liabilities</u>. In accordance with and subject to the terms of the Purchase Agreement, effective as of the Closing, Assignee does hereby assume from Assignors (and from and after the Closing agrees to pay, perform, discharge, or otherwise satisfy in accordance with their respective terms or as may otherwise be agreed between Assignee and the relevant obligee), and Assignors do hereby irrevocably convey, transfer and assign to Assignee, the respective Assumed Liabilities of Assignors, as contemplated by Section 1.03 of the Purchase Agreement.

1.4.    <u>Excluded Liabilities</u>. The Parties expressly acknowledge and agree that Assignee is not a successor to Assignors in respect of, and does not assume and shall not be deemed to have assumed or be liable or obligated to pay, perform, or otherwise discharge or in any other manner be liable or responsible for, the Excluded Liabilities, as contemplated by Section 1.04 of the Purchase Agreement.

## II.

## MISCELLANEOUS

2.1.    <u>Purchase Agreement</u>. This Agreement is expressly made subject to the terms of the Purchase Agreement. The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive, or otherwise impair any of the representations,

warranties, covenants, terms, or provisions of the Purchase Agreement or any of the rights, remedies, or obligations of Assignors or Assignee provided for therein or arising therefrom in any way. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement shall control.

2.2.    <u>Incorporation By Reference</u>. The terms set forth in Article IX of the Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references to "this Agreement" shall mean and refer to this Agreement.

[*Signature Pages Follow*]

2

**IN WITNESS WHEREOF**, Assignors and Assignee have executed this Assignment and Assumption Agreement to be effective as of the Closing.

**ASSIGNORS**:

**YIELD10 BIOSCIENCE, INC.**

By: _____
Name:
Title:

**YIELD10 OILSEEDS INC.**

By: _____
Name:
Title:

*[Signature Page to Assignment and Assumption Agreement]*

**ASSIGNEE:**

**NUSEED NUTRITIONAL US INC.**

By: _____
Name:
Title:

*[Signature Page to Assignment and Assumption Agreement]*

**EXHIBIT C**

## PATENT ASSIGNMENT AGREEMENT

**THIS PATENT ASSIGNMENT AGREEMENT** (this "Agreement") is executed as of [DATE], by and between Yield10 Bioscience, Inc., a Delaware corporation ("Assignor"), and Nuseed Nutritional US Inc., a Delaware corporation ("Assignee"). Assignor and Assignee may be referred to herein individually as a "Party" and, collectively, as the "Parties." This Agreement is being delivered in connection with the Closing under the Amended and Restated Asset Purchase Agreement dated as of December 3, 2024 (the "Purchase Agreement"), by and among Assignor, Yield10 Oilseeds Inc. ("Oilseeds"), and Assignee. Capitalized terms used but not defined in this Agreement have the meanings given such terms in the Purchase Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Assignor has agreed to sell, assign, transfer, and convey to Assignee all of Assignor's right, title, and interest in and to the Purchased Assets; and

**WHEREAS**, the Purchased Assets include certain patents and applications for patents owned by Assignor, as set forth on Schedule 1 attached hereto, as well as any application claiming priority to any such patent or application (collectively, the "Acquired Patents").

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements herein contained, and intending to be legally bound, the Parties hereby agree as follows:

**I.**

**ASSIGNMENT AND ASSUMPTION**

1.1.    Acquired Patents. In accordance with and subject to the terms of the Purchase Agreement and for the consideration set forth in the Purchase Agreement, the receipt and sufficiency of which Assignor and Assignee hereby acknowledge, Assignor does hereby irrevocably sell, transfer, assign, convey, and deliver to Assignee, effective as of the Closing, all of Assignor's right, title, and interest in, to, and under the Acquired Patents, including all of Assignor's rights to prosecute and maintain registrations and applications for, claim priority to, and sue and recover for past, present, and future infringements of, or other conflicts with, the Acquired Patents, free and clear of all Encumbrances other than Permitted Encumbrances, as contemplated by Section 1.01 of the Purchase Agreement.

1.2.    Assumption. In accordance with and subject to the provisions of the Purchase Agreement and this Agreement, Assignee hereby accepts the sale, assignment, transfer, conveyance, and delivery of Assignor's right, title, and interest in, to, and under the Acquired Patents.

1.3.    Recordation. The Parties agree to reasonably cooperate with each other with respect to preparing instruments to record Assignee as the owner of the Acquired Patents in the United States Patent and Trademark Office and any applicable non-U.S. Governmental Body or registrar, in each case in form and substance reasonably acceptable to the Parties and in accordance with the applicable Laws of the jurisdiction to which such instrument pertains.

1.4.    <u>Excluded Assets</u>. Assignor does not, and in no event shall Assignor be deemed to, sell, transfer, assign, convey, or deliver, and Assignor does hereby retain, all right, title, and interest in, to, and under the Excluded Assets, as contemplated by Section 1.02 of the Purchase Agreement.

## II.

## MISCELLANEOUS

2.1.    <u>Purchase Agreement</u>. This Agreement is expressly made subject to the terms of the Purchase Agreement. The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive, or otherwise impair any of the representations, warranties, covenants, terms, or provisions of the Purchase Agreement or any of the rights, remedies, or obligations of Assignor or Assignee provided for therein or arising therefrom in any way. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement shall control.

2.2.    <u>Incorporation By Reference</u>. The terms set forth in Article IX of the Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references to "this Agreement" shall mean and refer to this Agreement.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Patent Assignment Agreement to be effective as of the Closing.

**ASSIGNOR**:

**YIELD10 BIOSCIENCE, INC.**

By: _____
Name:
Title:

**ASSIGNEE:**

**NUSEED NUTRITIONAL US INC.**


By: _____
Name:
Title:

## SCHEDULE 1

### ACQUIRED PATENTS

| TITLE | JURISDICTION | FILING DATE | SERIAL NO. | STATUS | PATENT NO. | ISSUED DATE | OWNER / APPLICANT |
|-------|--------------|-------------|------------|--------|------------|-------------|-------------------|
|       |              |             |            |        |            |             |                   |