# Exhibit 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| Yield10 Bioscience, Inc., *et al.*, | ) Case No. 24-12752 (MFW) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: D.I. 106** |

**AMENDED DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION
OF YIELD10 BIOSCIENCE, INC. AND ITS AFFILIATE DEBTORS**

**THE ROSNER LAW GROUP LLC**

Frederick B. Rosner (DE 3995)
Zhao (Ruby) Liu (DE 6436)
Chan (Cora) Dong (DE 7393)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
Email: rosner@teamrosner.com
        liu@teamrosner.com
        dong@teamrosner.com

*Counsel to the Debtors and Debtors In Possession*

Dated: August 18, 2025

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Yield10 Bioscience, Inc. (x8289), (ii) Yield10 Bioscience Securities Corp. (x7435), and (iii) Yield10 Oilseeds Inc. (x9469).

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Joint Plan of Liquidation of Yield10 Bioscience, Inc. and its Affiliated Debtors that the Debtors are seeking to have confirmed by the Bankruptcy Court. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. Approval of this Disclosure Statement does not constitute a determination or recommendation by the Bankruptcy Court as to the fairness or the merits of the Plan.

This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents relating to the Plan, and certain financial information.  Although the Debtor believes that these summaries are fair and accurate and provide adequate information with respect to the documents summarized, such summaries are qualified to the extent that they do not set forth the entire text of, or are inconsistent with, such documents.

Although the Debtors have made every effort to be accurate, the financial information contained herein has not been the subject of an audit or other review by an accounting firm. In the event of any conflict, inconsistency, or discrepancy between the terms and provisions in the Plan, this Disclosure Statement, the exhibits annexed to this Disclosure Statement, or the financial information incorporated herein or therein by reference, the Plan shall govern for all purposes.  All holders of claims should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.

The statements and financial information contained herein have been made as of the date hereof unless otherwise specified.  Holders of claims and equity interests reviewing this Disclosure Statement should not infer at the time of such review that there have been no changes in the facts set forth herein.  Although the Debtors have made an effort to disclose where changes in present circumstances could reasonably be expected to affect materially the recovery under the Plan, this Disclosure Statement is qualified to the extent certain events do occur.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure.

Dissemination of this Disclosure Statement is controlled by Bankruptcy Rule 3017. This Disclosure Statement was prepared to provide parties in interest in these Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so

1

that those creditors who are entitled to vote with respect to the Plan can make an informed judgment regarding such vote on the Plan.

Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Each such Holder should, therefore, consult with his or her own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.

Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended plan and related disclosure statement from time to time, subject to the terms of the Plan. This Disclosure Statement does not constitute an offer to sell, or the solicitation of an offer to buy, any securities.

The effectiveness of the Plan is subject to several conditions precedent. There is no assurance that these conditions will be satisfied or waived.

No person has been authorized by the Debtors in connection with the Plan or the Solicitation to give any information or to make any representation other than as contained in this Disclosure Statement, the Plan and the exhibits, notices and schedules attached to or incorporated by reference or referred to in this Disclosure Statement and/or the Plan, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

Except where specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles.

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ................................................................................................ 1

    A.   Overview of the Plan ................................................................................ 1

       1.   General Structure of the Plan .................................................... 1

       2.   Material Terms of the Plan ........................................................ 2

       3.   Summary of Treatment of Claims and Equity Interests Under the Plan ........................................................................................... 2

    B.   Plan Voting Instructions and Procedures ................................................ 3

       1.   Voting Rights ............................................................................ 3

       2.   Solicitation Materials ............................................................... 3

       3.   Voting Instructions .................................................................. 4

       4.   Confirmation Hearing and Deadline for Objections to Confirmation ............................................................................ 6

II.   GENERAL INFORMATION ABOUT THE DEBTORS ................................. 7

    A.   Background ............................................................................................. 7

    B.   Non-Debtor Affiliates ............................................................................ 8

    C.   The Debtors' Business is Federally Regulated ...................................... 8

    D.   Prepetition Capital Structure ................................................................. 9

       1.   Unsecured Debt ........................................................................ 9

       2.   Equity Interests ........................................................................ 9

       3.   Tax Attributes .......................................................................... 9

    E.   Events Leading to the Filing of the Bankruptcy Cases .......................... 9

       1.   The Rothamsted Agreement ................................................... 10

       2.   The VISION License ............................................................. 10

       3.   Other License Agreements ..................................................... 10

    F.   The Failure to Find a Potential Acquirer. ........................................... 11

    G.   NuSeed Offer and the Original Agreement. ......................................... 11

    H.   The Failure to Achieve Stockholder Approval. .................................... 11

III.  THE DEBTORS' BANKRUPTCY CASES ................................................... 12

    A.   Commencement of the Chapter 11 Cases ............................................. 12

    B.   Schedules and Statements of Financial Affairs .................................... 12

i

C.     Sale Motion ................................................................................ 12

D.     Rejection of Woburn Lease ......................................................... 12

E.     Rejection of Vision License ......................................................... 13

F.     Bar Date .................................................................................... 13

G.     Additional Orders ...................................................................... 14

H.     Appointment of Independent Director ........................................ 14

IV.    SUMMARY OF THE CHAPTER 11 PLAN ................................................ 15

    A.     Treatment of Unclassified Claims .............................................. 15

         1.     Treatment of Administrative Claims .............................. 15

         2.     Bar Date For Administrative Claims .............................. 15

         3.     Treatment of Allowed Priority Tax Claims .................... 16

         4.     Payment of United States Trustee Quarterly Fees. ......... 16

    B.     Classification and Treatment of Claims and Interests ................. 17

         1.     Class 1: Allowed Other Priority Claims ........................ 17

         2.     Class 2: Allowed General Unsecured Claims ................. 17

         3.     Class 3: Intercompany Claims ....................................... 17

         4.     Class 4: Equity Interests ................................................ 17

    C.     Acceptance or Rejection of the Plan ........................................... 18

         1.     Impaired Classes Entitled to Vote ................................. 18

         2.     Acceptance by Class 2 .................................................. 18

         3.     Presumed Acceptances by Class 1 ................................. 18

         4.     Deemed Rejection by Classes 3 and 4 ........................... 18

V.    MEANS FOR IMPLEMENTATION OF THE PLAN ................................... 18

    A.     Consolidation of the Debtors and their Estates for Plan Purposes. ...................... 18

    B.     Transfer of Debtors' Assets/Right to Actions. ............................ 19

    C.     Selection and Appointment of Plan Administrator. ..................... 19

    D.     Compensation of Plan Administrator/Retention of Post-Effective Date Professionals. ...................... 20

    E.     Plan Administrator's Rights, Powers and Duties. ....................... 20

    F.     Corporate Governance. ............................................................. 21

    G.     Dissolution of Debtors Oilseeds, Inc. and Securities Corp. ........ 21

    H.     Investments. .............................................................................. 21

    I.     Resignation, Death or Removal of Plan Administrator. .............. 21

ii

|  | J. | Attorney Client Privilege. | 21 |
|---|---|---|---|
|  | K. | Limitation of Liability | 21 |
|  | L. | Winding up Affairs. | 22 |
|  | M. | Indemnification. | 22 |
|  | N. | Reservation of Rights Regarding Claims | 22 |
|  | O. | Post-petition Interest on Claims | 22 |
|  | P. | Insurance | 22 |
|  | Q. | Class Without Voting Claim Holders | 23 |
|  | R. | Sole Recourse. | 23 |
|  | S. | Post-Confirmation Reporting. | 23 |
| VI. |  | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 23 |
|  | A. | Rejection of Executory Contracts | 23 |
|  | B. | Bar Date for Rejection Claims | 23 |
|  | C. | Assumption of Executory Contracts | 24 |
|  | D. | Amendment of the Plan Supplement of Assumed Executory Contracts | 24 |
|  | E. | Payments Related to the Assumption of Executory Contracts | 24 |
|  | F. | Insurance Policies and Agreements | 25 |
|  | G. | Reservation of Rights. | 25 |
| VII. |  | DISTRIBUTIONS OF PROPERTY AND RESOLUTION OF DISPUTED CLAIMS | 25 |
|  | A. | General. | 25 |
|  | B. | Objections to Claims. | 26 |
|  | C. | Distributions to Disputed Claims. | 26 |
|  | D. | Interim Distributions on Account of Allowed Class 2 General Unsecured Claims. | 27 |
|  | E. | Final Distributions on Account of Allowed Class 2 General Unsecured Claims. | 27 |
|  | F. | Unclaimed Property. | 27 |
|  | G. | Withholding from Distributions. | 28 |
|  | H. | Fractional Cents. | 28 |
|  | I. | Payment of Less than Twenty-Five Dollars. | 28 |
|  | J. | Administrative Claim Reserve. | 28 |
|  | K. | Disputed Claim Reserve. | 28 |

iii

L.    Unclaimed Distribution Reserve. ......................................................... 29

M.    Estimation of Contingent or Unliquidated Unsecured Claims. ......................... 29

N.    Allocation of Distributions between Principal and Interest. ................................ 29

O.    Means of Cash Payment. ................................................................... 29

P.    Setoffs. ..................................................................................... 30

Q.    Record Date for Distributions. ............................................................ 30

VIII.    INJUNCTIONS, RELEASES, AND DISCHARGE ............................................ 30

A.    General Injunction. ........................................................................ 30

B.    Exculpation. ............................................................................... 30

C.    Releases by the Debtors ................................................................... 31

IX.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ................................ 31

A.    Conditions to Confirmation ............................................................... 31

B.    Conditions to Effectiveness ............................................................... 32

C.    Modification, Revocation or Withdrawal of the Plan ..................................... 32

    1.    Defects, Omissions, and Amendments of the Plan ................................ 32

    2.    Withdrawal of the Plan .............................................................. 32

X.    RETENTION OF JURISDICTION ............................................................ 33

XI.    RISK FACTORS ............................................................................. 34

A.    Risks Related to Bankruptcy ............................................................... 34

    1.    Parties May Object to the Plan's Classification of Claims and Equity Interests ...................................................................... 34

    2.    The Debtors May Not Be Able to Obtain Confirmation of the Plan ....... 34

    3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur ............................................................................ 34

    4.    Risks Associated with Proving and Collecting Claims Asserted in Litigation ............................................................................ 35

    5.    Allowed Claims May Exceed Estimates ............................................ 35

B.    Risks Related to Financial Information ................................................... 35

XII.    CONFIRMATION OF THE PLAN ............................................................ 35

A.    The Confirmation Hearing ................................................................ 35

B.    Requirements for Confirmation of the Plan .............................................. 36

C.    Best Interests of Creditors / Liquidation Analysis ....................................... 37

D.    Acceptance by Impaired Classes .......................................................... 37

iv

E.      Confirmation Without Acceptance by All Impaired Classes ............................... 38

      1.      No Unfair Discrimination ........................................................ 38

      2.      Fair and Equitable Test ........................................................... 38

XIII.   TAX CONSEQUENCES OF THE PLAN ..................................................................... 39

XIV.   RECOMMENDATION ................................................................................................. 39

## **EXHIBITS**

EXHIBIT A    Plan of Liquidation

EXHIBIT B    Liquidation Analysis

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

---

## I.    INTRODUCTION

Yield10 Bioscience, Inc. and each of its affiliate debtors and debtors-in-possession in the above-captioned cases (each, a, "<u>Debtor</u>", and collectively, the "<u>Debtors</u>"), hereby submit this disclosure statement (the "<u>Disclosure Statement</u>") pursuant to sections 1125 and 1126(b) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), in connection with the solicitation of votes on the *Joint Plan of Liquidation of Yield10 Bioscience, Inc. and Its Affiliate Debtors,* dated July 10, 2025 (as amended, supplemented or otherwise modified from time to time pursuant to its terms, the "<u>Plan</u>").  A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.[1]

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote to make an informed decision in exercising their right to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, its reasons for seeking protection under the Bankruptcy Code and the result of the private sale of its business to NuSeed.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

### A.    Overview of the Plan

#### 1.    General Structure of the Plan

Generally, the Plan provides for the *pro rata* Distribution of Net Distributable Assets to holders of Allowed General Unsecured Claims of Post-Effective Date Assets in accordance with the priority scheme established by the Bankruptcy Code. The Post-Effective Date Assets are essentially the net Sales Proceeds resulting from the post-petition sale of substantially all of the Debtors' assets to NuSeed plus the post-Effective Date monetization of Retained Causes of Action. There is no secured debt.  The Plan provides that holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in full under the Plan on (or soon as practical) after the Effective Date.  As set forth more fully below, it is anticipated that Holders of Allowed General Unsecured Claims will receive an approximate 20% Distribution.[2]

The Plan provides that the Debtors' Intercompany Claims and all Equity Interests in the Debtors will be cancelled, released and extinguished.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

[2] There can be no assurance that a 20% Distribution will be achieved.  It is a function of variables that cannot not be predicted with certainty.  It requires a reduction in the amount of filed claims and prosecution and recovery of Retained Causes of Action.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE VALUE TO THE ESTATES, IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND STAKEHOLDERS.**

**FOR THESE REASONS, THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

### 2.    Material Terms of the Plan

The following is an overview of certain material terms of the Plan:

- All Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims will be satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Debtors and the holders of such Claims.

- Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Net Distributable Proceeds.

- All Intercompany Claims and Equity Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors on the Effective Date. Holders of Intercompany Claims and Equity Interests will not receive any Distribution on account of their Intercompany Claims and Equity Interests.

- The Plan shall be administered post-Effective Date by a Plan Administrator.

### 3.    Summary of Treatment of Claims and Equity Interests Under the Plan

The table below summarizes the classification and treatment of the Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim or Interest | Summary of Treatment | Estimated Aggregate Amount of Claims[3] | Projected Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired; Deemed to Accept Plan | $105,900.00 | 100% |
| 2 | General Unsecured Claims | Impaired; Entitled to Vote on Plan | $5,408,440.85 | 20% |

---

[3] Subject to review and potential objection, the Holders of Allowed Class 1 Claims will be paid in full.  Projected recoveries for Class 2 Claims could vary significantly based upon the final Allowed amount of aggregate claims in Class 2 and pursuit and recovery of Retained Causes of Action.  Nothing herein shall be construed to be an admission by the Debtors as to the extent, priority or validity of any claim.

4898-3974-9728, v. 1

| 3 | Intercompany Claims | Impaired; Deemed to Reject | N/A | 0% |
| 4 | Equity Interests | Impaired; Deemed to Reject | N/A | 0% |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

### B.    Plan Voting Instructions and Procedures

### 1.    Voting Rights

Under the Bankruptcy Code, only Classes of Claims that are "Impaired" and that are not deemed as a matter of law to have rejected a plan of liquidation under section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan.  Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan of liquidation and is conclusively presumed to have accepted the Plan.  As set forth in section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims in Class 2 (General Unsecured Claims) are Impaired by, and entitled to receive a Distribution under the Plan, and only the holders of Claims in this Class are entitled to vote to accept or reject the Plan.  Whether a holder of a Claim in Class 2 may vote to accept or reject the Plan will also depend on whether the holder holds a Claim as of the Voting Record Date.

Pursuant to the Plan, Claims in Class 1 are Unimpaired by the Plan, and such holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Holders of Intercompany Claims and Equity Interests in Classes 3 and 4 will not receive any Distribution and are deemed to have rejected the Plan and are therefore not entitled to vote on the Plan.

### 2.    Solicitation Materials

The Debtors' counsel, The Rosner Law Group LLC, has agreed to serve as the solicitation agent (the "Solicitation Agent") to process and tabulate Ballots for Class 2 entitled to vote on the Plan and to generally oversee the voting process.  The following materials shall constitute the solicitation package (the "Solicitation Package"):

- ▪ This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- ▪ The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order");

- ▪ The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for

3

filing objections to Confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>");

▪ One or more Ballots, as applicable, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "<u>Voting Instructions</u>");

▪ A pre-addressed return envelope; and

▪ Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Solicitation Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.  The Solicitation Package is also available upon written request at: The Rosner Law Group LLC, 824 Market Street, Suite 810, Wilmington, DE 19801, Attn:  Zhao (Ruby) Liu, Esq.

If you are the holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Solicitation Agent by writing to: The Rosner Law Group LLC, 824 Market Street, Suite 810, Wilmington, DE 19801, Attn:  Zhao (Ruby) Liu, Esq.

If the reason that you did not receive a Ballot is because your Claim is subject to a pending claim objection, Avoidance Action or otherwise has been designated as a Disputed Claim and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by **September 17, 2025 at 4:00 p.m. (prevailing Eastern Time)**, or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS, AVOIDANCE ACTION OR OTHERWISE TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR VOTING AND DISTRIBUTION PURPOSES.**

### 3.    Voting Instructions

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed **August 19, 2025** as the record date ("<u>Voting Record Date</u>") for the determination of the holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is <u>September 24, 2025 at 5:00 p.m. (prevailing Eastern Time)</u> (the "<u>Voting Deadline</u>")**.  In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually **received** no later than the Voting Deadline at the address set forth below:

**The Rosner Law Group LLC
824 Market Street, Suite 810
Wilmington, Delaware 19801
Attn:  Zhao (Ruby) Liu, Esq.**

Only the Holders of Claims in Class 2 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballot and returning it in the envelope provided by the Solicitation Agent so as to be actually received by the Solicitation Agent by the Voting Deadline. Each holder of a Claim must vote its entire Claim within a particular Class either to accept or reject the Plan and may not split such votes.  If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  The Ballot will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots or otherwise ordered by the Bankruptcy Court, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtor has granted an extension of the Voting Deadline with respect to such Ballot, or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim;

- Any Ballot cast by a Person or Entity that does not hold an Allowed Claim in a voting Class; and

- Any unsigned Ballot or Ballot without an original signature.

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  In the case where more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted for purposes of

4898-3974-9728, v. 1

determining whether the requisite acceptances have been received.  Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and, in the case of Claims, the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in substantially the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Solicitation Agent prior to the Voting Deadline.

The Debtors, in their sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein, the Debtors may, in their sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE CLASS ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Solicitation Agent at the address specified above.  Copies of the Plan, Disclosure Statement, and other documents filed in this Chapter 11 Case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Solicitation Agent will process and tabulate Ballots for the Class entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") as soon as reasonably practicable following the Voting Deadline.  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

### 4.    Confirmation Hearing and Deadline for Objections to Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [•], 2025 at [•] (prevailing Eastern Time)**, before the Honorable Mary F. Walrath, United States

Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**Objections to Confirmation of the Plan must be filed and served on the Notice Parties in accordance with the Confirmation Hearing Notice by no later than <u>September 24, 2025 at 4:00 p.m. (prevailing Eastern Time)</u>.**  Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement, they may not be considered by the Bankruptcy Court.

## II.    GENERAL INFORMATION ABOUT THE DEBTORS

### A.    Background

In 1992, Yield10 was incorporated in Massachusetts under the name Metabolix, Inc. Metabolix was a pioneer in the development of synthetic biology to enable advanced bioplastics production technology. Metabolix provided sustainable solutions to the plastic, chemical and energy industries.  In September 1998, Yield10 reincorporated in Delaware, and in January 2017 changed its name to Yield10 to reflect its change in mission to crop research.

Prior the Asset Sale (discussed below), Yield10 Bioscience, Inc. ("<u>Yield10</u>" or the "<u>Company</u>") was an agricultural bioscience company focused on commercializing sustainable products using the oilseed *Camelina sativa* ("<u>Camelina</u>") as a platform crop. The unique features of Camelina, including the availability of winter varieties and a short growth cycle, make it attractive for integration into crop rotations and double cropping on millions of acres in North America. To unlock this potential and make Camelina an attractive option for farmers, the Company planned on developing and commercializing advanced varieties with elite weed control herbicide tolerance traits, improved agronomic performance, and increased crop value.

Yield10 pursued two Camelina seed oil products with different market opportunities, value chains, scale requirements and challenges. The first product, Camelina seed oil, used as a low-carbon intensity feedstock oil for biofuels including biodiesel, renewable diesel ("<u>RD</u>") and sustainable aviation fuel ("<u>SAF</u>").  Markets for biofuels are driven by government policies, have the potential to be very large, and will require the production of tens of millions of acres of new oilseed cover crops like Camelina. The second product, seed oil produced by Camelina which has been genetically engineered to enable production of high levels of the omega-3 fatty acids eicosapentaenoic acid ("<u>EPA</u>") and docosahexaenoic acid ("<u>DHA</u>") in the oil is driven by the growing demand for new sources of omega-3 feedstocks and the production constraints and supply volatility of the traditional raw material source, fish oil extracted from ocean harvested fish.  The growing omega-3 market opportunity offered the potential for revenue and margin growth at acreage levels accessible to Yield10 operationally, addressed an unmet need for a reliable, scalable supply of omega-3 oils for aquaculture, and represented multiple opportunities for further product development to address higher value markets for omega-3 oils in nutraceuticals and pharmaceuticals.

In early 2023, the Company revised its commercial strategy for biofuels to focus on providing research and development services to third parties interested in Camelina for biofuels and/or partnering with the goal of generating service and licensing revenues from the Company's advanced Camelina capabilities, technology capabilities, varieties, and traits. This decision reflected the then oversupply of soybean oil for the biofuels market as new refinery capacity is being built as well as the challenging financing environment for small cap pre-revenue companies. Over the last four years, Yield10 has developed proprietary, engineered spring and winter Camelina varieties, including herbicide tolerant ("HT") and stacked herbicide tolerant ("stacked HT") varieties traits which form the genetic foundation for introducing commercial-quality Camelina varieties tailored to address both markets. Based on the then biofuels strategy, in early 2024 the Company signed its first non-exclusive global, commercial license with Vision Bioenergy Oilseeds for certain Camelina herbicide tolerance traits. Yield10 was headquartered in Woburn, Massachusetts and had a Canadian subsidiary, Yield10 Oilseeds Inc., located in Saskatoon, Saskatchewan, Canada.

**B.      Non-Debtor Affiliates**

Yield10 has two wholly-owned subsidiaries: (i) Yield10 Bioscience Securities Corp. (f/k/a Metabolix Securities Corp.), a Massachusetts corporation ("Securities Corp.") and (ii) Yield10 Oilseeds Inc., a company organized under the laws of Canada ("Oilseeds" and, collectively with Yield10 and Securities Corp., the "Debtors"). Crop development was conducted at Oilseeds at five greenhouses.  Oilseeds also managed contract research organizations in the United States and Canada.  Securities Corp. is a tax-driven entity where the Company's excess working capital was invested due to lower state income tax rates in Massachusetts for qualified securities corporations.

**C.      The Debtors' Business is Federally Regulated**

The Debtors' business involves producing genetically modified plants that are engineered to produce plant incorporated protectants; i.e., pesticides, during the growing season.   In the United States, the Debtors' business developing genetically modified crops is federally regulated by the USDA Animal and Plant Health Inspection Service (APHIS), U.S. Food and Drug Administration, the Environmental Protection Agency and the Department of Agriculture.  In Canada, genetically engineered crops and the food products into which they are incorporated are regulated by multiple government agencies including the Canadian Food Inspection Agency (CFIA) under a federal framework for the regulation of biotechnology products that is similar to the U.S. system. The Debtors are required to operate their business in a highly regulated framework that controls the spread of such plants, and ensure appropriate handling, confinement and disposal.

Furthermore, because the key assets of the Company are plants going through the growth cycle in contained greenhouses or in farmer fields, they need to be maintained and monitored for the full growth cycle until seed is produced which can be collected and stored. Simply stopping in the middle of the growing process requires the destruction of crop materials which would have resulted in the loss of a major part of the Company's assets and value.

Accordingly, unlike most businesses, the Debtors' directors and officers could not simply resign from or abandon their business. The Debtors' directors and officers always acted diligently and responsibly to ensure at all times that the Debtors managed their genetically modified crops in

accordance with all such regulations and their feed products met safety standards. This is necessary to protect human health, the health of livestock, prevention of the unintentional spread of trace amounts of the Company's yield trait genes in the products of third parties and the environment in general.

To ensure that strict compliance was always and consistently met, directors and officers had to, among other things, forego salary and other considerations from time to time to ensure the Debtors had sufficient capital to ensure such compliance. Given their responsibilities to the public, directors and officers could not simply "walk away" from the Debtors' business, especially during the growing season. Directors and officers passed on various opportunities until the Debtors' business was responsibly transferred to NuSeed.

### D.    Prepetition Capital Structure

#### 1.    Unsecured Debt

The Debtors, on a consolidated basis, have approximately seventy-seven (77) unsecured creditors that have asserted claims aggregating approximately $5,514,340.85. Of that amount, $0 are Priority Tax Claims and $105,900.00 are Other Priority Claims.

#### 2.    Equity Interests

Debtor Yield10's equity securities are publicly held as follows (as of December 6, 2024):

| Amount Authorized | Amount Issued | Amount Outstanding |
|---|---|---|
| Preferred Stock | None | None |
| Common Stock | 734,408 | 734,408 |

Debtor Yield10 owns 100% of each of Oilseeds and Securities.

#### 3.    Tax Attributes

As of December 31, 2023, the most recent year for which the Debtor has prepared and filed its U.S. corporate income taxes, the Debtor estimates that it possesses federal net operating loss carryforward of approximately $1,095,240.

### E.    Events Leading to the Filing of the Bankruptcy Cases

As part of the ongoing consideration and evaluation of Yield10's long-term prospects and strategies, the Debtors frequently reviewed strategic and financial alternatives for Yield10. Among other things, the Debtors considered developments in Yield10's business, the sectors which it is targeting commercially, the economy generally and financial markets, with the goal of enhancing value for its stockholders. The restructuring discussions resulted in several agreements and then the Original Agreement (defined below) with NuSeed.

1.      **The Rothamsted Agreement**

One restructuring effort involved forming a biofuel partnership/joint venture where the partner would support Yield10's Camelina development activities, as well as financing plans and a cash runway. The Debtors believed that by using this approach they could leverage the interest in biofuels to secure funding that would enable Yield10 to focus on commercializing the omega-3 oils that have a higher market value at lower scale. Based on its exclusive Option Agreement, on June 13, 2024, Yield10 and Rothamsted Research Limited ("Rothamsted") signed an agreement whereby Rothamsted granted Yield10 an exclusive, global license to advanced technology for producing omega-3 products in Camelina (the "Rothamsted Agreement"). This facilitated Yield10 executing its plan to use engineered Camelina to commercially produce omega-3 oil and meal products targeting the aquafeed, pet food, and nutritional markets for omega-3 fatty acids. In consideration for the commercial license, Yield10 was expected to pay certain license fees, future milestone payments, and royalties based on commercialization of Rothamsted's omega-3 technology.

2.      **The VISION License**

Another restructuring effort was with Vision Bioenergy Oilseeds LLC ("VISION").  On February 9, 2024, Yield10 executed a license and service fee agreement with VISION for access to herbicide tolerance technology in Camelina ("Vision License Agreement").  In consideration for the Vision License Agreement and completion of certain deliverables, VISION was expected to make cash payments to Yield10 totaling $3 million. By facilitating the large-scale commercial production of herbicide tolerant Camelina, this license agreement was intended to empower farmers to capitalize on the growing biofuel market while advancing the decarbonization goals of aviation, maritime, and heavy-duty transport industries.

3.      **Other License Agreements.**

In the normal course of its business Yield10 in-Licensed patented technologies from other research organizations because of their potential to add value to Camelina. These License Agreements require Yield10 to pay for the prosecution and maintenance of the patents and patent applications and to pay milestones and royalties on commercial sales or sub-licensing. These License agreements are a valuable asset of the Company and include genetic technologies for improving crops including Camelina. These technologies were licensed from the University of Missouri Agriculture, Agrifood Canada (AAFC) the University of Massachusetts and Rotamsted Research (UK). In addition to the License agreement with AAFC, Yield10 entered into a Collaborative Research and Developments program to breed new varieties of Camelina.

The Debtors unfortunately continued to face financial challenges typical for pre-revenue agbiotech companies in the United States. To address this, on November 30, 2023, Yield10 caused the full or partial furlough of approximately 65% of Yield10's workforce, most of whom were located at the Woburn Premise.[4] Ultimately, the Debtors determined they would not be able to

---

[4] Yield10's headquarters was located in Woburn, Massachusetts pursuant to a lease (the "Woburn Lease") for the premise located at 19 Presidential Way, Suite 201, Woburn, MA  01801 (the "Woburn Premise").  On or before November 30, 2024, Yield10 surrendered full possession and control of the Woburn Lease back to the landlord.

achieve their operational goal as a revenue generating business. As a result, the Debtors consulted with experienced restructuring and other advisors to facilitate their review, analysis, and development of potential alternatives, including the sale of their assets.

### F.    The Failure to Find a Potential Acquirer.

Faced with financial and market challenges, the Debtors outreached to multiple potential partners and potential acquirers, including players along the oilseed value chain: seed companies, grain processing companies, biofuel producers and multiple players in the omega-3 nutrition business. No party came forward with a formal expression of interest in the acquisition of either Yield10 or its assets. There were indications of potential interest but when pressed for a formal offer no party except that (as described below) Nuseed was willing to and did move forward.

### G.    NuSeed Offer and the Original Agreement.

On October 1, 2024, the Debtors and Nuseed entered into the original asset purchase agreement (the "Original Agreement"). Because Yield10 is a public company, the Original Agreement was subject to approval by a majority of Yield10's common shareholders. To finance operations pending stockholder approval, the Debtors borrowed $3 million from Nuseed pursuant to a Secured Promissory Note (the "Promissory Note"). The $3 million was fully funded. Repayment of the Promissory Note was secured by a security interest in and lien upon substantially all of the Debtors' assets. The Promissory Note, as amended, was due and payable on December 2, 2024. Unfortunately, many holders of Yield10 common stock held a very small number of shares. Although the vast majority of those shareholders who voted, supported the asset sale (~5:1 in favor), due to voter apathy, the requisite percentage of stockholder approval was not achieved.

### H.    The Failure to Achieve Stockholder Approval.

Even although the vast majority of the shareholders casting votes, were in favor of the asset sale and the Company was unable to reach the 50% of shareholders voting threshold. The failure to achieve the necessary stockholder approval was a very disappointing result for the Debtors. After Yield10 failed to achieve the necessary stockholder approval to close the Original Agreement, it was left in a precarious and untenable financial position. The Debtors lacked sufficient funds to pay the Promissory Note at maturity, and the Debtors' failure to obtain the necessary stockholder approval triggered Nuseed's right to foreclose on the Purchased Assets as of December 2, 2024. The Debtors also lacked sufficient cash to pay rent going forward at their headquarters located in Woburn, Massachusetts where they stored much of the Purchased Assets. At this juncture, there was no likelihood of any recovery to the Debtors' general unsecured creditors because a foreclosure on all assets by NuSeed was imminent.

The directors and officers elected not to resign but continued to engage in good faith discussions with NuSeed.  The directors and officers thereafter were able to fashion a deal with NuSeed to be completed as an expedited private sale as part of a bankruptcy filing. Those extra efforts allowed Nuseed to acquire the Purchased Assets without stockholder approval and resulted in a value-maximizing proposition for Yield10 and its unsecured creditors.

III.    **THE DEBTORS' BANKRUPTCY CASES**

A.    **Commencement of the Chapter 11 Cases**

On December 6, 2024 (the "Petition Date"), the Debtors commenced their respective voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

B.    **Schedules and Statements of Financial Affairs**

On January 6, 2025, the Debtors filed the Schedules and Statement of Financial Affairs for all the three Debtors. [D.I. 54, 55, 56, 57, 58, 59].

C.    **Sale Motion**

On December 6, 2024 (the "Petition Date"), the Debtors filed *Motion of Debtors for Entry of: (I) an Order (A) Approving Form and Manner of Notices and (B) Scheduling a Sale Hearing and Establishing Dates and Deadlines Related Thereto, Including Treatment of Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Granting the Buyer the Protections Afforded to a Good Faith Buyer, and (C) Granting Related Relief* [D.I. 7].

On December 10, 2024, the Court entered the *Order (A) Approving Form and Manner of Notices and (B) Scheduling a Sale Hearing and Establishing Dates and Deadlines Related Thereto* [D.I. 22].

On January 8, 2025, the Court entered the *Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Granting the Purchaser the Protections Afforded to a Good Faith Purchaser, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases related thereto, and (D) Granting Related Relief* [D.I. 71].

D.    **Rejection of Woburn Lease**

On December 10, 2024, the Debtors filed their *Motion for an Order: (I) Authorizing Rejection of an Unexpired Lease and Sublease of Non-residential Real Property as of the Rejection Effective Date; (II) Authorizing Abandonment of Any Remaining Property Located at the Premise; and (III) Granting Related Relief* [D.I. 20].

On January 2. 2025, the Court entered the *Order (I) Authorizing Rejection of an Unexpired Lease and Sublease of Non-residential Real Property as of the Rejection Effective Date; (II) Authorizing Abandonment of Any Remaining Property Located at the Premise; and (III) Granting Related Relief* [D.I. 43].

### E.        Rejection of Vision License

On January 15, 2025, the Debtors filed their Motion for an Order: (I) Authorizing Rejection of the License and Service Fee Agreement with Vision Bioenergy Oilseeds LLC and Related Contracts; (II) Authorizing Abandonment of Certain Materials and (III) Granting Related Relief [D.I. 75].

On February 3, 2025, the Court entered the *Order (I) Authorizing Rejection of the License and Service Fee Agreement with Vision Bioenergy Oilseeds LLC and Related Contracts; (II) Authorizing Abandonment of Certain Materials and (III) Granting Related Relief* [D.I. 83].

### F.        Bar Date

On January 29, 2025, the Debtor filed their *Motion for Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of The Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [D.I. 81] (the "Bar Date Motion").

On February 24, 2025, the Court entered the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of The Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [D.I. 89] (the "Bar Date Order").

The Bar Date Order set the deadline for governmental units to file prepetition proofs of claim against the Debtor, as June 4, 2025 at 5:00 p.m. (prevailing Eastern Time), and the deadline for any creditor whose claims is (a) not listed on the Debtors' schedules and liabilities (collectively, the "Schedules"), (b) listed on the Schedules as disputed, contingent, or unliquidated, or (c) is listed on the Debtors' Schedules but against the wrong Debtor to file prepetition proofs of claim against the Debtor, as March 28, 2025 at 5:00 p.m. (prevailing Eastern Time). On February 25, 2025, notice of the bar date, in a form approved by the Bankruptcy Court, was been served on all known creditors.

As a result of the Bar Date, there were thirty (30)[5] claims filed against the Debtors generally described as follows:

The aggregate amount of claims filed against Debtors through the Bar Date totals $5,040,855.63[6] and includes:

- Research services and supplies,
- Communications services,
- Rental charges for real property as of Petition Date and through the termination of individual leases,
- Services provided by members of the Debtor's board of directors,

---

[5] This number does not include any duplicate or withdrawn claims.

[6] This number does not include any scheduled claims that are not required to file a proof of claim.

13

- Executive officer severance compensation and benefits as provided by their individual employment contracts,
- Technology license agreements, and
- Accounting, insurance, legal and other financial services.

### G.    Additional Orders

On or after the Petition Date, the Debtor filed a number of motions and applications to retain professionals, to streamline the administration of the Chapter 11 Cases, and to obtain other relief in the best interest of the Debtors.  The Court entered the following orders in these Chapter 11 Cases:

- *Final Order Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to (A) Pay Certain Prepetition Wages, Compensation, and Employee Benefits, (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business and (C) Continue Payment of Employment, Unemployment, Social Security and Other Taxes Incident to the Employee Obligations; and (II) Authorizing and Directing Debtors' Third-Party Payroll Administrator and Debtors' Bank to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing* [D.I. 60];

- *Final Order Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363, 1107 and 1108 Authorizing: (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms and (C) Waiver of Section 345(b) Deposit and Investment Requirements and Certain United States Trustee Guidelines* [D.I. 61];

- *Order Authorizing the Retention and Employment of The Rosner Law Group LLC Effective as of the Petition Date* [D.I. 67]; and

- *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 68]

### H.    Appointment of Independent Director

The Debtors' filed Statement of Financial Affairs identifies certain insiders, as that term is defined in the Bankruptcy Code, that may have received avoidable transfers and are therefore potentially the subject of one or more Avoidance Actions.  It is necessary and appropriate for the potentially avoidable transfers to be reviewed, vetted, settled or litigated in a fair and neutral manner.  The insiders understand they may be conflicted, or there is an appearance of impropriety, in them making a final decision regarding the prosecution and/or resolution of such Avoidance Actions.  To that end, the Debtors intend to retain an Independent Director for the specific and limited purpose of reviewing insider avoidance actions.  The Independent Director Fees shall not exceed $30,000.

14

## IV.    SUMMARY OF THE CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the Exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Equity Interests in the Debtors, their Estate, and the Plan Administrator, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, and/or any other operative document, the terms of the Plan, and/or such other operative document, as applicable, shall govern and control; provided that, in any event, the terms of the Plan shall govern and control over all other related documents.

### A.    Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and the respective treatment of such unclassified Claims is set forth in the Plan.

### 1.    Treatment of Administrative Claims

Except as specified in this section, and subject to the Administrative Claim Bar Date, unless (1) otherwise agreed by the Holder of an Administrative Claim and the applicable Debtor or the Plan Administrator, as applicable, (2) an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the full unpaid amount of such Allowed Administrative Claim from the Plan Administrator. At his option, the Plan Administrator will pay an Allowed Administrative Claim (i) in the ordinary course of business or (ii) on the latest to occur of (A) the Effective Date (or as soon as reasonably practicable thereafter), (B) the date such Claim becomes an Allowed Administrative Claim (or as soon as reasonably practicable thereafter) and (C) such other date as may be agreed upon by the Plan Administrator and the Holder of such Claim.

### 2.    Bar Date For Administrative Claims

#### a.    Bar Date for Filing Administrative Claims Except Professional Fee Claims.

Except with respect to Professional Fee Claims or otherwise as set forth in this Plan or separate order of the Bankruptcy Court, Holders of Administrative Claims must, no later than 30 days after the Effective Date and pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, file and serve on the Debtors or Plan

Administrator (as applicable) each of the Holder's respective requests for payment of Administrative Claims. Objections to such requests for payment of Administrative Claims and all requests for payment of Administrative Claims made pursuant to the Bar Date Order must be Filed and served on the Notice Parties and the requesting party by (i) 60 days after the Effective Date or (ii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. Except with respect to Professional Fee Claims, Holders of Administrative Claims that fail to File and serve a request for payment of such Administrative Claim are forever barred from asserting such Administrative Claim against the Debtors, Post-Effective Date Assets or Plan Administrator, and such Administrative Claims will be deemed released, extinguished and discharged as of the Effective Date.

### b.       Bar Date for Filing Professional Fee Claims.

To the extent required by a Final Order approving a Professional's retention, Professionals must file and serve all final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date no later than 30 days after the Effective Date. Professionals must provide notice of a proposed hearing on such final requests in accordance with the procedures established under the Bankruptcy Code, the Bankruptcy Rules and the Interim Compensation Order. All such final requests will be subject to the Bankruptcy Court's approval. Once approved for payment in accordance with the foregoing, the Plan Administrator will pay Allowed Professional Fee Claims.

### 3.       Treatment of Allowed Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim: (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim, or (iii) paid upon other agreed terms, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Debtors might otherwise agree; provided however, that all payments on account of Allowed Priority Tax Claims are to be applied first to extinguish all tax debts that may result in personal liability of officers, directors, responsible persons, and/or employees of the Debtors (collectively, "Trust Fund Tax Debts"), then to any and all remaining outstanding tax debts that are not Trust Fund Tax Debts, then to any interest and/or penalties that have accrued on all tax debts, including Trust Fund Tax Debts.

### 4.       Payment of United States Trustee Quarterly Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors and the Post-Effective Date Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, each of the Post-Effective Date Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors and the Post-Effective Date Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S.

16

Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

### B.    Classification and Treatment of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes or Claims and Equity Interests.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors' obligations in respect of such Claims and Equity Interests shall be satisfied in accordance with the terms of the Plan.

### 1.    Class 1: Allowed Other Priority Claims

Impairment and Voting.  Class 1 Claims are Unimpaired under the Plan. Consequently, each holder of an Allowed Class 1 Other Priority Claim shall be deemed to accept the Plan and is not entitled to vote on the Plan.

Treatment. Except to the extent the holder of an Allowed Other Priority Claim agrees otherwise, each holder of an Allowed Other Priority Claim shall be paid as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim, or (iii) upon other agreed terms.

### 2.    Class 2: Allowed General Unsecured Claims

Impairment and Voting. Class 2 is Impaired under the Plan. Consequently, each holder of an Allowed General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

Treatment. Each holder of such Allowed General Unsecured Claim shall receive its Pro Rata share of Net Distributable Assets.

### 3.    Class 3: Intercompany Claims

Impairment and Voting. Class 3 is Impaired under the Plan, is presumed to reject the Plan and is not entitled to vote.

Treatment. On the Effective Date, Intercompany Claims shall be extinguished, cancelled and released and the holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Intercompany Claims.

### 4.    Class 4: Equity Interests

Impairment and Voting.  Class 4 is Impaired under the Plan. Each holder of an Equity Interest is presumed to have rejected the Plan and is not entitled to vote.

<u>Treatment</u>. On the Effective Date, the Equity Interests shall be extinguished, cancelled and released and the holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Equity Interest.

### C.    Acceptance or Rejection of the Plan

#### 1.    Impaired Classes Entitled to Vote

Holders of Claims in Class 2 are impaired and entitled to vote as a Class to accept or reject the Plan.  Accordingly, only the Holders of Claims in Class 2 shall be solicited with respect to the Plan.

#### 2.    Acceptance by Class 2

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

#### 3.    Presumed Acceptances by Class 1

Class 1 is unimpaired under the Plan.  Under section 1126(f) of the Bankruptcy Code, holders of such unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such unimpaired Claim Holders shall not be solicited.

#### 4.    Deemed Rejection by Classes 3 and 4

Classes 3 and 4 are impaired under the Plan and are deemed to reject the Plan. Therefore, Classes 3 and 4 are not entitled to vote to accept or reject the Plan.

## V.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Consolidation of the Debtors and their Estates for Plan Purposes.

The Debtors' Estates will be consolidated for administrative purposes related to the Plan, including for purposes of (1) implementing the Plan, (2) voting, (3) assessing whether the standards for Confirmation have been met and (4) calculating and making Distributions under the Plan.

On the Effective Date (1) all of the Debtors' assets and liabilities will be merged; (2) all guarantees or responsibility of one Debtor for the obligations of any Other Debtor will be eliminated, and all guarantees or responsibility executed by multiple Debtors of the obligations of any other Entity will be consolidated into a single obligation, so that any Claim against any Debtor and any guarantee or responsibility thereof executed by any Other Debtor and any joint or several liability of any of the Debtors will be one obligation of the Debtors; (3) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be Filed against, and will be a single obligation of, the Debtors; (4) Intercompany Claims between Debtors will be cancelled. eliminated and extinguished; and (5) Equity Interests of one Debtor in another Debtor will be cancelled,

18

eliminated and extinguished. This consolidation will not affect (1) the vesting of the Debtors' assets in the Post-Effective Date Debtors; (2) the right to distributions from any Insurance Policies or proceeds of such policies; (3) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; (4) the rights of the Debtors or the Plan Administrator to contest setoff or recoupment rights alleged by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law or (5) the right of the Plan Administrator to prosecute Avoidance Actions on behalf of the Debtors notwithstanding the consolidation of the Debtors or the dissolution of Other Debtors.

This Plan serves as a motion seeking entry of an order consolidating the Debtors, as described herein. Unless an Entity Files an objection with the Bankruptcy Court and serves such objection on or before the Objection Deadline, or such other date as may be fixed by the Bankruptcy Court, the Bankruptcy Court may enter order (which may be the Confirmation Order) approving the Debtors' consolidation. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### B.     Transfer of Debtors' Assets/Right to Actions.

On the Effective Date, the Debtors' Estates, all Property of the Debtors' Estates, and all Retained Causes of Action including Avoidance Actions, will transfer, and will be deemed to have irrevocably transferred, to the Plan Administrator. Any recovery of Cash by the Plan Administrator on account of such Retained Causes of Action will be distributed pursuant to the terms of the Plan.

### C.     Selection and Appointment of Plan Administrator.

Prior to the Effective Date, the Debtors shall appoint a Person to serve as the Plan Administrator until the resignation or discharge of the Plan Administrator and the appointment of a successor Plan Administrator. The Plan Administrator shall be the "representative" of the post-Effective Date estates under section 1123(b)(3)(B) of the Bankruptcy Code. The Plan Administrator succeeds to all rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the post-Effective Date estates. The Plan Administrator shall also act as the Disbursing Agent for the purpose of implementing the Plan.

The Plan Administrator, in the exercise of the Plan Administrator's reasonable business judgment, will, in an expeditious, but orderly, manner, liquidate and convert to Cash the Post-Effective Date Assets, including monetizing all Retained Causes of Action including Avoidance Actions, and make timely distributions, and not unduly prolong the duration of the Chapter 11 Cases. The liquidation of the Post-Effective Date Assets may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or Retained Causes of Action, or otherwise. The Plan Administrator will have the absolute right to take any and all action with respect to the Post-Effective Date Assets as the Plan Administrator determines is in the best interests of stakeholders, and consistent with the purposes of implementing the Plan,  and will have no liability for the outcome of such decision except for any damages caused by willful misconduct or gross negligence. The Plan Administrator may incur any reasonable and necessary expenses in liquidating and converting the Post-Effective Date Assets to Cash and will be reimbursed in accordance with the provisions of this Plan.

**D.** **Compensation of Plan Administrator/Retention of Post-Effective Date Professionals.**

Except as otherwise ordered by the Bankruptcy Court, the Plan Administrator will be paid as a Plan Administrator Expense at the rate of $375/hr.

The Plan Administrator may, without further order of the Bankruptcy Court, retain professionals or other Entities to assist in carrying out its duties hereunder and may compensate and reimburse the expenses of these professionals or other Entities without further order of the Bankruptcy Court as a Plan Administrator Expense in accordance with the Plan.

**E.** **Plan Administrator's Rights, Powers and Duties.**

Subject to, and to the extent set forth in the Plan and Confirmation Order, the Plan Administrator will be empowered to take the following actions, and any other actions, as the Plan Administrator determines to be necessary or appropriate to implement the Plan, all without further order of the Bankruptcy Court:

(a) adopt, execute, deliver or file all plans, agreements, certificates and other documents and instruments necessary or appropriate to implement the Plan;

(b) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Retained Causes of Action;

(c) sell, liquidate or otherwise dispose of the Retained Causes of Action;

(d) calculate and make distributions to Holders of Allowed Claims;

(e) exercise rights and fulfill obligations under the Plan;

(f) retain firms to prosecute the Retained Causes of Action on any reasonable basis including on a contingency fee basis;

(g) review, reconcile, settle or object to Claims and resolve such objections;

(h) prepare and file appropriate Tax returns and other reports on behalf of the Debtors and Post-Effective Date Debtors and pay Taxes or other obligations owed by the Debtors and the Post-Effective Date Debtors;

(i) take any and all actions necessary to process the termination of the any welfare / benefit plans, including, but not limited to, filing all applicable forms required by the plans and/or applicable law, and providing all applicable notices to plan participants;

(j) pay the Plan Administrator Expenses including the cost of pursuing Retained Causes of Action;

(k) cause the dissolution of any of the Debtors or close or dismiss any or all of the Chapter 11 Cases.

### F.      Corporate Governance.

All corporate governance activities of the Debtors shall be exercised by the Plan Administrator, subject to the terms of the Plan.

### G.      Dissolution of Debtors Oilseeds, Inc. and Securities Corp.

On the Effective Date, the Debtors' members, directors, managers and officers and any remaining employees shall be deemed to have resigned and the Others Debtors; *i.e.*, Oilseeds, Inc. and Securities Corp.  shall be dissolved for all purposes and of no further legal existence under any applicable state, federal or foreign law, without the need to take any further action or file any plan of dissolution, notice or application with the Secretary of State of the State of Delaware or any other state or government authority, and without the need to pay any franchise or similar taxes in order to effectuate such dissolution.  The respective chapter 11 cases of Oilseeds and Securities Corp. shall be dismissed as part of the Confirmation Order.

### H.      Investments.

All Cash held by the Plan Administrator in any accounts or otherwise shall be invested in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court.

### I.      Resignation, Death or Removal of Plan Administrator.

Upon application and for good cause shown, the Bankruptcy Court may remove the Plan Administrator from his or her role.  In the event of the resignation, removal, death or incapacity of the Plan Administrator, the Bankruptcy Court, shall designate another Person to succeed the Plan Administrator and, without any further act, such successor shall become fully vested with all of the rights, powers, duties and obligations of the Plan Administrator.

### J.      Attorney Client Privilege.

Without limiting other such rights, powers, and obligations, on the Effective Date, the Debtors will transfer, and will be deemed to have irrevocably transferred, to the Plan Administrator all of the Debtors' evidentiary privileges, including, without limitation, the attorney- client privilege, work product privilege and other privileges and immunities that they possess.  The Debtors will provide to the Plan Administrator documents, other information, and work product relating to Retained Causes  of Action, provided that the provision of any such documents and information will be without waiver of any evidentiary privileges or immunity.

### K.      Limitation of Liability.

The Plan Administrator shall neither have nor assume any individual, personal or corporate duty, obligation or other liability of the Debtors or the Estates merely by reason of its service in the capacity of the Plan Administrator including, without limitation, any such liability for: (i) remediation of any environmental condition created by the Debtors; or (ii) effecting a cure, restitution, or other act ordered by any court or agency by reason of any criminal act or omission by the Debtors.

### L.    Winding up Affairs.

Following the Confirmation Date, the Plan Administrator shall not engage in any business activities or take any actions, except those necessary to effectuate the Plan, including, but not limited to, selling, transferring, liquidating or abandoning the Retained Causes of Action, and winding up the affairs of the Debtors. On and after the Effective Date, the Plan Administrator may take such actions without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, and the Confirmation Order. Without limiting any of the foregoing, the Plan Administrator may, without application to or approval from the Court, pay the charges that it incurs after the Effective Date for professionals' fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Administrative Claims.

### M.    Indemnification.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date, to indemnify, defend, reimburse, or limit the liability of the directors and officers, against any Claims or causes of action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors and assigned to the Post-Effective Date Debtors which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; provided that, notwithstanding anything herein to the contrary, the Post-Effective Date Debtors' obligation to fund such indemnification obligations shall be limited to the extent of Net Distributable Assets.

### N.    Reservation of Rights Regarding Claims

Except as otherwise provided in this Plan or in other Final Orders of the Bankruptcy Court, nothing will affect the Debtors' or Plan Administrator's rights and defenses, whether legal or equitable, with respect to any Claim, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### O.    Post-petition Interest on Claims

Except as required by applicable bankruptcy law, post-petition interest will not accrue or be payable on account of any Claim.

### P.    Insurance

Notwithstanding anything to the contrary herein, if any Allowed Claim is subject to coverage under an Insurance Policy, distributions on account of such Claim will first be paid in full from proceeds of such Insurance Policy, with the balance, if any, treated in accordance with the provisions of this Plan governing the Class applicable to such Claim.

### Q.      Class Without Voting Claim Holders

If Holders of Claims in a particular Impaired Class of Claims are entitled to vote to accept or reject this Plan, but no Holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims will be deemed to have accepted this Plan.

### R.      Sole Recourse.

Except as otherwise set forth in this Plan or other Final Orders of the Bankruptcy Court, Holders of Allowed Claims against any Debtor will have recourse solely to the Post-Effective Date Debtors' Estate and Net Distributable Assets for the payment of their Allowed Claims in accordance with the terms of this Plan.

### S.      Post-Confirmation Reporting.

After the Effective Date, the Plan Administrator, on behalf of the Post-Effective Date Debtors, will File unaudited reports of its activities and the financial affairs of the Post-Effective Date Debtors with the Bankruptcy Court on a quarterly basis, within 30 days after the conclusion of each such quarterly period until the earlier of the dissolution of such Debtor, entry of a final decree closing each of the Chapter 11 Cases or a Bankruptcy Court order converting or dismissing each of the Chapter 11 Cases. Such filed unaudited quarterly reports will contain information regarding the liquidation of the Retained Causes of Action, the distributions made by the Plan Administrator and other matters required to be included in such reports in accordance with any applicable Bankruptcy Court and United States Trustee guidelines for such matters.

## VI.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Rejection of Executory Contracts

On the Effective Date, except as otherwise provided in this Plan, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court will be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (1) identified on the Plan Supplement as an Executory Contract or Unexpired Lease designated for assumption, (2) that is the subject of a separate motion or notice to assume or reject Filed by a Debtor and pending as of the Confirmation Hearing or (3) that previously expired or terminated pursuant to its own terms.

### B.      Bar Date for Rejection Claims

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such rejection claim will be forever barred and will not be enforceable against the Plan Administrator or the Post-Effective Date Assets unless a proof of Claim is Filed and served on the Plan Administrator no later than 30 days after the Effective Date. The Plan Administrator reserves the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

### C.       Assumption of Executory Contracts

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor will assume each of the respective Executory Contracts and Unexpired Leases listed on the Plan Supplement.  Each Executory Contract and Unexpired Lease assumed will include any modifications, amendments, supplements or restatements to such contract or lease.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the assumption and assignment contemplated by this Plan will not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### D.       Amendment of the Plan Supplement of Assumed Executory Contracts

The Debtors, at any time prior to the Effective Date, reserve the right to amend the Plan Supplement by (a) deleting any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant hereto on the Effective Date or (b) adding any Executory Contract or Unexpired Lease to the Plan Supplement, thus providing for such Executory Contract or Unexpired Lease's assumption on the Effective Date. In the event that the Debtors amend the Plan Supplement, the Debtors will file and serve a revised Plan Supplement Assumption List Notice on the counterparties to such contract and the Notice Parties notifying such parties of the Debtors' revised intention, including the proposed Cure Amount Claim (if applicable). Objections to the treatment of any Executory Contract or Unexpired Lease as described in a Revised Assumption List Notice must be Filed and served on the Notice Parties within fourteen (14) calendar days from the File date of such revised Assumption List Notice. If no objection is Filed, the Confirmation Order shall serve as an order approving the assumption, or rejection, of the relevant contracts. If an objection is Filed, the Debtors shall have fourteen (14) calendar days to resolve such objection. At the expiration of the fourteen (14) calendar day period, the Debtors and the objecting party shall work in good faith to schedule a hearing with the Bankruptcy Court to resolve the objection. Nothing herein is an admission by a Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor has any liability thereunder.

### E.       Payments Related to the Assumption of Executory Contracts

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code (1) by payment of the Cure Amount Claim in Cash by the Plan Administrator; or (2) on such other terms as are agreed to by the parties to such Executory Contract and Unexpired Lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim will be allowed for a penalty rate or other form of default rate of interest. If there is a dispute regarding (1) the amount of any Cure Amount Claim; (2) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the

24

contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

### F.   Insurance Policies and Agreements

All rights of the Debtors under the Insurance Policies will automatically become vested in the Plan Administrator as of the Effective Date without necessity for further approvals or orders. For the avoidance of doubt, to the extent that any of the rights of a Debtor or Debtors in one or more of said Insurance Policies are disputed in a court proceeding, or otherwise by any insurance company that issued one or more of such Insurance Policies, all rights of the Debtors under the Insurance Policies will mean any such rights as are finally determined by the Court having jurisdiction over such dispute or by the terms of any settlement thereof.

To the extent that any such Insurance Policies are deemed Executory Contracts, then, unless such Insurance Policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in this Plan, this Plan will constitute a motion to assume and assign to the Insurance Policies to the Plan Administrator.

Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute both approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estates. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments will be required to cure any defaults existing as of the Confirmation Date with respect to any Insurance Policy assumed and assigned to the Plan Administrator.  Nothing in this Plan will impair the rights of the Plan Administrator with respect to (or affect the coverage under) any Insurance Policy that provides liability coverage for officers, directors and other fiduciaries of the Debtors and their Affiliates.

### G.   Reservation of Rights.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, causes of action, or other rights of the Debtors under any executory or non-executory contract or any unexpired or expired lease, nor shall any provision of the Plan increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors under any such contract or lease.

## VII.   DISTRIBUTIONS OF PROPERTY AND RESOLUTION OF DISPUTED CLAIMS

### A.   General.

Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Plan Administrator to the Holder of each Allowed Claim shall be mailed to the address as listed on the Schedules, unless the holder of such Allowed Claim has filed a proof of claim or notice of transfer claim filed by such holder that provides an address for such holder different from the address

reflected on the Schedules.  Nothing in this Plan shall require the Plan Administrator to attempt to locate any holder of an Allowed Claim.

**B.    Objections to Claims.**

After the Confirmation Date, the Debtors (or after the Effective Date, the Plan Administrator), will have primary authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court. After the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court in accordance with the Plan.

All objections to Claims must be Filed and served on the Holders of such Claims no later than the Claims Objection Bar Date and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Chapter 11 Cases. Responses and litigation over the allowance of any Claim that is subject of an objection shall be governed by the Bankruptcy Code and the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court.

From and after the Effective Date, all objections shall be litigated to Final Order except to the extent that the Plan Administrator elects to withdraw such objection or elects to compromise, settle or otherwise resolve any such objection, in which event (A) as to General Unsecured Claims, if (i) the amount of such Claim, as set forth in the Schedules and any applicable proof of claim, is $100,000 or less, the Plan Administrator may settle the objection to such claim without notice to any party or order of the Bankruptcy Court, (ii) the amount of such claim as set forth in the Schedules and any applicable proof of claim, is greater than $100,000 and less than $250,000, the Plan Administrator may settle the objection to such Claim for an amount within $50,000 of the amount of such Claim set forth in the Schedules without notice to any party or order of the Bankruptcy Court, or (iii) the amount of such claim as set forth in the Schedules and any applicable proof of claim, is $250,000 or more, the Plan Administrator may settle the objection to such Claim for an amount within $100,000 of the amount of such Claim set forth in the Schedules without notice to any party or order of the Bankruptcy Court or (iv) the settlement amount is any amount other than an amount described in clauses (i) through (iii) of this Section, the Plan Administrator may settle the objection to such claim upon entry of an order of the Bankruptcy Court approving such settlement after notice and opportunity to be heard, and (B) as to Administrative Claims, Priority Claims, and Priority Tax Claims, if (i) the settlement amount is $100,000 or less, the Plan Administrator may settle the objection to such claim without notice to any party or order of the Bankruptcy Court, or (ii) the settlement amount is greater than $100,000, the Plan Administrator may settle the objection to such claim upon entry of an order of the Bankruptcy Court approving such settlement after notice and an opportunity to be heard.

**C.    Distributions to Disputed Claims.**

No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless all objections to such Disputed Claim have been settled or withdrawn.  Distributions with respect to and on account of Claims to which objections have been filed will be made as soon as practicable after an order, judgement, decree or settlement agreement with respect to such Claim

becomes a Final Order and such Claim becomes an Allowed Claim or as otherwise agreed to by the parties, and the applicable Creditor shall not receive interest on its Allowed Claim.

**D.    Interim Distributions on Account of Allowed Class 2 General Unsecured Claims.**

In his discretion, the Plan Administrator may make distributions on account of Allowed Class 2 General Unsecured Claims from Net Distributable Assets provided that any such distribution is warranted, economical and not unduly burdensome; provided, however, that any such distribution(s) shall only be made if (i) the Disputed Claim Reserve is fully funded and will remain fully funded after such interim distribution is made; (ii) the Administrative Claim Reserve is fully funded and will remain fully funded after such interim distribution is made; and (iii) the Plan Administrator Expenses are fully funded and will remain fully funded after such interim distribution is made.

**E.    Final Distributions on Account of Allowed Class 2 General Unsecured Claims.**

Notwithstanding any other provisions of the Plan, after settlement of or satisfaction of all Administrative Claims, Priority Tax Claims, Other Priority Claims, Professional Fee Claims and General Unsecured Claims, the prosecution, settlement or abandonment of all Causes of Action, and the liquidation or abandonment of all other Post-Effective Date Assets, the Plan Administrator shall distribute as soon as practical, all remaining Net Distributable Assets pursuant to the terms of the Plan.

**F.    Unclaimed Property.**

If any interim distribution remains unclaimed for a period of forty-five (45) days after it has been delivered (or attempt to be delivered) in accordance with the Plan to holders entitled thereto, such unclaimed property, along with any subsequent distribution to be made in accordance with the Plan, shall be forfeited by such holder whereupon all right, title and interest in and to the unclaimed property shall be forfeited by such holder whereupon all right, title and interest in and to the unclaimed property shall be held and distributed to other holders of Allowed Claims in accordance with the Plan. Distributions unclaimed for a period of forty-five (45) days after they have been delivered (or attempted to be delivered) in accordance with the Plan to the holders entitled thereto that: (i) are intended to be final distributions; and (ii) do not exceed $25,000 in the aggregate, shall, as hereafter as practical, be donated to an organization officially recognized by the Internal Revenue Service as a charitable organization, a contribution to which would be deductible for federal income tax purposes, in the name of the unsecured creditors of the Debtors to an organization designated by the Plan Administrator; provided, however, that if the giving of such unclaimed property under this section would result in a donation greater than $25,000 in the aggregate, then such unclaimed property shall be distributed to other holders of Allowed General Unsecured Claims in accordance with the Plan. The Plan Administrator shall be entitled to any tax or other benefits associated with any donation made under this section.

**G.      Withholding from Distributions.**

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Persons holding Claims shall be required to provide to the Plan Administrator any information necessary to effect the withholding of such taxes.  The Plan Administrator may withhold from amounts distributable to any Claim holder any and all amounts, determined by the Plan Administrator's reasonable discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

**H.      Fractional Cents.**

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

**I.      Payment of Less than Twenty-Five Dollars.**

If a Cash payment otherwise provided for by the Plan with respect to an Allowed Claim would be less than $25, notwithstanding any contrary provision in the Plan, the Plan Administrator shall not be required to make such payment and such funds shall be held in reserve by the Plan Administrator to be distributed to the holders of Allowed Class 2 Claims in accordance with the Plan.

**J.      Administrative Claim Reserve.**

On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator shall establish and maintain an Administrative Claims Reserve with sufficient Cash necessary to fund the (i) Distributions made by the Plan Administrator to holders of Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, and Professional Fee Claims on account of such Allowed Claims, and (ii) payments of any other valid tax obligations of the Debtors made by the Plan Administrator as part of the Plan Administrator functions.   This reserve shall be funded to be sufficient to cover all Administrative Claims, Priority Tax Claims, Other Priority Claims and Professional Fee Claims that have been Allowed and all such Claims that have been Disputed.

The balance of Cash in the Administrative Claims Reserve, if any, remaining after all Administrative Claims, Priority Tax Claims, and Other Priority Claims have been resolved, shall be distributed to holders of Allowed Class 2 Unsecured Claims in accordance with the terms of this Plan. No payments or distributions shall be made with respect to a Professional Fee Claim until such Professional Fee Claim is Allowed by Final Order. Holders of Allowed Administrative Claims as of the Effective Date may be paid directly from Cash.

**K.      Disputed Claim Reserve.**

On the Effective Date or as soon thereafter as is reasonably practicable, the Plan Administrator will establish a Disputed Claims Reserve for any Disputed Class 2 Claims, which reserve will be administered by the Plan Administrator. The Plan Administrator will reserve, in Cash, on account of the full asserted amount (or such lesser amount as may be determined or

28

estimated by the Bankruptcy Court after notice and a hearing in accordance with this Plan) with respect to each such Disputed Class 2 Claim. With respect to any interim distributions made to holders of an Allowed General Unsecured Claim, the amount reserved for each Disputed General Unsecured Claim shall be the amount that would be distributed on account of such Claim if it was an Allowed General Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in the Proof of Claim filed by the holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount if it is shown set forth on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court. As soon as practicable, after (and to the extent) a Disputed Claim becomes an Allowed Claim, the Plan Administrator shall make a payment from the Disputed Claim Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Plan Administrator has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Disputed Claim Reserve and distributed pursuant to the terms of this Plan. After (and to the extent) a Disputed General Unsecured Claim is determined not to be an Allowed Claim, the portion of the Disputed Claim Reserve reserved for such Claim shall be released from the Disputed Claim Reserve and distributed pursuant to the terms of this Plan. Any amounts remaining in the Disputed Claim Reserve following the final disposition of all disputed Claims shall be released from the Disputed Claim Reserve and distributed in accordance with this Plan.

### L.    Unclaimed Distribution Reserve.

On the Effective Date (or as soon thereafter as practicable), the Plan Administrator shall create the Unclaimed Distribution Reserve into which it shall deposit from time to time the Unclaimed Distributions as described herein.

### M.    Estimation of Contingent or Unliquidated Unsecured Claims.

The Plan Administrator may, at any time, File motion(s) pursuant to section 502(c) of the Bankruptcy Code for order(s) estimating and limiting the amount of Cash which shall be deposited in the Disputed Claim Reserve in respect to any Contingent or Unliquidated Unsecured Claims, with notice and an opportunity to be heard to the affected holders of such Contingent or Unliquidated Unsecured Claims.

### N.    Allocation of Distributions between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### O.    Means of Cash Payment.

Payments of Cash made pursuant to the Plan shall be made, at the option and in the discretion of the Plan Administrator, by checks drawn on, or wire transfer from, a bank selected by the Plan Administrator.

P.    **Setoffs.**

Except as otherwise provided for herein, the Plan Administrator may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors or their Estates may have against the Creditor, but neither the failure to do so nor the allowance of a Claim hereunder shall constitute a waiver or release by the Debtors, their Estates or the Plan Administrator of any claim that it might have against the Creditor.

Q.    **Record Date for Distributions.**

The Plan Administrator will have no obligation to recognize the transfer of, the sale of, or any participation in, any Allowed Claims that occur after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders of such Claims as of the Distribution Record Date. The Plan Administrator shall be entitled to recognize and deal, for all purposes under the Plan, with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

## VIII.    INJUNCTIONS, RELEASES, AND DISCHARGE

A.    **General Injunction.**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all Entities who have held, hold, or may hold Claims against the Debtors that arose on or before the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors with respect to any such Claim, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors on account of any such Claim, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim and (d) asserting any right of setoff, or subrogation of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim. Such injunction shall extend to successors of the Debtor (including, without limitation, the Plan Administrator and the Post-Effective Date Assets).

B.    **Exculpation.**

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any cause of action for any claim between the Petition Date and the Effective Date related to any act or omission in connection with, relating to, or arising out of, post-petition conduct within the Chapter 11 Cases, the Disclosure Statement, this Plan, the Asset Sale or any Dissolution Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the Asset Sale, post-petition conduct within the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful

misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.

### C.    Releases by the Debtors

On and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates and the Plan Administrator from any and all Claims, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Equity Interest in, a Debtor or other Entity, based upon, or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of- court restructuring efforts, intercompany transactions between or among a Debtor and any Other Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the APA, or any Dissolution Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the APA, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on, or before, the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.  For the avoidance of doubt, no Person or Entity is hereby being released from an Avoidance Action.

Notwithstanding anything to the contrary in the foregoing paragraph, the releases and discharges set forth above do not release any post-Effective Date obligations of any party or Entity under this Plan, or any document, instrument, or agreement executed to implement this Plan and do not affect the rights of Holders of Allowed Claims to receive Distributions under this Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the injunction, releases and exculpation provisions herein, that includes by reference each of the related provisions and definitions contained herein.

## IX.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

### A.    Conditions to Confirmation

The Confirmation Order will not be effective unless:

(a)    The Confirmation Order will have been entered by the Bankruptcy Court in a form and substance acceptable to the Debtors.

(b)    All Plan exhibits are in form and substance satisfactory to the Debtors.

**B.      Conditions to Effectiveness**

The Effective Date will not occur and the Plan will not be consummated unless and until each of the following conditions has been satisfied or duly waived:

      (a)      The Bankruptcy Court will have entered the Confirmation Order.

      (b)      The Plan Administrator shall be appointed and approved as part of the Confirmation Order.

      (c)      The retention of the Independent Director shall be approved by Order of the Court.

      (d)      All other actions required to be taken in connection with the Effective Date will have occurred.

**C.      Modification, Revocation or Withdrawal of the Plan**

**1.      Defects, Omissions, and Amendments of the Plan**

The Debtors may, with the approval of the Bankruptcy Court and without notice to holders of Claims and Equity Interests, insofar as it does not materially and adversely affect holders of Claims and Equity Interests, correct any defect, omission, or inconsistency in the Plan in such a manner and to such extent necessary or desirable to expedite the execution of the Plan.  The Debtors may propose amendments or alterations to the Plan before the Confirmation Hearing as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of holders of Claims and Equity Interests, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code.  The Debtors may propose amendments or alterations to the Plan after the Confirmation Date but prior to substantial consummation, in a manner that, in the opinion of the Bankruptcy Court, does not materially and adversely affect holders of Claims and Equity Interests, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors have complied with section 1125 of the Bankruptcy Code, and after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

**2.      Withdrawal of the Plan**

The Debtors reserve the right to withdraw the Plan at any time prior to the Confirmation Date. If the Debtors withdraw the Plan, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute an admission, waiver or release of any claims by or against the Debtors or any other person, or to prejudice in any manner the rights of the Debtors, the Debtors' Estate, or any person in any further proceedings involving the Debtors.

## X.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, reclassify, estimate or establish the priority, secured or unsecured status (or proper Plan classification) of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance, priority or classification of Claims or Equity Interests;

(b)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(c)    resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(d)    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan or the Confirmation Order;

(f)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan;

(g)    modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code;

(h)    issue injunctions, enforce the injunctions and exculpations contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(i)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

(j)     determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Confirmation Order;

(k)     determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

(l)     determine any matters arising in connection with the APA; and

(m)     enter a final decree closing the Debtors' Chapter 11 Cases.

## XI.     RISK FACTORS

### A.     Risks Related to Bankruptcy

#### 1.     Parties May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims or Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.     The Debtors May Not Be Able to Obtain Confirmation of the Plan

The Debtors may not receive the requisite acceptances to confirm the Plan.  Only in the event that votes from Claims in Class 2 are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, will the Debtors be ablet to seek confirmation of the Plan by the Bankruptcy Court.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code have not been met.

#### 3.     The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to certain conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not occur.

4.    **Risks Associated with Proving and Collecting Claims Asserted in Litigation**

The ultimate recoveries under the Plan depends in part upon the pool of claims asserted against the Debtors and the ability of the Plan Administrator to realize favorable litigation outcomes or settlements of Disputed Claims.  It is extremely difficult to place a value on litigation, and litigation outcomes cannot be predicted.

The risks in such litigation include, but are not limited to, risks associated with defenses and counter-claims of opposing parties to the litigation, the delay and expense associated with discovery and trial of factually intensive and complex disputes, and the additional delay and expense inherent in appellate review.

5.    **Allowed Claims May Exceed Estimates**

The projected distributions set forth in this Disclosure Statement are based upon, among other things, good faith estimates of the total amounts of Claims that will ultimately be Allowed. The actual amount of Allowed Claims could be materially greater than anticipated, which may significantly impact the distributions to be made to holders of Claims.

As of the date of this writing, the aggregate total dollar amount of General Unsecured Claims is approximately $5,408,440.85.  The Plan Administrator will reconcile filed claims and reserve the right to object or compromise any filed claims on all applicable grounds.

B.    **Risks Related to Financial Information**

The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtor's books and records and schedules and statements that was available at the time of such preparation. Although the Debtors have used reasonable efforts to assure the accuracy of the financial information provided in this Disclosure Statement  the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

## XII.    CONFIRMATION OF THE PLAN

A.    **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **[•], 2025 at [•] (prevailing Eastern Time)**, before the Honorable Mary M. Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. 4, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served by no later than **September 24, 2025 at 4:00 p.m. (prevailing Eastern Time)**.  **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims or Equity Interests, or, if rejected by an Impaired Class of Claims or Equity Interests, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims or Equity Interests; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims or Equity Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, in addition to other applicable requirements, the Debtor believes that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each holder of a Claim in an Impaired Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Administrative Claims, Allowed Priority Tax Claims and Allowed Other

36

Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

### C.    Best Interests of Creditors / Liquidation Analysis

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the Effective Date. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to chapter 7 on the Effective Date and the assets of the Debtors' Estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a Claim or an Equity Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the Plan that the holder would receive if the Plan were confirmed and consummated.

As further support, the Debtors have attached hereto as **Exhibit B** a liquidation analysis. Based on the foregoing and the liquidation analysis, the Debtors believe that holders of Allowed Class 2 Claims will receive greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation and will receive Distributions sooner under the confirmed Plan than in chapter 7.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims or Equity Interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### E.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" (as discussed below) and is "fair and equitable" (as discussed below) with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, to the extent applicable, the Debtors shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, subject to the written approval of the Plan Sponsor.

### 1.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submits that if the Debtors "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2.     Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending upon the type of claims or interests in such rejecting class. The Debtors submit that if the Debtors "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that the applicable "fair and equitable" standards are met.

## XIII.  TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.  RECOMMENDATION

In the opinion of the Debtors, the Plan is superior and preferable to the alternatives described in this Disclosure Statement.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated: August 18, 2025
       Wilmington, Delaware

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Zhao Liu*
Frederick B. Rosner (DE # 3995)
Zhao (Ruby) Liu (DE# 6436)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Tel.: (302) 777-1111
Email:  rosner@teamrosner.com
       liu@teamrosner.com

*Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

**Plan of Reorganization**

**\* The Plan has been separately filed with the Court, concurrently herewith.**

# **EXHIBIT B**

**Liquidation Analysis**

**\*To be filed**